# BOB W. STANLEY

# V.

# CLEAN FUEL LAKELAND, LLC, ET AL.

# AARON KNIGHT

January 27, 2014

BARBARA PERRY & COMPANY
PHONE 407-422-2953
FAX 407-422-2990

In The Circuit Court Of The
Tenth Judicial Circuit In And
For Polk County, Florida

Bob W. Stanley, as Trustee of The
Bob W. Stanley Revocable Trust
Dated July 2, 1991, d/b/a
Lakeland Industrial Park,

    Plaintiff,

  -vs-            Case no.: 53-2013-CA-001896

Clean Fuel Lakeland, LLC, a
Florida limited liability company;
Associated Receivables Funding,
Inc., a South Carolina Corporation,
Elbow River Marketing, Limited
Partnership, a Delaware limited
partnership and U.S. Equipment
Company, LLC, a Delaware limited
liability company,

    Defendants.

---

                    January 27, 2014
                    10:00 a.m.

The deposition of Aaron Knight, taken on behalf of the Defendants pursuant to notice of taking deposition, at the offices of Barbara Perry & Company, 1516 East Hillcrest Street, Suite 103, Orlando, Florida before Shelley N. Troise, Registered Professional Reporter, and Notary Public, in and for the State of Florida, at Large.

```
 1
 2      APPEARANCES:
 3      Gregory W. Stoner, Esquire
        The Property Rights Law Firm, P.A.
 4      121 South Orange Avenue
        Suite 1470
 5      Orlando, Florida 32801
 6              Representing the Plaintiff
 7
        Rosemary Hanna Hayes, Esquire
 8      Hayes Law, PL
        830 Lucerne Terrace
 9      Orlando, Florida 32801
10      and
11      A. Brian Phillips, Esquire
        A. Brian Phillips, P.A.
12      912 Highland Avenue
        Orlando, Florida 32803
13
                Representing the Defendants
14              Clean Fuel Lakeland, LLC and
                U.S. Equipment Company, LLC
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    P R O C E E D I N G S
 2                    AARON KNIGHT,
 3        Having been first duly sworn by the reporter,
 4        thereupon testified upon his oath as follows:
 5                    DIRECT EXAMINATION
 6   BY MS. HAYES:
 7        Q.   Would you state your name please?
 8        A.   Aaron Knight.
 9        Q.   And your address?
10        A.   ████████████████████████████████████████
     ████.
12        Q.   And are you employed, Mr. Knight?
13        A.   I'm self-employed.
14        Q.   Do you have a business?
15        A.   I do.
16        Q.   What's the name of it?
17        A.   Knight Energy.
18        Q.   How long have you had that business?
19        A.   A year, a year and two months.
20        Q.   Okay.  Is that a corporation?
21        A.   It's an LLC.
22        Q.   And are you the only member?
23        A.   I am.
24        Q.   And you formed it, you said, about 14 months
25   ago?
```

```
 1   that.  I know it's hard sometimes.
 2        A.   Okay.
 3        Q.   And I'll try to do the same.
 4             What year did you graduate?
 5        A.   2006.
 6        Q.   And what's your birth date, Mr. Knight?
 7        A.   ▓▓▓▓▓▓▓ 1971.
 8        Q.   Prior to Knight Energy, LLC, where did you
 9   last work?
10        A.   I worked for Clean Fuel, LLC.
11        Q.   And how long were you with Clean Fuel?
12        A.   September 2009, April 2013.
13        Q.   And why did your employment with Clean Fuel
14   end?
15        A.   I decided to leave the company.
16        Q.   So you resigned?
17        A.   I did.
18        Q.   And what was the reason for your resignation?
19        A.   The corporate conditions were not conducive
20   to an employment situation that I wanted to continue.
21        Q.   And what do you mean specifically?
22        A.   It just was not a good fit any longer.
23        Q.   And did you -- did you leave the company to
24   go work somewhere else?
25        A.   No.
```

```
 1      Q.   Tell me about what your job duties were when
 2   you were working for Clean Fuel starting in 2009?
 3      A.   Sure.  Director of Operations for Clean Fuel,
 4   LLC and Clean Fuel Lakeland, LLC.
 5      Q.   Do you differentiate between Clean Fuel and
 6   Clean Fuel Lakeland?
 7      A.   Yes.
 8      Q.   How do you differentiate between these two
 9   entities?
10      A.   Clean Fuel, LLC was a corporation owned by
11   Lee Maher; the plant location was in Groveland,
12   Florida.  Clean Fuel Lakeland, LLC was a corporation
13   owned by Lee Maher; plant location, Lakeland, Florida.
14      Q.   When you started with Clean Fuel were both of
15   those plants purchased?
16      A.   Yes.
17      Q.   And did you work initially at Groveland?
18      A.   I worked at both locations.
19      Q.   So did you travel back and forth between the
20   two locations?
21      A.   Yes.
22      Q.   What was your expertise that you were hired
23   for by Clean Fuel?
24      A.   Prior to Clean Fuel I owned a biofuel company
25   called Summit Biodiesel, LLC.
```

