IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

UNITED STATES OF AMERICA

      vs.                                      Case No.:   4:16cr30-MW

LEE JOHN MAHER
_____/

## OPPOSITION TO MOTION TO SUPPRESS

COMES NOW, the United States of America, in opposition to Defendant Maher's motion to suppress documents and electronic data obtained by subpoena. Defendant argues that the possessor of these items, Aaron Knight, was acting as an agent of the government and that Knight's surrender of the subpoenaed documents amounted to a warrantless search by the government.  Defendant misunderstands the facts and ignores the very limited grounds on which a grand jury subpoena may be challenged.   This motion should be denied.

As set out in the Indictment, Defendants Maher and Long filed a fraudulent application for a federally-funded reimbursement grant in the fall of 2010, obtaining a payment of $2,232,000 in December 2010 and the possibility of obtaining an additional $248,000 (10%) during the life of the grant. These filings falsely stated that Maher had invested more than $8,000,000[1] in his business, falsely stated that he had paid an additional $2,480,000 to purchase and install a dual fuel generator at the Clean Fuels Lakeland ("CFL") plant, and fraudulently included copies of eight checks to Fairbanks Morse Engine ("FME"), reflecting purported payment to FME for the generator. In fact, the checks were never transmitted to FME and there were never sufficient funds in the account to pay FME.

Defendants thereafter filed false monthly progress reports, reiterating their false claims of investment and purchase and otherwise seeking to lull government officials into believing that they were actually proceeding with the installation of the generator. Defendants failed to reveal that the plant had been idled since September, 2010, because they were not paying rent to the plant site's owner.

---

[1] In fact, Defendant Maher agreed to pay $7,250,000 for the plant assets and made an initial $500,000 down payment, but failed to make the required $3,250,000 payment due at the end of 2009 or the $3,500,000 payment due at the end of 2010. The successors of the sellers obtained summary judgment against Maher in December 2010, reduced to final judgment in October 2011.

2

About March 1, 2011, Defendants tried to create the illusion of plant activity, by bringing people onsite during a visit by representatives of the granting agencies.

Around September 28, 2012, Long met with several employees, including Mr. Knight. In that meeting, Mr. Knight learned that Long wanted to locate a used generator which, at least superficially, met the grant requirements, and that the grant documents and monthly reports had contained false information. When Mr. Knight inquired further, Long advised that he could not have access to the grant papers, that the transaction had not been run through or conducted with the approval of the accounting department, and that Long was acting confidentially, at the behest of Maher.

Mr. Knight summarized his concerns arising from this meeting in a "Confidential Memo," which he sent to Defendant Maher on about October 4, 2012. A copy of this memo is attached as Exhibit 1. Mr. Knight advises that he repeatedly attempted to discuss this matter with Maher and was repeatedly told not to be concerned.

In November 2012, an anonymous caller advised the Florida Office of Energy ("OOE"), that the grant was fraudulently obtained. Mr. Knight has denied being that anonymous informant or knowing who that person is. Authorities contacted FME and learned that CFL had signed a purchase order for the original generator,

but that no payment had ever been received from CFL and that the generator was eventually sold to an unrelated purchaser.

Agents then obtained copies of relevant grant documents from the State of Florida. Subpoenas were issued to banks which verified (1) that the checks made payable to FME were never presented for payment and (2) that the grant proceeds were disbursed through a number of accounts associated with the Defendants. Public records were searched, including in litigation with Elbow River Marketing, whose predecessor sold the plant assets to Maher.

On March 7, 2013, agents interviewed Shanna Getto, who advised that she had prepared about ten blank checks, with Maher's signature stamp, at the specific direction of Maher and provided them to Long.

About March 12, 2013, agents contacted Mr. Knight, who agreed to be interviewed. In preparation for that meeting, Mr. Knight forwarded the agents copies of approximately 20 documents, including copies of emails relating to the efforts to purchase a substitute generator in 2012 and a copy of the Confidential Memo, documenting that Defendant Maher was aware of the grant fraud no later than October 4, 2012. Copies of these documents are attached as Exhibit 2.

Agents met with Mr. Knight on March 14, 2013. As noted in the investigative narrative attached as Exhibit 3, Mr. Knight repeated concerns arising

from Long's disclosure that the grant had been fraudulently obtained. He noted Maher's approval of the substitution of a different generator set in 2012. He stated that Maher had engaged in obstruction of justice, offering to pay Mr. Knight thousands of dollars if he could dissuade Ms. Getto from talking to agents and offering to pay Ms. Getto $5,000 to sign an affidavit which Maher had prepared. Mr. Knight also volunteered that he had within his possession boxes of relevant CFL documents which been left in his office and a number of relevant e-mails on a laptop computer.

