FLORIDA DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES
OFFICE OF INSPECTOR GENERAL

# INVESTIGATIVE UPDATE

| **CASE NUMBER:** | **SERIAL#:** | **DATE SUBMITTED:** | **AUTHOR:** |
|---|---|---|---|
| 2012-0118 | IU-2 | November 8, 2013 | Captain Brian Balser |

**DESCRIPTION:**
**Aaron Knight** interview

## INVESTIGATIVE NARRATIVE

On March 14, 2013, **Brian Balser,** Captain, OIG, and **Emily Beyer**, Special Agent, United States Secret Service (USSS), conducted an interview with **Aaron Knight**, Vice President Operations, CleanFuel - Lakeland LLC (CF). Knight was placed under oath, and the interview was recorded. The following is a synopsis of the interview; the full recording should be consulted for additional details:

- Knight has been employed by CF since September 2009. He is still employed by CF, but preparing to submit his resignation.

- CF originally had two locations. CleanFuel-Groveland was sold in approximately September 2009. CleanFuel-Lakeland is the only current location.

- **Larry Long** is the President of CF. Long works at the direction of **Lee Maher**, Chief Executive Officer.

- Many of the CF office employees are shared with SolarBlue, LLC (SB), another business owned by Maher. The office personnel for both businesses share the same building in Orlando, FL. Financial transactions for both businesses are supervised by Maher.

- Accounts Payable for CF is analyzed on a weekly basis and operational funds for the business are authorized personally by Maher. Maher maintains strict financial control by approving expenses line by line before authorizing payment. Checks are signed using a signature stamp. The signature stamp is kept in a secure location by Maher's executive assistant or the accounting staff.

- Maher has used four executive assistants since September 2009. In order of employment, the executive assistants were **Laura Burness**, **Annetta Moreau**, **Virginia "Gin" Kinney**, and most recently, **Kaitlin Doulou**.

- **Dover Drummond** was the Director of Operations and a partner with Maher.

- CF-Lakeland was acquired in the spring of 2009. It was an asset acquisition purchase at a cost of approximately $7 million with a $500 thousand down payment.

- Two generator sets (gen/sets) were purchased during the fourth quarter of 2009 for use at CF-Groveland and CF-Lakeland.

- CF-Lakeland was idled during September 2010. There were problems with the federal environmental protection agency until February 2011, when CF-Lakeland

GOVERNMENT EXHIBIT 3

| ...sory Approval: Director C. Pate | Date Approved: November 19, 2013 |
|---|---|

was closed.

- The CF-Lakeland grant was solely the work of Long and Maher. There were not significant renovations done at CF-Lakeland. Some work was done by Unitherm to insulate pipes. There was a major repair to a Roots blower used for glycerin production. Many CF-Lakeland purchase orders were not executed. The purchase order was cancelled for an ultrasonic bio-diesel processing system and a centrifuge.

- Knight had received a written notice from Maher stating the OOE grant documents were not accessible to the staff. Maher did not want the grant documents circulated in the office. Long was to be responsible for the OOE grant.

- Knight showed Long and Maher a July 2012 article that stated the OOE was going to become part of the Florida Department of Agriculture and Consumer Services (FDACS). There was some concern that the grant requirements were not being met and the grant would be audited. In 2012, Knight was asked to find a gen/set that would meet the grant requirements retroactively.

- Maher knew about the problems with the OOE grant. During 2012 Maher and Long requested that Knight find a gen/set to retroactively match the gen/set reimbursed by the OOE grant during 2010. Maher gave verbal directions to Long indicating that used gen/sets were a good fit.

- An email written on November 1, 2012, referred to making a deposit on a used Canadian gen/set similar to the new gen/set allegedly purchased with the OOE grant. The concerns about the OOE grant were strengthened because of fears that **Syed Jafri** would report the gen/set substitution plan to OOE. During resulting conversations about the gen/set substitution plan Long made admissions to Knight that fraudulent documents were submitted to OOE. According to Knight, Long admitted, *"that fake checks were given to the Department of Energy"* (42:20). Maher and Long violated the terms of the OOE grant and Long was worried, *"he had personal liability if Maher did not back him up"* (42:30). Long expected either to find a gen/set to satisfy the grant or for Maher to give back the $2.2 million.

- Knight authenticated an email about a visiting potential buyer; and the need to access the CF-Lakeland property and make the plant look functional. The visitors were really from the OOE inspectors conducting a site visit.

- On two occasions during 2012, Knight reported his concerns about CF-Lakeland to the Federal Bureau of Investigations (FBI) in Maitland, FL.

- Maher had a meeting with Knight and told him that the OOE visit needed to go well. Knight was instructed that he *"needed to make the place look alive."* (41:00)

- Knight provided a copy of a confidential memo the he wrote to Maher on October 4, 2012. The memo was written after Long made a series of admissions to Knight and Jafri that *"fake checks were given to the Department of Energy"*. (42:20) Long told the OOE that he worked as a consultant for CF and got his CF business information from CF Operations personnel. *"Larry (Long) was very concerned for his own personal liability."* Long worried that *"he had personal liability if Maher did not back him up."* (42:30)

- Knight discussed **Shanna Getto**, a bookkeeper who had recently been fired by Maher. Getto had to regularly request money from Maher in order to pay CF or SB bills. On one occasion a check payable to baseball player, Johnny Damon, bounced because of insufficient funds in the business account. The bounced check to Damon may have been the reason Getto was fired.

- The check to Damon was partial repayment for an investment in SB-Canada. The investment may have been $1 million. There are two people actively promoting SB-Canada, Brian Thompson and an unidentified minor league ballplayer.

- When it was learned that Getto may speak with investigators, Maher had conversations with Knight about Getto. Maher offered to pay Knight $2,500-$3,000 if he could influence her not to talk for a few weeks.

- Maher offered to hire an attorney for Getto and Maher insisted the attorney be present if she spoke to investigators. Maher would reinstate a $5 thousand severance check to Getto and agree not to sue her about unauthorized overtime pay, if she agreed to sign an affidavit he had prepared. Getto would sign a document stating that she did not disclose information to the OOE in return for the severance pay and agreement not to sue her. Knight believes that Maher paid a retainer for an attorney to represent Getto, but Getto did not want to use the attorney.

- On March 13, 2013, Knight was told by Long that he was going to look through archived CF records to be used in the Washington DC1603 grant lawsuit. Long hoped to rehire Getto to help research the records.