1    A.   No.
2    Q.   During the period of time you were employed
3 by Clean Fuel, Clean Fuel had records, correct; records
4 of its diesel production; records of its activities;
5 bills and invoices it received from vendors; payroll
6 records, et cetera.  Are you familiar with that?
7    A.   Yes.
8    Q.   And where were those records maintained?
9    A.   Operational records were kept both in
10 Lakeland at the plant facility as well as the
11 headquarter office, also known as the Solar Blue office
12 downtown Orlando.
13   Q.   Did you keep electronic copies of any of the
14 operational records?
15   A.   I have copies of records, yes.
16   Q.   What did you do with the records that you had
17 copies of?
18   A.   Those records were turned over under
19 subpoena.
20   Q.   A subpoena from whom?
21   A.   The Secret Service and the U.S. Department of
22 Agriculture.
23   Q.   So you received a subpoena from one of those
24 groups or both?
25   A.   The agencies were together in my deposition.

```
 1  I don't recall if the subpoena was through the
 2  Department of Agriculture or if it was the U.S. Secret
 3  Service that issued the subpoena.  I don't have a copy
 4  of that.
 5       Q.   So was that subpoena served on you?
 6       A.   It was handed to me.
 7       Q.   Who handed it to you?
 8       A.   It was either Brian Balzer, Captain Balzer,
 9  or Emily, Special Agent Emily -- I don't recall her
10  last name.
11       Q.   When was the subpoena given to you?
12       A.   I don't recall the exact date.  It was
13  approximately February of 2013.
14       Q.   So it's during the time you were employed by
15  Clean Fuel?
16       A.   Yes.
17       Q.   And the records that you had of Clean Fuel
18  were records that you had based on your status as the
19  Director of Operations, right?
20       A.   That's correct.
21       Q.   And so you turned over the records that you
22  had of Clean Fuel to -- based on that subpoena?
23       A.   Yes.
24       Q.   Did you keep a copy of the records?
25       A.   No.
```

1  Q. So you turned over all electronic records
2  that you had and you deleted any record of them?
3  A. Yes.
4  Q. And did you inform your employer of what you
5  were doing?
6  A. No.
7  Q. And why not?
8  A. I believe Mr. Maher, along with Mr. Larry
9  Long, was engaged in government contract fraud, of
10 which I had notified him multiple times prior to that
11 period that it should be corrected.
12 Q. Notified who?
13 A. Mr. Larry long. And written notice to
14 Mr. Lee Maher. As far as I could tell, those notices
15 were disregarded.
16 Q. What written notice did you give to
17 Mr. Maher?
18 A. An email notice.
19 Q. When was that?
20 A. October or November 2012.
21 Q. So October or November 2012 before you left
22 in April 2013, correct?
23 A. Correct.
24 Q. You sent an email to Mr. Maher. Did you keep
25 a copy of the email?