When so advised, the undersigned had a grand jury subpoena issued to Mr. Knight, for the documents and e-mails within his possession. As is routine practice, the subpoena permitted Mr. Knight to turn over the items subpoenaed to the government's case agent, rather than appearing in person at the grand jury. Mr. Knight turned over these documents to the Orlando Secret Service Office about March 18, 2013. The Orlando office forwarded these boxes to the Tallahassee office, where they arrived about March 21-22, 2013. Mr. Knight also presented a laptop computer and permitted agents to download e-mails from the laptop to a portable hard drive. The case agent returned the subpoenaed items to the grand jury in June 2013.

The government has not entered into any agreement with Mr. Knight whereby he would become a government agent, whereby he would receive payment or a share in forfeited or recovered monies, or would receive assistance in any criminal or civil matter. It is the government's understanding that Mr. Knight was in possession of the e-mails because they were sent to him. It is the government's understanding that Mr. Knight came into possession of the boxes because they were placed in his office, when Maher's several entities moved to new offices spaces. The government has never asked Mr. Knight to search through files of Maher's companies and it is understood that he has not done so.

Some confusion arises over which entity obtained the grant in question. In 2009, Maher purchased Clean Fuel LLC ("Clean Fuel"), which operated a grease rendering plant in Groveland, Florida. Defendant's initial application for a grant from the State of Florida was premised upon this facility. The State of Florida approved this grant, but was unable to fund it, leaving this as a priority to be funded when new monies were available. Around the end of 2010, Defendant sold this plant to new owners. In September 2011, Clean Fuel was administratively dissolved.

In the Spring of 2010, Defendants made the initial application for federal funds under the American Recovery and Reinvestment Act ("ARRA"). Although

this application referred to the CFL plant, it was filed under "Clean Fuel," perhaps to maintain the priority achieved under the state grant application. The Amended Grant application, which was ultimately approved and funded, also referred to the Lakeland plant but used the Clean Fuel name. This plant went out of operation when Defendants lost access to the plant site, in September 2010, and did not operate again prior to the March 2013 subpoena. Maher used overlapping staff among a number of entities, including entities attempting to obtain solar energy contracts. Maher comingled funds between his entities, including funds from this grant. By the time the subpoena issued, CFL had little existence beyond grant issues and lawsuits.

   Secret Service Agent Beyer prepared a series of forfeiture warrants around the end of 2012, while she was recovering from knee surgery. These warrants were actually approved and executed on March 28, 2013, resulting in the seizure of more than one million dollars from bank accounts. Agent Beyer's recollection is, and the affidavits suggest, that they in no way derive from the materials produced by Aaron Knight. Agent Beyer's recollection is that she did not review the boxes until after executing the forfeiture warrants. Agent Beyer advises that she has never reviewed the hard drive containing e-mails.

While in Orlando to serve the seizure warrants, Agent Beyer spoke with Mr. Knight. Mr. Knight was separating himself from CFL and would resign a few days later. Mr. Knight advised that he had gone to collect personal belongings from a condominium controlled by Defendant Maher and used by out of town employees. Mr. Knight advised that numerous boxes with labels referring to CFL or Clean Fuels were inside that condominium. Mr. Knight provided a key to the condominium.

On March 29, 2013, while another investigator remained at the condominium, Agent Beyer obtained a search warrant for the condominium from the United States District Court, Middle District of Florida. With the search warrant in hand, the key was used to avoid damage when entry was made to the condominium. As reflected in Exhibit 4, approximately 22 boxes of documents, several binders, and some loose papers were seized under the search warrant. The included affidavit reflects the absence of information derived from the boxes previously turned over by Mr. Knight.

Because several of the boxes had labels reflecting possible litigation, such as the Elbow River case, an agent and an AUSA not involved in this case reviewed possible attorney-client materials. Those materials have been sequestered and have not been conveyed, directly or indirectly, to the prosecution team. Copies will be turned over to Defendant's counsel prior to hearing on this motion.