1  A.  I had a hard copy in my possession after
2  sending the email, yes.
3  Q.  And so where is that email now?
4  A.  In electronic format or hard copy?
5  Q.  Either one.
6  A.  I assume the electronic copy is in
7  Mr. Maher's email.  I assume -- I know the hard copy is
8  with the records that were turned over under subpoena.
9  Q.  So were all the records that you turned over
10 under subpoena printed into paper format?
11 A.  A combination of electronic as well as hard
12 copy that I had in my possession.
13 Q.  So did you put the electronic data on a zip
14 drive of some type or a CD ROM?
15 A.  It was put onto a hard drive that was
16 supplied to me.
17 Q.  Who supplied you with that hard drive?
18 A.  It was Secret Service.
19 Q.  You had a computer that was supplied to you
20 by Clean Fuel, right?
21 A.  Yes.
22 Q.  And it was that computer from which you took
23 the data that we're talking about, correct?
24 A.  Yes.
25 Q.  And that, the email address that you used,

1   was an email address for Clean Fuel or later for Solar
2   Blue, correct?
3       A.   I would have used my work -- internal work
4   email to correspond with Mr. Maher, yes.
5       Q.   And also the email that you furnished to
6   Ms. Beyer, the electronic documents that you furnished
7   that were emailed would have come from your work email?
8       A.   That's correct.
9       Q.   And your work email wasn't sent to the Clean
10  Fuel server, correct?
11      A.   I wouldn't know.
12      Q.   It was only stored on your laptop; isn't that
13  true?
14      A.   I wouldn't know.  I wasn't in charge of the
15  I.T.
16      Q.   Did you ever ask?
17      A.   My understanding the I.T. -- no, I didn't
18  ask.
19      Q.   Did you have any concern about giving up the
20  operational records that you were turning over and then
21  deleting in regard to whether there would be a record,
22  a company record, of its own records that you were
23  producing?
24      A.   The records that I had were also left with
25  Mr. Maher.

```
 1        Q.    How were they left with Mr. Maher?
 2        A.    A flash drive upon my departure from the
 3   company.
 4        Q.    And what did you do with that flash drive?
 5        A.    I left it on my desk.
 6        Q.    You left it on your desk?
 7        A.    Yes.
 8        Q.    And that to you was leaving it with
 9   Mr. Maher?
10        A.    Yes.
11        Q.    Did you tell anyone what it was?
12        A.    Yes.
13        Q.    Who did you tell?
14        A.    His executive assistant.
15        Q.    And who is that?
16        A.    Kate.
17        Q.    You told Kate, there's a flash drive on my
18   desk and everything that I gave to the Secret Service
19   is on it?
20        A.    No.
21        Q.    What did you tell her?
22        A.    There's a flash drive on the desk; it
23   contains any records I have in my possession with
24   regards to Clean Fuel.
25        Q.    Was the flash drive labeled?
```

```
 1        A.   No.
 2        Q.   Did you get a receipt?
 3        A.   No.
 4        Q.   Did you put anything in writing?
 5        A.   No.
 6             MS. HAYES:  Do you have exhibit stickers?
 7             THE REPORTER:  Yes.  (Stickers tendered.)
 8            (A discussion was had off the record.)
 9      (Defendants' Exhibit 1 was marked for identification.)
10        Q.   Let me show you what I've marked as Exhibit
11   1.  Tell me if you can identify that.
12        A.   Yes.
13        Q.   What is that document?
14        A.   That is my resignation.
15        Q.   Now this says you're happy to inform that you
16   resigned effective April 4, 2013, correct?
17        A.   Correct.
18        Q.   Do you know whether or not Mr. Maher reads
19   email?
20        A.   Yes.
21        Q.   Yes, he does?
22        A.   Yes, I have seen him read email.
23        Q.   Over the course of your career at Clean Fuel
24   it was common for you to receive email that was
25   actually typed and sent to you by Mr. Maher?
```