8

Shortly thereafter, agents and the undersigned met with attorney's representing Maher. One result of that meeting was a resolution of the remaining forfeiture/restitution issues. Also, on October 23, 2013, counsel Brian Phillips was given 7 boxes recovered by the grand jury subpoena and 24 items recovered under the search warrant. A confirmatory email is attached as Exhibit 5. The email notes that copies were substituted where items appeared to have evidentiary value, that materials sequestered by the taint team were not in the boxes, and that only the face page of certain bound documents had been provided.

In the last month, Defense counsel has been provided a copy of the hard drive containing the e-mails downloaded from Mr. Knight's laptop computer.

Defendant's motion is directed to the items obtained under subpoena, with the additional belief that items obtained under the search warrant are "fruit of the poisonous tree."

Defendant's motion is based upon the erroneous premise that Aaron Knight somehow qualified as a government agent. As set out above, he was not. Aaron Knight was a classic "good citizen" witness, who tried to get his boss to address the company's criminal issues. When interviewed, he did what a good citizen is supposed to do – he gave truthful answers to the agents. This included his knowledge that relevant documents were in boxes in his office. Once Mr. Knight

9

made the agents aware that he possessed materials relevant to the ongoing criminal investigation, the government unsurprisingly subpoenaed those materials.

Despite the fact that CFL was largely defunct and that its operations were chaotic at best, Defendant suggests that the government erred by subpoenaing the wrong person. Defendant offers no authority that the government is required to go through some particular corporate structure when the person actually in possession of the documents is at hand. *In re: Grand Jury Subpoena (Paul)*, 957 F.2d 807 (11th Cir. 1992) (grand jury could subpoena copies of documents held by former bank officer, who was target of criminal investigation, despite claims that subpoena was overbroad and burdensome, despite claim that act of production would incriminate him, and despite claim that compliance would violate Florida bank secrecy laws.) Here, little corporate structure remained.

A custodian of records may not avoid production on Fifth Amendment grounds. *Braswell v. United States*, 487 U.S. 99 (1988); *Grand Jury Subpoena (Paul)*. The corporation itself has no Fifth Amendment privilege. *Hale v. Henkel*, 201 U.S. 43 (1906).

A corporation may not refuse to provide records because of foreign laws protecting their secrecy. *In re: Grand jury Proceedings (Bowe)*, 694 F,2d 1256 (11th Cir. 1982). A person subpoenaed cannot require the government to make a

showing of relevance. *In re: Grand Jury Proceedings (Slaughter)*, 694 F.2d 1258 (11th Cir. 1982).

Defendant offers no grounds on which a different custodian of records or corporate counsel might have successfully resisted the subpoena. While Defendant claims that the subpoena was overbroad, this is based upon the false premise that Mr. Knight searched through all the CFL records to determine what to surrender. Rather, the subpoena requested, and Mr. Knight provided, those CFL documents and e-mails which were in his direct possession. This was a limited amount, between four and seven boxes.[2]

A grand jury has extremely broad investigative powers:

> The grand jury occupies a unique role in our criminal justice system. It is an investigatory body charged with the responsibility of determining whether or not a crime has been committed. Unlike this Court, whose jurisdiction is predicated on a specific case or controversy, the grand jury "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." The function of the grand jury is to inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred. As a necessary consequence of its investigatory function, the grand jury paints with a broad brush. "A grand jury investigation 'is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find out if a crime has been committed.'"

---

[2] The undersigned has been given references of four boxes and of seven boxes. It is unclear whether this reflects a failure of memory or whether the records may have been repackaged at some point.

A grand jury subpoena is thus much different from a subpoena issued in the context of a prospective criminal trial, where a specific offense has been identified and a particular defendant charged. "[T]he identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning." In short, the Government cannot be required to justify its issuance of a grand jury subpoena by presenting evidence sufficient to establish probable cause because the very purpose of requesting information is to ascertain whether probable cause exists.

This Court has emphasized on numerous occasions that many of the rules and restrictions that apply at a trial do not apply in grand jury proceedings. This is especially true of evidentiary restrictions. . . . The teaching of the Court's decisions is clear: A grand jury "may compel the production of evidence or the testimony of witnesses as it considers appropriate, and its operation generally is unrestrained by the technical procedure and evidentiary rules governing the conduct of criminal trials."

*United States v. R. Enterprises*, Inc., et al., 408 U.S. 292, 297-98, 111S.Ct. 722,727 (1991). Internal citations omitted.

*R. Enterprises* reversed the Fourth Circuit's opinion, which had quashed grand jury subpoenas, incorrectly requiring the government to make preliminary showings.

*R. Enterprises* does state that a grand jury's powers are not unlimited, at 408 U.S. 298. It may not engage in an arbitrary fishing expedition. It is not arbitrary to investigate people who swindled the government out of more than two million dollars. It may not select targets out of malice or an intent to harass. Defendant does not claim that his investigation was malicious or done to harass. Rule 17(c),

Fed.R.Crim.P. permits a subpoena to be quashed if compliance would be unreasonable or oppressive. Defendant can hardly claim that compliance was unreasonable or oppressive, when it was completed without him noticing it.

Despite having the documents in his counsel's possession for more than three years, Defendant does not claim that any attorney-client or other privileged materials are contained within them. Inasmuch as the documents are relevant and are not privileged, Defendant has not offered a ground for suppression.

Defense counsel states that it has found about 100 attorney-client e-mails on the hard drive[3]. The government is willing to work with defense counsel to sequester any arguably attorney-client messages before inspecting the remaining e-mails. For obvious reasons, the government is concerned with those communications between the Defendants, showing Maher's knowledge of the fraud. That can likely be accomplished in relatively short order.

The government notes that, even absent the subpoena, the documents could have been seized upon probable cause and exigent circumstances. Agent Beyer had the same probable cause to believe that evidence of crimes was present in these files as led this Court to authorize seizure of eight bank accounts and two new Mercedes

---

[3] The government assumes that the privilege is not based upon Maher's employment of a disbarred lawyer, who was then serving a federal term of supervised release.

Benz automobiles, as well as that which led the Middle District of Florida to authorize the search of the condominium. See, Exhibit 4. Mr. Knight confirmed the evidence from the State of Florida, the bank account information, and the communications with FME, that Defendants had defrauded the State of Florida. And added that relevant evidence was in his office.

This is probable cause. "The definition of probable cause is easily stated: probable cause exists whenever the facts and circumstances known to the officer, and of which he has reasonably trustworthy information, are sufficient to warrant a person of reasonable caution to believe that an offense has been or is being committed. The currency of probable cause is probability, not legal certainty; it may exist even though the evidence before the officer is insufficient to convict." *United States v. Tinkle*, 655 F.2d 617, 621 (5th Cir. Sept. 8, 1981).

Moreover, there were exigent circumstances. CFL had actually operated for only about one month of its existence. It lost access to the plant site more than two years earlier for non-payment of rent. It had defaulted on the bulk of the payments for the plant assets. Maher had persistently refused to respond to employee questions about the fraud, even when prodded by the Confidential Memo. The files of the organization were dumped in several locations, without regard to their organization or safekeeping. Personnel turned over frequently. Maher was now

14

offering to bribe witnesses for exculpatory statements and/or to avoid interviews. The agent could reasonably believe that it was necessary to seize the records before they were lost or destroyed.

    In the unlikely event that this Court were to find impropriety in the routine issuance of a grand jury subpoena, the government will proceed with this prosecution.  In that event, the Court may be required to determine whether other evidence was derived from materials that were suppressed.  It is the belief of the undersigned and of the case agent that the search warrant affidavit, which closely tracked the seizure warrant affidavits, was in no way based upon the documents received under the subpoena.  The bulk of the government's evidence comes from government records, from third party records, and from witness interviews. Because of the burden of a taint inquiry, the government suggests that it need be had only if the Court grants this motion to suppress.

Because Defendant offers no ground on which the subpoena was improper or could have been opposed and because there was no unauthorized search by a government agent, the motion to suppress should be denied.

Respectfully submitted,

CHRISTOPHER P. CANOVA
United States Attorney

\s\ Michael T. Simpson
MICHAEL T. SIMPSON
Assistant U. S. Attorney
Florida Bar 254339
111 North Adams Street, 4th Floor
Tallahassee, Florida 32301
(850)942-8430
michael.t.simpsonusdoj.gov

## CERTIFICATE OF WORD COUNT

I hereby certify, pursuant to N.D. Fla. Loc. R. 7.1(f), that this brief complies with the word limit and contains 3361 words. This response was prepared using Microsoft Word 2010 software. In making this certification, I have relied upon the word-count feature of Microsoft Word 2010.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing is being furnished by electronic filing to counsel of record, this 4th day of January, 2017

                                        \s\ Michael T.  Simpson
                                        MICHAEL T. SIMPSON
                                        Assistant United States Attorney