**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No: 4:16-cr-30 |
| | ) | |
| v. | ) | Tallahassee, Florida |
| | ) | December 12, 2017 |
| LEE JOHN MAHER, | ) | EXCERPT - DAY 2 |
| | ) | |
| Defendant. _____) | | |

**TRANSCRIPT OF EXCERPT OF JURY TRIAL**
**(TESTIMONY OF LARRY LONG)**
**BEFORE THE HONORABLE MARK E. WALKER**
**UNITED STATES DISTRICT JUDGE**
**(PAGES 1-98)**

APPEARANCES:

For the Government:     U.S. Attorney's Office
                       Christopher Canova
                       By:   MICHAEL T. SIMPSON
                             Assistant U.S. Attorney
                       michael.t.simpson@usdoj.gov
                       111 North Adams Street
                       Tallahassee, Florida 32301


For the Defendant:     A. Brian Phillips, PA
                       By:  ANDREW BRIAN PHILLIPS
                             Attorney at Law
                             CARLY MARIE NEWMAN
                             Attorney at Law
                       912 Highland Avenue
                       Orlando, Florida 32803
                       brian.phillips@phillips-law-firm.com
                       carly.newman@phillips-law-firm.com

                        Sands White Sands Pa
                        By:   KENTON VOGES SANDS
                              Attorney at Law
                        760 White Street
                        Daytona Beach, Florida 32114

*MEGAN A. HAGUE, RPR, FCRR, CSR*
**Official United States Court Reporter**
**111 North Adams Street, Tallahassee, Florida 32301**
850.422.0011 * megan.a.hague@gmail.com

1        P R O C E E D I N G S

2        (Following is an excerpt of the jury trial held on the

3    12th day of December, 2017.)

4            MR. SIMPSON:  And we call Larry Kenneth Long.

5            THE COURT:  Ladies and gentlemen of the jury,

6    while the next witness is coming in, I told you I would

7    narrate and try to give you some guidance when I could.  Of

8    course, the first witness took quite some time.  We expect

9    this witness to be -- take quite some time.  I realize we

10   listed, you know, approximately 20 witnesses.  It's not

11   anticipated that the other witnesses will be nearly as long

12   as the first two witnesses.  So for purposes of scheduling,

13   I didn't want you to think we were that off in terms of our

14   estimates.

15       (Larry Kenneth Long entered the courtroom.)

16           THE COURT:  Sir, if you'll raise your right hand

17   and face the courtroom deputy, you will be sworn in.

18       **LARRY KENNETH LONG, GOVERNMENT WITNESS, DULY SWORN**

19           COURTROOM DEPUTY CLERK:  Please state your full

20   name and spell your last name for the record.

21           THE WITNESS:  Larry Kenneth Long, L-o-n-g.

22           THE COURT:  Sir, you can take your seat.

23           And let me say this to Mr. Simpson as well as

24   Mr. Phillips, if any of the witnesses, especially the

25   witnesses that are this long -- we certainly can provide

1    them with bottled water.  So if anybody -- if you'd like

2    something to drink, just let us know, sir.

3            THE WITNESS:  Great.  Thank you.

4            THE COURT:  Pam, why don't we go ahead and do

5    that.  Do you have any bottled water?

6            COURTROOM DEPUTY CLERK:  I'll get some.

7            THE COURT:  Okay.  If you will, thank you.

8            Mr. Simpson, you can proceed.  I just --

9            MR. SIMPSON:  Thank you.

10           THE COURT:  It's a long time to be without water.

11                         DIRECT EXAMINATION

12   BY MR. SIMPSON:

13   Q.   How old are you, sir?

14   A.   75.

15   Q.   What education do you have?

16   A.   Normal high school, went to Purdue University for an

17   international relations degree and to Harvard University for

18   the Business School, MBA.

19   Q.   Generally, what areas have you worked in during your

20   life?

21   A.   Marketing, sales, mergers, and acquisitions.

22   Q.   Did there come a time when you became acquainted with a

23   man named Lee John Maher?

24   A.   Yes.

25   Q.   Do you see him here in the courtroom today?

1   A.   Yes.

2   Q.   If you would tell us how he's dressed and where he's

3   seated.

4   A.   He's seated over there, and he has the light reddish

5   hair.

6            MR. SIMPSON:  The record should reflect the

7   identification of the defendant.

8   BY MR. SIMPSON:

9   Q.   And about when did you meet Mr. Maher?

10  A.   December of '07 or January of '08, right around that

11  time.

12  Q.   Did you become employed with Mr. Maher?

13  A.   Yes.

14  Q.   And eventually did your employment with Mr. Maher

15  result in you being charged in a criminal case in this

16  court?

17  A.   Yes.

18  Q.   Have you pled guilty in this court?

19  A.   Yes.

20  Q.   Both to a count involving a conspiracy to commit fraud

21  and to a count involving the receipt and concealment of

22  government funds with the intent to defraud?

23  A.   Yes.

24  Q.   I'll show you what have been marked for identification

25  as Government's Exhibit 216A and 216B.  Would those

1    documents together comprise your plea agreement in this

2    case?

3    A.   Yes.

4    Q.   Have you been sentenced yet?

5    A.   No.

6    Q.   Who did you enter your guilty plea before?

7    A.   This gentleman.

8    Q.   And he will be sentencing you?

9    A.   Yes.

10   Q.   Now, am I --

11            MR. SIMPSON:  We offer 216A and B.

12            THE COURT:  Any objection?

13            MR. PHILLIPS:  None, Your Honor.

14            THE COURT:  Without objection, 216A and B --

15   Government's 216A and B, as distinguished from Defense 216A

16   and C that were previously admitted, are hereby admitted.

17       (GOVERNMENT'S EXHIBITS 216A and 216B:  Received in

18   evidence.)

19   BY MR. SIMPSON:

20   Q.   And do those documents together address how you will be

21   sentenced in this case?

22   A.   Yes.

23   Q.   In particular, do they tell you what the maximum

24   sentences are?

25   A.   Yes.

1  Q.   What's the most you can get?

2  A.   I believe it's 20 years.

3  Q.   On a substantive count?

4  A.   Excuse me?

5  Q.   Okay.  Let's go back to paragraph 1 of the plea

6  agreement itself.  Twenty years on one count.  Is there a

7  separate sentence on the other?

8       THE COURT:  He's just directing his attention to a

9  document.  He's not asking a question.

10       MR. SIMPSON:  I'm sorry?

11       THE COURT:  I said you weren't asking a question.

12  You were just directing the witness's attention to the

13  document.

14  BY MR. SIMPSON:

15  Q.   You pled guilty to the conspiracy in the first count up

16  to 20 years, and the second count is being dismissed, okay.

17       Have you also participated in a process to develop a

18  presentence report in your case?

19  A.   Yes.

20  Q.   And does that indicate at least a tentative guideline

21  range, not a binding but a starting point for your sentence?

22  A.   Yes.

23  Q.   Is it something less than 20 years?

24  A.   Yes.

25  Q.   Now, is the second part -- actually, 216B, the

1  supplement, does that address your cooperation with the

2  government?

3  A.    Yes.

4  Q.    And if the government determines you have cooperated

5  and provided substantial assistance, is there a possibility

6  the government would file a motion telling the Court that

7  you provided substantial assistance?

8  A.    Yes.

9  Q.    And would you hope that to have a beneficial impact on

10  your sentence?

11  A.    Yes.

12  Q.    What does the agreement say you're supposed to do if

13  you want to get that motion?

14  A.    Tell the truth.

15  Q.    Have you had more than one conversation with me in

16  preparation for this trial and during this investigation?

17  A.    Yes.

18  Q.    And in those conversations, what have I told you to do

19  if you want to get benefits from your testimony?

20  A.    Tell the truth.

21  Q.    I'm going to kind of start at the end and then work

22  back to the beginning.

23        The conspiracy you pled to involves an agreement to

24  defraud the government in the administration of a grant?

25  A.    Yes.

1  Q.   Did you do that?

2  A.   Yes.

3  Q.   Who did you agree with?

4  A.   I'm sorry?

5  Q.   Who did you agree with when you agreed to defraud the

6  government?

7  A.   Mr. Maher.

8  Q.   Let's move back to the beginning.  This morning while

9  you were waiting to testify, did I ask you to look through a

10 notebook which contained Government's Exhibits 123 through

11 228 as well as 235 and 250?

12 A.   Yes.

13 Q.   Did you recognize those documents?

14 A.   Yes, I did.

15 Q.   Did you recognize them as documents you had seen during

16 the time you worked at Clean Fuel and for Mr. Maher?

17 A.   Yes.

18 Q.   Were those documents which you kept copies of in the

19 regular course of business at Clean Fuel?

20 A.   Yes.

21 Q.   Was it your practice to keep to -- make and keep those

22 documents at or about the time of the events reflected?

23 A.   Yes.

24 Q.   And to keep them as accurate reflections of those

25 events?

1    A.   Yes.

2          MR. SIMPSON:  We offer Government's Exhibits 123

3    through 228, 235, and 250.

4          THE COURT:  And you're saying just 235 and 250,

5    not 235 through 250; correct?

6          MR. SIMPSON:  Yes, the individual, not the --

7          MR. PHILLIPS:  Your Honor, with that foundation,

8    no objection.

9          THE COURT:  Without objection, 123 through 228 and

10   235 and 250 are admitted.

11       (GOVERNMENT EXHIBITS 123 - 228, 235, and 250:  Received

12   in evidence.)

13   BY MR. SIMPSON:

14   Q.   How did you come to meet Mr. Maher in the first place?

15   A.   One of his key employees had business with me before in

16   Groveland, and he recommended me to be the president to

17   replace one of his real estate people.

18   Q.   Okay.  What was at Groveland that you were being

19   recommended for?

20   A.   To run the biodiesel and the grease operation.

21   Q.   Okay.  Did it -- was there an operating name over that

22   set of entities?

23       Did Mr. Maher's business in Groveland have a name?

24   A.   Yes.  Clean Fuel Groveland.

25   Q.   Clean Fuel, singular?

1   A.   Yes.

2   Q.   Not fuels?

3   A.   Right.

4   Q.   Okay.  And you said it was both a grease collection

5   operation and some kind of a plant?

6   A.   Yes.

7   Q.   At the time you came on board, was the –– did you come

8   on board?

9   A.   Yes, sometime in February of 2008.

10  Q.   Okay.  I'll show you Government's Exhibit 123.  Do you

11  recognize that document?

12  A.   Yes, I do.

13  Q.   And what is that?

14  A.   It's my employment agreement and compensation package.

15  Q.   And the portion of that agreement that's printed, who

16  prepared that?

17  A.   I prepared that.

18  Q.   And the portion that's handwritten, who did that?

19  A.   Mr. Maher.

20  Q.   So according to the top line, how much were you going

21  to be paid a month?

22  A.   15,000.

23  Q.   Which worked out to how much a year?

24  A.   180,000.

25  Q.   And there's a line that says "Fundraising Bonus CFE."

1   What's that about?

2   A.   That was to raise $16 million for Clean Fuel.

3   Q.   If you raised $16 million, what did you get?

4   A.   $30,000.

5   Q.   There's also a reference to a fundraising bonus for SB.

6   What's that?

7   A.   Solar Blue.

8   Q.   Who owned Solar Blue?

9   A.   Mr. Maher.

10  Q.   And what would you get if you raised money for

11  Solar Blue?

12  A.   I can't tell whether it's 50 and the zero is marked out

13  or whether it was left at 50.  If I add it up --

14  Q.   And if you raise more money for Clean Fuel, did you get

15  a bigger bonus?

16  A.   Yes.

17  Q.   Now, what's this thing in the middle there?

18  A.   It's totaling up what the first year of pay could be.

19  Q.   Okay.  I'm not talking about the printed matter so much

20  as this squiggly thing there.

21  A.   That's a -- Lee's initials.

22  Q.   Now, the bottom part about long-term equity, what's

23  that about?

24  A.   For every year I stayed, I got 1 percent of the

25  company.

1    Q.   And again, what's this squiggle over here?

2    A.   Again, initials of Mr. Maher.

3    Q.   And the next page there are various provisions and

4    again there are a number of different squiggles on that

5    page.  What are those squiggles?

6    A.   All five of them are variations of Mr. Maher's

7    initials.

8    Q.   In your time at Clean Fuel, did you have the

9    opportunity to see Mr. Maher sign and initial things on more

10   than one occasion?

11   A.   Yes.

12   Q.   Did he always use the same signature?

13   A.   It was done very fast and often varied a little bit.

14   Q.   And the signatures at the bottom of the page, who are

15   those?

16   A.   Mr. Maher and my full signature.  His was an initial.

17   Q.   Now, the page captioned "Larry Long Partnership with

18   Lee Maher," who created the -- first of all, the printed

19   words on this page?

20   A.   The initial printed, me.

21   Q.   Okay.  Then there a number of things written in with

22   what appears to be maybe a black Sharpie.  Who did the

23   writing in?

24   A.   Mr. Maher.

25   Q.   And the last entry on that page refers to Solar?

1    A.    Solar Blue.

2    Q.    Okay.  Now, the next page refers to -- first, there is

3    a section about Orlando plants and the first thing is Grease

4    Tech.  What is that?

5    A.    Grease Tech was a company that -- or a division that

6    collected grease from approximately 1,200 restaurants,

7    yellow grease.

8    Q.    Okay.  Give me the nickel version.  Is there another

9    kind of grease besides yellow grease?

10   A.    Yes.  There is a brown grease which they pay you to

11   take away.  It's much more volatile and harder to use.

12   Q.    Dirtier?

13   A.    Yes, yes.

14   Q.    There's a reference to -- it looks like ECO brown

15   grease.  What's that about?

16   A.    The gentleman that recommended me had a proprietary

17   method.  He was trying to say that we could use the brown

18   grease to also make biodiesel.  It never reached the

19   economic stage where it was used.

20   Q.    Okay.  Now, was Grease Tech part of the setup at

21   Groveland?

22   A.    Not initially.  It was up in Tavares, a small village

23   north of there, and then we moved it to Groveland.

24   Q.    Okay.  So when Grease Tech collected whatever kind of

25   grease it did, what did y'all do with it?

1  A.   It would be brought in by collection trucks, and we

2  would refine it and heat it and boil off the water and

3  strain out the -- mainly it was from restaurants.  So strain

4  out the contaminants that were there and then we would sell

5  it.  We originally wanted to use it in our own plant.  Very

6  little of it was used for that.  We mainly sold it to other

7  people to make biodiesel.

8  Q.   Okay.  So you're cleaning up the grease, but you're --

9  at least for the majority of it, you are not trying to make

10 biodiesel out of it?

11 A.   Right.  The majority, no.

12 Q.   Was there actually equipment on site there in Groveland

13 that had the potential for producing biodiesel?

14 A.   Yes, the potential, keyword.

15 Q.   Okay.  Tell us about the equipment at Groveland.  I

16 mean, was this an operating plant when you were brought on?

17 A.   If it had operated, it was to very little degree,

18 mainly test batches and things like that.  When I arrived,

19 it was not in what I'd call very good shape.

20 Q.   Okay.  Were there some safety issues at the Groveland

21 plant?

22 A.   Yes.

23 Q.   Give us an overview.

24 A.   Approximately 20 yards to the left of the main

25 building, which was a multipurpose building, was a

1  child-care facility and we had flammable materials on site.

2  Q.   What kind of flammable materials?

3  A.   Methanol.

4  Q.   Okay.  That's basically a type of alcohol?

5  A.   Yes.

6  Q.   And in what kind of containers was the methanol?

7  A.   It was possibly in one or two actual tanks, but most of

8  it was in what are called totes, 250-gallon totes, that you

9  then would put in and combine with the grease to make

10  biodiesel.  They are very explosive.

11  Q.   250 gallons --

12  A.   Yes.

13  Q.   -- at a time?

14  A.   Yes.

15  Q.   And how many 250-gallon totes were on the property?

16  A.   Maximum probably at any one time was probably 20.

17  Q.   Would they all be full or just some of them?

18  A.   Some were empty, some were full.

19  Q.   Okay.  Now, you were brought on in February of '08.

20  Did Mr. Maher already own the plant at that point?

21  A.   Yes, they had bought it the previous year.

22  Q.   And at some time during your acquaintance with

23  Mr. Maher was that plant sold?

24  A.   Yes.

25  Q.   Do you remember about when that was?

1   A.   Since it was a leased facility, we only sold the

2   equipment and that would have been November/December of

3   2010.

4   Q.   Okay.  In that two years then between the time you came

5   on and the time the plant was sold, to the best of your

6   recollection, how much biodiesel was produced out of that

7   plant, if any?

8   A.   It's an estimate, but I would say less than 20 or

9   30,000 gallons.

10  Q.   Okay.  Now, that same exhibit refers to a -- if I'm

11  reading right, a Philadelphia plant.

12  A.   (Nods head up and down.)

13  Q.   What did that refer to?

14  A.   We tried to buy an operation in Pennsylvania.  I don't

15  know that it was particularly in Philadelphia, but in

16  Pennsylvania.

17  Q.   Did that deal go through?

18  A.   No.

19  Q.   And when you say "we," whose money was involved?

20  A.   Mr. Maher.

21  Q.   Now, did you stay in the capacity as president of

22  Clean Fuel?

23  A.   Not very long.

24  Q.   Do you happen to remember about when you got put in a

25  different position?

1  A.    Late summer, early fall of the year of --

2  Q.    Of the same year or different year?

3  A.    Now I -- I think it was 2009.

4  Q.    Okay.  Did there come a time when Mr. Maher acquired a

5  second plant?

6  A.    Yes.

7  Q.    And what was the second plant?

8  A.    It was in Lakeland and it was, I believe, in April of

9  2009.

10  Q.    Okay.  Can you remember where you -- was your position

11  changed before or after the Lakeland plant was acquired?

12  A.    I believe it was shortly after, but it could have been

13  before.

14  Q.    Okay.  Did the -- had the Lakeland plant ever operated

15  as a production facility on a regular basis?

16  A.    Yes.  Prior to our ownership, it operated at quite high

17  levels at various times.

18  Q.    And at the time that Mr. Maher bought the Lakeland

19  facility, was it producing anything?

20  A.    It was producing glycerin and -- most of which we

21  bought, and occasionally a test batch of biodiesel.

22  Q.    I'm not sure what a test batch is.

23  A.    8,000 gallons usually.

24  Q.    I'm sorry.

25  A.    8,000 gallons usually.

1  Q.   Okay.  When your position was changed, what was it

2  changed to?

3  A.   I was let go as an employee with benefits and re-hired

4  as a consultant to mainly raise money.

5  Q.   Did you keep your benefits?

6  A.   No.

7  Q.   When you say "benefits," you are talking about health

8  benefits?

9  A.   Right, right.

10  Q.   Did you keep your salary?

11  A.   No.

12  Q.   What happened to your salary?

13  A.   It went from 180 to approximately 80,000.

14  Q.   I'm sorry.  To approximately?

15  A.   80 -- 80,000.

16  Q.   Okay.  Was Florida your regular home at the time that

17  you began working for Mr. Maher?

18  A.   No.  I lived in -- and still do, in South Carolina.

19  Q.   Did you have some kind of local residence at the times

20  you were here?

21  A.   Yes.  It ranged from a condo he had to apartments to

22  motels or whatever was appropriate at the time.

23  Q.   And during the time that you -- well, I guess this may

24  have varied.  When you started as president of Clean Fuel

25  with the Groveland operation, how much of your time were you

1  spending in Florida?

2  A.   At least 50 hours a week, counting transit, and

3  occasionally the full weekends when my wife would be with

4  the grandchildren in Ohio.

5  Q.   Okay.  And let me just step aside for a minute.  From

6  your dealings with Mr. Maher's various companies, has this

7  made you a wealthy man?

8  A.   No.

9  Q.   Have you in the last year or so filed a bankruptcy?

10 A.   Yes.

11 Q.   Do you still at least hold title to the home in

12 South Carolina?

13 A.   Yes.

14 Q.   Do you have any equity in it to speak of?

15 A.   No.  It's upside down.

16 Q.   You indicated that when you became a consultant your

17 responsibilities were to do what?

18 A.   Raise money.

19 Q.   And in what fashion did you endeavor -- who told you

20 that was your job?

21 A.   Both in writing and in meetings Mr. Maher.

22 Q.   And in what fashions did you attempt to raise money?

23 A.   Every conceivable fashion known to man, but primarily

24 grants.

25 Q.   Did you also try to find investors?

1   A.   Yes.

2   Q.   Let me ask you, in 2008 and 2009, was it a good time to

3   find investors?

4   A.   Yes, there were none for biodiesel that we could find.

5   Q.   Was it a good time generally in the economy?

6   A.   No, it was a terrible time.

7   Q.   Did you attempt to find loans and loan guarantees?

8   A.   Yes.

9   Q.   And you said you tried to find grants?

10  A.   Yes.

11  Q.   Was there an effort to get a grant from the State of

12  Florida?

13  A.   Yes.

14  Q.   A state-funded grant?

15  A.   Yes.

16  Q.   And did you participate in that process?

17  A.   Yes.

18  Q.   Was an application filed?

19  A.   Yes.

20  Q.   And was there a time when you were advised that that

21  grant had been awarded?

22  A.   Yes.

23  Q.   About when was this?

24  A.   Approximately, we went for the award disbursal with the

25  other ten winners -- or the other nine winners in February,

1    I believe, of 2009.

2    Q.   Where did you go for that award?

3    A.   Tallahassee.

4    Q.   And, I mean, is this a banquet hall or in a meeting

5    room, or how was it done?

6    A.   It was just in a meeting room, and the people that made

7    the decision of the 125 applications were there, along with

8    the staff, Kelley Smith Burk and Bob Vickers, and other

9    people that worked for the governor at that time.

10   Q.   And did -- was Clean Fuel, at least in some sense,

11   awarded a grant?

12   A.   Yes, we were Number 6.

13   Q.   Did you get any money?

14   A.   No.

15   Q.   What happened?

16   A.   They ran out of money.  They theoretically had

17   $25 million, ten 2.5-million-dollar grants to the top ten

18   finishers.  Unfortunately, they only had $12.5 million that

19   they disbursed and gave it to the top five, and I suggested

20   that they should give it because we were shovel ready to the

21   top ten -- give a million and a quarter to each of the top

22   ten because some of them were in the planning stage and ours

23   was ready to go.  We could --

24   Q.   Did you get the money?

25   A.   What?

1    Q.    Did you get any money?

2    A.    Zero.

3    Q.    Okay.  And was this based on Groveland or Lakeland or

4    something else?

5    A.    It was based mainly on Groveland, but we had Lakeland

6    in approximate progress at that time.  We were trying to get

7    Lakeland.

8    Q.    All right.

9          Were you told anything that -- to give you hope at that

10   point in terms of getting a grant?

11   A.    They said when there was further funding, they would

12   disburse to the 6 through 10.

13   Q.    Okay.  And was there some signs of funding on the

14   horizon?

15   A.    Yes, the Department of Energy had a lot of money they

16   were giving out.

17   Q.    That would be the American Recovery and Reinvestment

18   Act?

19   A.    Yes.

20   Q.    Did you make efforts to obtain grants for the American

21   -- from the -- the federal money from the state?

22   A.    Yes.

23   Q.    Did you make more than one effort?

24   A.    Yes.

25   Q.    In the year 2008, were you successful?  I'm sorry,

1    2009.

2    A.    No, we were unsuccessful in the first effort.

3    Q.    And towards May of 2010, did you actually succeed in

4    getting a grant signed?

5    A.    Yes, we did.

6    Q.    Now, who acted -- who did the day-to-day work on the

7    grant or the day-to-day communications with the State of

8    Florida?

9    A.    Me.

10   Q.    Who owned the company that was getting the grant?

11   A.    Mr. Maher.

12   Q.    And how frequently would you and Mr. Maher communicate

13   about your fundraising efforts?

14   A.    Tried to do weekly, although he traveled a lot, so it

15   was probably more biweekly on average.

16   Q.    Okay.  Now, when you were working on grants with him,

17   did you have somebody intermediary between you and him, or

18   do you talk directly to him?

19   A.    Talk directly to Lee.

20   Q.    In addition to talking to him, did you send him faxes

21   and e-mails?

22   A.    Yes.

23   Q.    Did you also talk to him on the telephone?

24   A.    Yes.

25   Q.    And after the grant agreement was signed, did you

 1  submit, trying to get reimbursed?

 2  A.    Yes.

 3  Q.    And was there a problem?

 4  A.    Yes.

 5  Q.    What was the problem?

 6  A.    The problem was we had to put the money in and then

 7  we'd get reimbursed from the state, and we did not do it

 8  that way.

 9  Q.    Okay.  When you say you had to put the money in, you

10  mean you had to put more money in?

11  A.    Yeah, we had to put another two and a half million in.

12  The original grant way back that we'd won was based on a

13  previous investment and that was enough.

14  Q.    This was a different set of rules?

15  A.    Yes, the rules changed completely.

16  Q.    Did that lead to an expansion of the original grant

17  agreement?

18  A.    Yes.  And we had Lakeland by then, too.

19  Q.    Okay.  You had Lakeland.  In May, you sign a grant

20  agreement based on Lakeland or Groveland?

21  A.    Primarily Lakeland, but Groveland was a part of the

22  whole -- still part of the company.

23  Q.    Okay.  Now, you say -- I mean, Mr. Maher owned

24  Clean Fuel -- we'll call it Clean Fuel Groveland.  He also

25  owned Lakeland?

1  A.   Uh-huh.

2  Q.   He also owned Grease Tech?

3  A.   Uh-huh.

4  Q.   He also owned one or more companies named Solar Blue?

5  A.   Yes.

6  Q.   He also had something called GenCorp or GenCo?

7  A.   We had a period of time where we had a GenCo.

8  Q.   Okay.  Was there a division within Mr. Maher's entities

9  between one company and another?

10 A.   Not that I was used to.  It was very open between the

11 companies.

12 Q.   Okay.  Did you get called on sometimes to work for

13 companies other than Clean Fuel and Clean Fuel Lakeland?

14 A.   Yeah, occasionally Solar Blue.

15 Q.   And did you sometimes call on personnel that were being

16 paid by other companies to assist you?

17 A.   Yes.

18 Q.   What was the nature of the expansion of the grant that

19 you came up with?

20 A.   We had to put in an additional $2.5 million for

21 equipment that was going to improve or reduce carbon

22 emissions and create efficiency and things like that.

23 Q.   Okay.  And was there a particular piece of equipment

24 that you and Mr. Maher settled on?

25 A.   Right.  We had been working on for GenCorp and other

1  things a very large 3.2-megawatt Fairbanks Morse Engine, and

2  it would apply and make sense to do that at Lakeland.

3  Q.   And if the genset had been installed at Lakeland, what

4  would it have done?

5  A.   It would have burned biodiesel in addition to regular

6  diesel that we made.  It would have supplied electricity for

7  our entire operation, and there would have been excess

8  electricity, and we were working on a PPA with the City of

9  Lakeland who had their own utility to either sell them

10  electricity or the public's headquarters -- not

11  headquarters, but a major distribution center was contiguous

12  to us, and we wanted to sell electricity to them.

13  Q.   So if you bring it in, first of all, you quit paying

14  electric bills?

15  A.   Yes, a lot of bills got -- would stop.

16  Q.   Were those significant bills?

17  A.   Yes.  Yeah.

18  Q.   I mean, if you were producing your own electricity, you

19  didn't have to buy it from the City of Lakeland anymore?

20  A.   Right.  And we would save a lot of money.

21  Q.   Any idea how much the electrical bills were when it was

22  running full-bore?

23  A.   It was in the hundreds of thousands of dollars a year,

24  as I can remember.

25  Q.   Okay.  And, additionally, you are going to have surplus

1  electricity to sell?

2  A.   Uh-huh.

3  Q.   Does -- if you get this, does the asset value of the

4  plant go up?

5  A.   Considerably.

6  Q.   Because you put -- and what -- had you already had some

7  discussions with Fairbanks Morse in connection with some of

8  your other fundraising ideas?

9  A.   Yes.  We thought cogeneration, which is where you use

10  the exhaust heat to double the efficiency of the engine,

11  would be applicable in many opportunities.

12  Q.   Okay.

13         MR. PHILLIPS:  Your Honor, I'm going to object to

14  the witness's response using the plural pronoun "we" without

15  further explanation.

16  BY MR. SIMPSON:

17  Q.   Did you discuss --

18         THE COURT:  Hold on.

19         Sustained in terms of ambiguous.  You can ask him

20  to clarify.

21  BY MR. SIMPSON:

22  Q.   Did you discuss the plans regarding the Fairbanks Morse

23  generator with other persons?

24  A.   Yes.

25  Q.   Did you discuss them with people that might have

1  technical knowledge in the -- in Mr. Maher's organizations?

2  A.   Yes.

3  Q.   Would that include an engineer?

4  A.   Yeah, it included a chief engineer and Mr. Maher

5  himself, yes.

6  Q.   Okay.  Was there also some potential for getting some

7  tax credits if you obtained this equipment?

8  A.   Yes.

9  Q.   And how did that work?

10 A.   Normally, there was a tax credit called a 1603, which

11 allowed you to accelerate depreciation to get tax protection

12 sooner.  For the year of 2000, I think '9 and '10, one of

13 the two years, we were allowed to -- you got cash back from

14 the government because they were trying to get people to do

15 this.  So they were giving cash back instead of the

16 traditional depreciation benefit, and so up to 30 percent of

17 your investment you could get an additional either

18 depreciation or for that one year's time, I believe it was

19 only one year, you could get cash back from the government.

20 So it was another way to raise money.

21 Q.   So on a two-and-a-half-million-dollar project,

22 800-and-some-thousand dollars?

23 A.   Yes, approximately.

24 Q.   Did it appear possible that you could both get the

25 state -- get the grant program to pay for it and get the tax

1   credit?

2   A.    I didn't think there was any reason you couldn't do

3   both.  I don't think there was a prohibition against that.

4   Q.    And did you talk this over with Mr. Maher at any point?

5   A.    Of course.

6   Q.    And what's Mr. Maher's response?

7   A.    He was excited.  We wanted to do not only that 1603,

8   but others if we could.

9   Q.    And at the same time, are you having any conversations

10  with the state about expanding or reforming the original

11  grant agreement that you can't get reimbursed under?

12  A.    I'm not sure I quite understand what you mean.

13  Q.    Okay.  You'd indicated that in May of 2010, a grant

14  agreement had been executed, but that it -- you weren't able

15  to get funds under that because it required the investment

16  of new money.

17        Did some new paperwork have to be done to create an

18  agreement under which this Fairbanks Morse unit could be --

19  A.    Yes, we had to file a major amendment to go with the

20  original application.

21  Q.    Okay.  Does that involve a lot of going back and forth?

22  A.    Yes.

23  Q.    And does that agreement eventually get signed?

24  A.    Yes, it does.

25  Q.    And either before or after it's been signed, do you

1    have conversations with Mr. Maher about what it's going to

2    take with this agreement to get the reimbursement?

3    A.    Yes.

4    Q.    And what's Mr. Maher going to have to do to get the

5    reimbursement?

6    A.    Put $2.5 million in or at least 2.25 to get it started,

7    and then the final 5 percent you can get upon completion.

8    Q.    And when push comes to shove, does Mr. Maher put the

9    2.5 or thereabouts in it?

10   A.    No.

11   Q.    What's he do?

12   A.    We had what was perceived as a short-term cash flow

13   problem and that we would, shortly after getting the money

14   from the state, go ahead with the program, using their money

15   or other money that might appear, and buy the genset and do

16   the installation and go ahead with the cogen plan.

17   Q.    Okay.  You're going to get the money from the state,

18   but how are you going to get the money from the state if you

19   hadn't spent the money?

20   A.    You had to commit fraud.

21   Q.    Did you know that up front?

22   A.    Yes, sir.

23   Q.    Did Mr. Maher know that up front?

24   A.    Yes.

25   Q.    Now, did you sit down at some point with Mr. Maher and

1    write out in paper what y'all were going to do?

2    A.    No, that was not recorded or memorialized or anything,

3    no.

4    Q.    Why didn't you do that?

5    A.    No reason to.  I mean, it would be, I guess,

6    incriminating later on potentially.

7    Q.    Did the grant paperwork get filed, the amended grant

8    paperwork?

9    A.    Yes.

10   Q.    And eventually were documents created to support a

11   payment request?

12   A.    Yes.

13   Q.    Including a signed agreement to buy a genset from

14   Fairbanks Morse?

15   A.    Yes.

16   Q.    Did Mr. Maher actually sign that agreement?

17   A.    Yes.

18   Q.    Were there checks prepared that appeared to show the

19   purchase?

20   A.    Yes.

21   Q.    Did Mr. Maher know the checks were being created?

22   A.    Yes.

23   Q.    Could you have gotten the checks without Mr. Maher's

24   agreement?

25   A.    I could get no checks on my own.  They had to be

1  approved.  Remember, I wasn't an employee at this point.

2  Q.   And did all this eventually result in grant monies

3  being issued?

4  A.   Absolutely.

5  Q.   Did you get a portion of the grant monies?

6  A.   I got my 1 percent that I got out of any transaction.

7  Q.   Okay.  So 1 percent of -- is it the whole grant or is

8  it a portion of the grant?

9  A.   The cash that was disbursed, so it was 22,000 and

10 change.

11 Q.   Okay.  And does Mr. Maher then turn around and take the

12 bulk of the funds and buy the genset?

13 A.   No, sir.

14 Q.   Where does that leave you?

15 A.   Deep trouble eventually.

16 Q.   Did you have the funds to finance the purchase of a

17 genset itself?

18 A.   No.

19 Q.   Did you have the responsibility to -- under the grant

20 agreement to make regular reports to the state on the

21 progress?

22 A.   Every month.

23 Q.   And once the request for reimbursement had been filed,

24 was there ever one of those that was truthful?

25 A.   No.

1   Q.   Did you talk with Mr. Maher to try to get him to fix

2   the problem, to go ahead and get a genset?

3   A.   In the very beginning, yes, I pushed very hard to get

4   the genset and get it done.

5   Q.   And did he respond?

6   A.   "We'll do it later."

7   Q.   Did he -- well, when you said, "We need to get the

8   genset," what was his response?

9   A.   "We can't do it now."  And so I would remind him that

10  we could always pay the state back the money.

11  Q.   What was his response to that?

12  A.   Not now, basically.

13  Q.   Okay.

14  A.   That's a paraphrasing.

15  Q.   I'm going to back up at this time and try to walk

16  through sequentially some of these events and some of the

17  exhibits you talked about.

18      Are you acquainted with Government's Exhibit No. 124?

19  Are you acquainted with that exhibit, sir?

20  A.   Yes.

21  Q.   Who's it from and who's it to?

22  A.   It's from Lee's executive assistant, Deborah Ferro, to

23  me and a new gentleman they hired.

24  Q.   And when was it sent?

25  A.   September of 2008.

1    Q.   Now, in different organizations, assistants and

2    executive assistants, sometimes we're talking about a

3    secretary, sometimes we are talking about somebody that has

4    some real say-so in the company.  Where does Ms. Ferro fit

5    in that?

6    A.   I would say that she was more the assistant secretary

7    type, but was very strident in trying to get things done.

8    Q.   Okay.  And were Mr. Maher's offices on site at one of

9    these plants or were they someplace else?

10   A.   No, they were downtown Orlando.

11   Q.   And what kind of offices did he have when you started

12   working with him?

13   A.   First class.

14   Q.   Do you remember what floor they were on?

15   A.   We had the penthouse.  The 21st, I believe.  The 21st

16   Floor, I think.

17   Q.   And in relation to Mr. Maher's offices, where were

18   Ms. Ferro's offices.

19   A.   Right next door, adjacent.

20   Q.   Okay.  In September of '08, what direction were you

21   given by Deborah Ferro on behalf of Lee Maher?

22   A.   That I needed help managing the operations and Mark was

23   donated for that and that I should only raise money.

24   Q.   Now, at this point are you still president of

25   Clean Fuel or are you a consultant or can you tell?

1  A.    I can't really remember exactly --

2  Q.    Okay.

3  A.    -- when I lost the presidency.

4  Q.    Now, let me go to 125 and this actually drops back to

5  October of 2008.  This is while you were president of

6  Clean Fuel?

7  A.    Yes.  Well, I think I was.  I know when we first

8  applied I was president, but as we went through the

9  iterations, I'm not sure.

10 Q.    Okay.  Does that tell us who's -- what your position

11 was?

12 A.    Yes.

13 Q.    And you were?

14 A.    I think so.  I don't know the exact date I was removed

15 as president.  I don't remember.

16 Q.    And what is -- is -- 125, is that the state grant that

17 was awarded but not funded or is that one of the iterations

18 of the federal grant?

19 A.    No, this was the one -- initial one.  It was a state

20 grant.

21 Q.    Okay.  Now, what relationship did you have with -- or

22 did Mr. Maher's companies have with Progress Energy?

23 A.    I'm sure they supplied us electricity at one of the

24 locations.  Lakeland -- would have been, of course,

25 Lakeland.

1  Q.    Okay.  Let me take you to 126 and I want to start out

2  with the -- there is an e-mail at the bottom from Tammy

3  Steen to Ed Neal, Deborah Ferro, and Robin West.  And is she

4  identifying a problem there?

5  A.    Yes.  We are not paying some of the bills promptly.

6  Q.    And that caused the power to be shut off?

7  A.    Yes.

8  Q.    And when it references to "this affects the grease area

9  and the center bay where the grease equipment is kept," does

10 that have to do with Lakeland or Groveland or can you tell?

11 A.    That's got to be Groveland.

12 Q.    Because of the grease collection?

13 A.    Yes.

14 Q.    And does Ms. Ferro take some action in response to

15 this?

16 A.    Yes, get some of the bills paid.

17 Q.    How did she get the bills paid?

18 A.    Had to request the money from Lee.

19 Q.    Now, let me ask you, the two businesses, Groveland and

20 Lakeland, were they ever spinning off a lot of cash flow?

21 A.    No.  Mainly the grease sales covered our payroll and

22 the purchase of some glycerin.

23 Q.    Okay.  When funding came up short, how did y'all keep

24 going?

25 A.    We'd have to get a release of funds from Lee.

1  Q.   How frequently did that happen?

2  A.   More than I'd like to remember, but I don't know the

3  exact frequency.

4  Q.   Okay.  And did you end up making a response to Deborah

5  Ferro's comments about having to use the credit cards

6  because the bills had been shut off?

7  A.   Yes.

8  Q.   And what was your response?

9  A.   That we needed more money and that I had actually spent

10  some of my own at one time, a small amount, which I

11  obviously got reimbursed for.

12  Q.   How did you decide which bills to pay?

13  A.   What it took to keep the grease operation going would

14  be the number one and keep the doors open.

15  Q.   Okay.  So you paid what you had to?

16  A.   Yes.

17  Q.   Now, is that just something you were saying or is that

18  actually the truth?

19  A.   No, that's exactly what we'd do.

20  Q.   I think on the same day there is a series of e-mails,

21  which are Government's 127, and I think you get involved

22  in -- first, there's some communications with you about

23  checks that came in.  Are these checks that -- were they

24  checks y'all had to pay or were these checks y'all were

25  receiving?

1  A.   The Slim's Properties was the name of our landlord in

2  Groveland, so those would have been paid out.  The 15K in

3  the one above it is checks we got for the grease from our

4  broker that was selling it for us.

5  Q.   And when you are talking about the difference is about

6  8.6K, that's the difference between what and what?

7  A.   The difference between what we got in and had to pay.

8  The shortfall had to be made up by Mr. Maher.

9  Q.   Okay.  And at the top, Deborah Ferro's response to you

10 is -- what exactly did she say to you?

11 A.   "Why haven't you raised money?" by saying, "Larry,

12 where is the funding?"

13 Q.   Okay.  Were you trying to raise money?

14 A.   Yes.

15 Q.   Were you being successful?

16 A.   No.

17 Q.   Were you happy about it?

18 A.   No.

19 Q.   Was anybody else?

20 A.   No.  No one was happy.

21 Q.   And also on the same day, Government's 128, what's the

22 blunt question that Deborah Ferro asks you?

23 A.   "Why don't you close the company?" was her comment.

24 Q.   And your response was what?

25 A.   A company that's operating is worth a lot more money

1    than a company that isn't operating basically is what I

2    said.

3    Q.    And what's this about producing fuel at Groveland?

4    A.    We would occasionally produce fuel at that time --

5    Q.    To show --

6    A.    What?

7    Q.    To show it could be done?

8    A.    Yes.

9    Q.    And her response to your response?

10   A.    I'd given a list of potential investors to her and --

11   Q.    Who's Donnie?

12   A.    Donnie Wallace was the, I believe, director of

13   operations for the PGA and was known through a gentleman

14   named Brian Thompson, I believe, and there was a gentleman

15   in Louisiana that we flew out to see to try and raise $10

16   million and were unsuccessful.

17   Q.    Speaking of Brian Thompson, is he also mentioned in an

18   e-mail chain, Government's 129, on March the 3rd of 2009?

19   A.    Yes.

20   Q.    What was going -- had -- those talks about taking him

21   off the payroll, had he been on the payroll?

22   A.    Yes, he had been put on the payroll of Clean Fuel for a

23   short period of time.

24   Q.    And what was he supposed to be doing?

25   A.    He was supposed to be raising funds from many of the

1    contacts he had in the sports world.

2    Q.   And how did he get those contacts?

3    A.   When he first moved to Orlando, his roommate was a

4    gentleman named J. J. Redick, I believe, who played for the

5    Orlando Magic, and he met a lot of very famous and important

6    people because of that.

7    Q.   And was Mr. Thompson able to get funds through those

8    people?

9    A.   Not short term.  Later on, I know he did raise some

10   substantial amounts of money.

11   Q.   Okay.  According to Ms. Ferro, was getting Thompson off

12   the payroll going to be enough to turn things around?

13   A.   No.

14   Q.   Again, same day, March the 3rd, in Government's 130,

15   did Ms. Ferro address you about the writing of checks?

16   A.   Reminded me I had no check-writing capability.

17   Q.   And who did have the authority to -- who could

18   authorize checks for Clean Fuel?

19   A.   Mr. Maher.

20   Q.   And there's a reference there to a Florida Biodiesel

21   check.  Was there a check written that met with disapproval?

22   A.   I'm sure, but I don't remember the specifics.

23   Q.   Okay.  Who was Florida biodiesel?  Were they somebody

24   you bought from or sold to?

25   A.   They are people that had bought some limited amounts of

1    fuel from us, I believe.

2    Q.   I'm still on March the 3rd with Government's 131.  I'm

3    not sure whether it's a response to one of these previous

4    e-mails.  Were there discussions of what you were doing in

5    order to try to raise funds?

6    A.   Yes.

7    Q.   And this first one, was Mark Mareno a potential

8    investor or a connection to an investor, or what was he?

9    A.   He was the gentleman that was in Louisiana, happened to

10   be in Miami, and I went down and met him with Donnie

11   Wallace, and that lead to the trip to Louisiana with

12   Mr. Maher to attempt to get $10 million.

13   Q.   Okay.  And this David Albaugh, was that somebody you

14   actually talked to?

15   A.   I never got to talk to him directly.  I was talking to

16   some of his intermediaries, and he was a wealthy person.  He

17   happened to be in Florida, and I offered to go down to Marco

18   Island, but never did get to meet him.

19   Q.   And something about a wind turbine investor from

20   Iowa -- Nebraska or Iowa?

21   A.   Right.  And nothing came of that either.

22   Q.   Now, in the bottom of this, there's reference to what

23   it takes to keep this place open and to buy Lakeland from

24   WEA.

25   A.   Uh-huh.

1  Q.   What's Lakeland?

2  A.   That's the Lakeland operation, which we eventually buy

3  in April of 2009.

4  Q.   And WEA?

5  A.   World Energy Associates, I believe -- no, World Energy

6  Alternatives I believe was the official name.

7  Q.   And is Ms. Ferro impressed with your idea of buying

8  another biodiesel plant?

9  A.   No.

10  Q.   And is this your response to her:  Include, first of

11  all, cash flow problems at Groveland?

12  A.   Yep, exactly.

13  Q.   And is Ms. Ferro satisfied with your response?

14  A.   No.

15  Q.   Now, that's a fairly rough set of interchanges between

16  yourself and Ms. Ferro?

17  A.   Right.

18  Q.   Did Ms. Ferro seem to be in communication with

19  Mr. Maher?

20  A.   Daily, they were.

21  Q.   Did you -- did Mr. Maher -- was he somebody you'd think

22  of as a confrontational individual?

23  A.   No, he did not like confrontation.

24  Q.   So in the course of running these businesses, were

25  there occasions when people were hired -- I mean, when

1  people were fired?

2  A.   Yes.

3  Q.   And would he do that himself?

4  A.   Generally not.

5  Q.   And the occasion when your pay was cut in half or more,

6  did he do that himself?

7  A.   It was a joint effort with a gentleman named

8  Dower Drummond who wanted me out, and because we were in the

9  middle of securing the grant, Lee changed me to a consultant

10 that same day at much less pay.

11 Q.   So Mr. Drummond tried to fire you?

12 A.   Yeah, he was intimately involved in that process.

13 Q.   Okay.  Did the -- now, you weren't around when

14 Mr. Maher bought Groveland?

15 A.   No.  It was bought prior to me.

16 Q.   Did Mr. Maher indicate to you how much he had invested

17 in Groveland?

18 A.   Approximately $3.5 million.

19 Q.   You've been to the plant there?

20 A.   I've been there before, yes.

21 Q.   Was what was on site worth $3.5 million?

22 A.   No.

23 Q.   $2.5 million?

24 A.   No.

25 Q.   A million five?

1   A.   No.

2   Q.   A million?

3   A.   At best, a half million in my judgment.

4   Q.   Did you go forward with the efforts to purchase the

5   World Energy plant in Lakeland?

6   A.   Yes.

7   Q.   Okay.  And I'm looking at Government's Exhibit 132.

8   The bottom part starts with a fella named Leigh Williams.

9   Did you know Leigh Williams?

10   A.   It was a lady, but, yes, I knew Leigh.

11   Q.   And what relation did she have to Mr. Maher?

12   A.   She was with Stump Dietrich and a lawyer that he used

13   quite frequently.

14   Q.   Okay.  So it starts with something that she sends.

15       The next e-mail is the revised draft of the asset

16   purchase agreement.  Would that have been Lakeland?

17   A.   Yes.

18       And, Mr. Simpson, may I mention that we tried to buy

19   them actually in 2008, and it didn't get consummated, and we

20   came back again in 2009 and actually did buy the plant in

21   the spring, but this is the actual purchase effort.

22   Q.   And later in this, there's an e-mail from Deb Ferro

23   again -- actually from Leigh Williams to Deb Ferro and

24   Lee Maher.  And is there some caution expressed there?

25   A.   Yes.

1  Q.   What does she say?

2  A.   She's saying she didn't want him to sign personally,

3  but it was the only way we could close the deal.

4  Q.   And what did -- I'm sorry.  What did Deb Ferro think of

5  the idea?

6  A.   She did not like it.

7  Q.   That's an e-mail that you were copied with from Deb

8  Ferro to Lee Maher?

9  A.   Uh-huh.

10          THE COURT:  You need to answer out loud, sir.

11          THE WITNESS:  I'm sorry?

12          THE COURT:  The court reporter can't take down

13  uh-huh.  So if you'll answer --

14          THE WITNESS:  Okay.

15          THE COURT:  -- out loud.  No, you need to answer

16  yes or no not uh-huh.

17          THE WITNESS:  Okay.  Sorry.

18          THE COURT:  Is that a "yes"?

19          THE WITNESS:  Yes.

20          THE COURT:  Okay.  Thank you.

21  BY MR. SIMPSON:

22  Q.   And one of the things she's cautioning about is

23  Mr. Maher's personal guarantee?

24  A.   Yes.  There was a reason for that.

25  Q.   Okay.  What's the reason for that?

1  A.   The reason was that we originally were going to pay

2  cash for approximately $5 million, and then I was instructed

3  that we wanted to pay over time and to raise the price, and

4  it got raised to 7 million and something above that slightly

5  to --

6  Q.   You say you were instructed.  Who instructed you?

7  A.   Mr. Maher, that we weren't going to pay the 5 million

8  up front, but we were going to pay 7 million spread over a

9  year or slightly more.

10  Q.   So where does that lead to the personal guarantee?

11  A.   That they were not happy with a guarantee, with us

12  owning the plant and operating it, so they asked for that,

13  and Lee agreed to it.

14  Q.   And did the Lakeland plant operate under the same

15  corporate shell as Groveland or a different corporation?

16  A.   It was the Clean Fuel companies, and whether they filed

17  separate taxes, I'm not sure because I had no financial

18  responsibility then.

19  Q.   Okay.

20      And these handwritten comments, are those -- who wrote

21  those?

22  A.   Me, that's my writing.

23  Q.   And there's something about "I lose a job if we don't

24  get the money."  That is if the plant is not successful or

25  something else?

1  A.   I suspected that I was going to lose my job at that

2  point.

3  Q.   And you say something about we don't do Penn -- was

4  that --

5  A.   Go ahead.  I'm sorry

6  Q.   That refers to what?

7  A.   That refers to the Pennsylvania plant was still in

8  play.

9  Q.   Okay.  And when you talk about the same team that was

10 there, the same team that was where?

11 A.   That ran Purada for World Energy was a gentleman named

12 Mitch Bishop, and his whole team would work for us, and they

13 knew how to run the plant.

14 Q.   Okay.  You could take over, if not quite a working

15 operation, the people that knew how to work it?

16 A.   Yes.

17 Q.   And in August of '09, there's communications first from

18 you to Ferro and Lee Maher, a copy to Don Sproat.

19      Who was Don Sproat?

20 A.   He was our CFO at the time.

21 Q.   And the subject is about an appraisal from Frazier

22 Barnes.

23      What was Frazier Barnes?

24 A.   They were a consulting company that specialized in the

25 biodiesel and ethanol world.

1  Q.   What were you bringing to people's attention about

2  Fairbanks Morse -- I mean, I'm sorry, about Frazier Barnes?

3  A.   Frazier Barnes was owed money, and we had wanted to

4  have them redo the appraisal at a higher level, and we had

5  to pay them some money before they would release and do the

6  second appraisal.

7  Q.   When you say "at a higher level," what does that mean?

8  A.   Because we were looking at Fairbanks Morse and some

9  other things to improve the plant and running at higher

10 levels of production, that they would increase their -- they

11 didn't guarantee it, but we asked for a higher valuation.

12 Q.   Do their numbers seem to have a connection to how much

13 money you were paying?

14 A.   I'm sure there was a correlation.

15 Q.   And would that be a follow-up, still trying to get some

16 money for Frazier Barnes?

17 A.   Yes.

18      THE COURT:  Mr. Simpson, why don't we do this.

19 It's been about an hour and 45 minutes.  We are going do

20 take our last afternoon break.  We'll go to approximately

21 six o'clock this evening.

22      I thank you for your patience.  Please leave your

23 notes in your chair and knock on the door when you are ready

24 to come back in.  Thank you.

25      (Jury out at 4:29 p.m.)

1          THE COURT:  Y'all can take your seats.

2          Mr. Simpson, I'm not asking you this question,

3   I'll never be asking Mr. Phillips this question, to hurry

4   anyone along.  I'm just trying to find out for planning

5   purposes.  How long do you believe, ballpark -- and there is

6   no buzzer.  I'm not going to hit a gong.  But what's your

7   best guess as to how long you need with this witness?

8          MR. SIMPSON:  Your Honor, on direct, I'm hoping to

9   be finish between 11:00, 12:00 tomorrow morning.

10          THE COURT:  Okay.  And, Mr. Phillips, are you or

11  Mr. Sands doing the cross-examination?

12          MR. PHILLIPS:  I'll be handling this witness,

13  Your Honor.

14          If we run until 6:00 tomorrow night, I don't think

15  I'll be finished, to be brutally honest, because I have

16  impeachment issues that are not necessarily the scope of

17  direct and stuff, by I also have to cover the direct.  So I

18  think we are going to be here awhile.

19          THE COURT:  Okay.  And of the remaining 20 -- I'm

20  sorry -- 18 witnesses, Mr. Simpson, how many do you think

21  you can get through on Friday and, say, three-quarters of

22  Thursday?

23          MR. SIMPSON:  I don't think I'm being overly

24  optimistic in thinking we still have a good shot of

25  finishing the government's case on Friday.

1          THE COURT:  All right.  And I'm asking, obviously,

2     to also let the defense know that you need to have your

3     witnesses here on Monday.

4          MR. PHILLIPS:  Not a problem at all, Your Honor.

5     I agree with Mr. Simpson.  I think the next series of

6     witnesses will be more frequent and materially shorter both

7     in direct and cross.

8          THE COURT:  All right.  Well, I can tell you both

9     I'm going to sustain my own objections to cumulative because

10    at some point if either one of you -- there's -- I mean, you

11    can't replow the same field over and over.  So certainly

12    folks that have direct knowledge of something can be asked

13    it, but -- the first two witnesses are going to place most

14    of the stuff in context, and so the balance of the witnesses

15    should be more targeted and should be called and crossed for

16    specific reasons and -- but neither one of you have done

17    anything to suggest that you don't understand that or won't

18    do that that way, but -- so I just -- again, I want to kind

19    of know where we are at so everybody is on the same page.

20         All right.  We'll take a 10-minute break.  We'll

21    come back at quarter of 5:00.

22      (Recess taken at 4:32 p.m.)

23         THE COURT:  Mr. Simpson, the jury is ready.  Do

24    you need a minute?

25         MR. SIMPSON:  No.  We are good, Your Honor.

1    THE COURT:  Mr. Phillips?

2    MR. PHILLIPS:  We are, Your Honor.

3    All right.  Let's bring in the jury.

4    (Jury in at 4:44 p.m.)

5    THE COURT:  Everyone can take your seats.

6    Ladies and gentlemen of the jury, just to give you

7  an update, we'll go to about six o'clock tonight, although

8  I'm going to give Mr. Simpson some flexibility.  If he

9  finishes with a topic at 5:50, you can certainly,

10  Mr. Simpson, let us know.  He'll then finish with this

11  witness tomorrow morning.  Mr. Phillips then anticipates a

12  lengthy cross.  Our best guess is we'll spend tomorrow with

13  Mr. Long on the stand.  The government then anticipates

14  calling a series of witnesses that will be brief witnesses.

15  I shouldn't say "brief witnesses."  Shorter witnesses in

16  terms of the duration of their testimony on Thursday and

17  Friday.

18    There is no guarantee, but the best guess is the

19  government will put on the bulk of their witnesses by the

20  close of business on Friday.  So that's sort of where we

21  believe we are at in terms of scheduling purpose.

22    I'll remind you, because I won't keep you when

23  Mr. Simpson is done this evening, you must not discuss this

24  case with anyone when you go home other than for scheduling

25  purposes.  When you return tomorrow, please avoid talking to

1    anyone, except courthouse personnel, so you don't speak with

2    a witness; and again, you must not discuss this case with

3    each other until the very end of the case.  You'll leave

4    your notes in your chair when you leave this evening, if

5    you've taken any, and they'll be back tomorrow.

6           If at any point I don't mention this before we run

7    out of something in the jury room, we try to -- I don't.  I

8    shouldn't say "we" because I don't do it.  Our dedicated

9    staff checks to make sure that you don't run out of

10   supplies.  If you run out of supplies in the jury room,

11   please just let one of the court security officers know and

12   they will bring it to our attention and we'll get somebody

13   to take care of that.  So we thank you for your patience.

14          Mr. Long, you are still under oath.

15          Mr. Simpson, you may proceed.

16   BY MR. SIMPSON:

17   Q.   Mr. Long, I'm underlining something on the screen.  I'm

18   trying to draw your attention to it and I'd like you to read

19   it out loud because I can tell you that the jurors trying to

20   read on the screen don't always -- it's not always clear.

21   A.   Okay.

22   Q.   So if I'm asking you what it says, tell us what it says

23   and give us word for word.

24   A.   Okay.

25   Q.   Government's 134 appears to be an e-mail from yourself

1   to Don Wood on September the 1st of '09.  Who was Don Wood?

2   A.   Don Wood was a consultant that we hired who knew

3   Mr. Maher from before, a very bright young guy, and he

4   helped write a lot of the grants.  We probably did 8 or 10

5   efforts.

6   Q.   Okay.  And also copied with it appears to be an M.

7   Bishop.  Who would that be?

8   A.   That was Mitch Bishop, the plant manager.

9   Q.   And Louis Altic?

10  A.   Chief engineer.

11  Q.   At Lakeland?

12  A.   Yeah, at Lakeland.  Both at Lakeland.

13  Q.   And also Mr. Maher?

14  A.   Yes.

15  Q.   Let me ask you:  When you sent e-mails to Lee Maher,

16  was there anybody else that -- you know, was this a secret

17  way to send them to somebody beside Mr. Maher?

18  A.   No.

19  Q.   If you addressed them to Lee Maher, whose computer did

20  you expect them to pop up on?

21  A.   Lee's.

22  Q.   And what was the subject of this e-mail?

23  A.   Florida grant plan for immediate 2.5 million, exactly

24  2,496,331, payout for Lakeland.

25  Q.   And would Mr. Wood have been involved in trying to

1  draft that grant plan?

2  A.   Yes.

3  Q.   Okay.  What's the first thing you suggest to Mr. Wood?

4  A.   Yes.  There were rules and guidelines about efficiency

5  and other things, so I told the team:

6      Mitch and Lucas, Lakeland will pick $2.7 million of

7  total asset list as efficiency improvements.  Mitch or

8  Lucas, be creative.

9  Q.   Okay.  Was this new stuff that was going to be put in

10 or stuff that was put in particularly for efficiency or is

11 this just going down the schedule and trying to find

12 something?

13 A.   Very little of it was new.  It was to pick things,

14 though, that did have to do with efficiency to fit the

15 guidelines of the grant.

16 Q.   Well, were you expecting them to be conservative in

17 what they found to be energy efficiency improvements?

18 A.   No.  Be creative meant be aggressive.  Go high, if

19 anything.

20 Q.   And would the other items be other things that could be

21 attributed to the grant?

22 A.   Yes.  All of those items were important and I wanted to

23 give them some guidance on what to do.

24 Q.   And what was the goal of this effort?

25 A.   To show we spent 2.7 million already and another equal

1  amount to be spent in the next 30 days, i.e. the cogen

2  system, so we get all the money by the end of September,

3  everything by the end of day September 3rd.

4  Q.   Now, you said cogen.  Are you talking - is that the

5  Fairbanks Morse?

6  A.   Yes.

7  Q.   Now, you are in '09 here, though.  This is before the

8  grant has actually been achieved.

9  A.   You know, you are right.  I misspoke.  Although we were

10 talking shortly after this about the cogen, but this

11 isn't -- this was just other things we had to spend money

12 on.  I apologize.

13 Q.   Okay.  So 2.7 already spent and an equal amount in the

14 next 30 days, is that matching funds and funds to be

15 reimbursed?

16 A.   Yes.

17 Q.   Okay.

18 A.   But it wasn't the Fairbanks Morse.

19 Q.   And in Government's 135 on September the 8th, again

20 you're communicating with Don Sproat, Lee Maher, and Deborah

21 Ferro, and Dower.

22 A.   Dower.  That was a -- you pronounce the W as a V.

23 Q.   Okay.  And this has to do with Frazier Barnes again?

24 A.   Absolutely, yes.

25 Q.   And Pete Moss was who?

1  A.    Pete Moss was the president of Frazier Barnes.

2  Q.    Okay.  What does Pete Moss want you to do?

3  A.    Clean Fuel sends 7.5 thousand the 9th or 10th of the

4  month.

5  Q.    And what is Frazier Barnes going to do?

6  A.    Frazier Barnes releases the draft upon receipt of the

7  money.

8  Q.    There's some history in here.  In particular, what's

9  this line 2 down here?

10  A.    Number 2:  In July '09 negotiated a new, larger

11  valuation for Lakeland for 18,000K, plus travel.  I had to

12  increase the offering to them by that amount of money.

13  Q.    And that resulted in a larger valuation?

14  A.    Yes.  No guarantees on the amount or size, but the

15  objective was to get them to be more aggressive.

16  Q.    Let me ask you, though, if you were on the other side

17  of the transaction and you knew that the amount of the

18  valuation depended on how much was paid for it, would that

19  cause you to be a little cautious about accepting that

20  valuation?

21  A.    Yes, it should have.

22  Q.    Okay.  136 actually starts on the previous page with a

23  request from you to Don Sproat on October the 11th.  What

24  are you asking for?

25  A.    We are asking for reliable numbers that we can use to

1  raise for funding.  There have been a lot of inner company

2  transfers and less than good bookkeeping under Mr. Neal, and

3  it was an effort.  And the new CFO, Don Sproat, was trying

4  to get GAAP numbers for us.

5  Q.    GAAP meaning?

6  A.    Generally accepted accounting principles.

7  Q.    Numbers that a CPA would produce?

8  A.    Yes.

9  Q.    And what is Mr. Sproat's response?  In particular, what

10  did he respond about the ability to come up with good

11  numbers?

12  A.    You don't want me to read the whole --

13  Q.    Yeah.

14  A.    Okay.  "Larry, as we told you last week, the 2000

15  numbers in accounting is so far off for Clean Fuel,

16  Clean Fuel Lakeland, and Silver Bullet as to be unable to be

17  estimated.  A guess by us could easily be off a million or

18  two.  As you know, months of transactions are missing from

19  the accounting system and must be rebuilt.  What is in the

20  system is not necessarily reliable.  The transactions are

21  mixed together although there are three legal entities.  A

22  single bank account was used for all companies,

23  unbelievable, so all cash transactions are mixed together as

24  well.  It will easily take several weeks or more to untangle

25  this mess."

1    Q.    What was Silver Bullet?

2    A.    Silver Bullet was a company -- was the marketing arm of

3    the biodiesel company when they bought Groveland originally.

4    They had a brand called Silver Bullet and money -- some

5    money transferred through that.

6    Q.    Okay.  And one of the people listed on this e-mail is

7    an Amber Karkouskas?

8    A.    Uh-huh.

9    Q.    Who was she?

10   A.    She was the chief accountant under the CFO, Don Sproat.

11   Q.    And your response to Mr. Sproat has to do with several

12   items.  The first is RBC.  What was RBC?

13   A.    Royal Bank of Canada.  They were doing a fundraising

14   effort for us.  We signed up for 60 or $70,000 worth at

15   10,000 a month for an extended period.

16   Q.    Were y'all current with your bills with RBC?

17   A.    No.

18   Q.    When you refer to Ed and his team Mastered Benign

19   Neglect, who is that Ed?

20   A.    That was that Ed Neal.

21   Q.    I'm sorry.  What position had Ed Neal been in?

22   A.    Well, he was acting as CFO, but I don't think he was an

23   accountant.  He was part of the original teams that bought

24   Groveland.  That was an effort on my part to be humorous,

25   but they didn't do anything.

1  Q.   And 137 appears to be a communication between yourself

2  and Mr. Maher on the 23rd of December of '09.  What are

3  you -- what are you doing through here generally?

4  A.   Excuse me for a minute.

5  Q.   Are these topics for discussions?  Are these things

6  you've already talked with him about?  What's --

7  A.   Some of it is from previous discussions.  Some is being

8  more precise at this time and then requesting future action

9  with help from people that work mainly for Solar Blue.

10 Q.   Okay.  Would that include Brian and Syed for the genset

11 package?

12 A.   Yes.

13 Q.   When you say "final numbers," is this for the

14 Fairbanks Morse package or for some other packages?

15 A.   That was a different set looking at the dates.  Yes,

16 that was prior to Fairbanks Morse.

17 Q.   And you refer to needing support from Sproat, Knight,

18 Kinney, Jafri?  Who was directing them not to support you?

19 A.   It was a request to make sure that they gave me

20 priority so we could get this done so -- and they all did

21 not work for me.  They worked for either Solar Blue or Lee

22 directly.

23 Q.   And when you get down to the bottom, what's this last

24 comment?

25 A.   We wanted to buy two smaller gensets from Cummins

1  Engine Company to qualify for the 1603 ITC, which is if we

2  ordered the two gensets for 2009, ITC estimated 55,000, we

3  will have to pay 30 percent or more before Friday.

4  Q.   That's to get them in the calendar year?

5  A.   Yes, because they had to to qualify, and I was

6  requesting the black Amex card from Lee.

7  Q.   Mr. Maher's card?

8  A.   Yes.

9  Q.   And ITC would be what?

10 A.   Investment tax credit.  And then the subset of that was

11 the 1603 that had the 30 percent special enhancement.

12 Q.   I don't have my documents in quite the order that I'd

13 like to, but you did tell us earlier that in '09 the

14 Lakeland purchase was complete?

15 A.   Yes, in April of '09, we completed the purchase.

16 Q.   And that involved some money down?

17 A.   500,000 down.

18 Q.   And money to be paid later?

19 A.   Yes.

20 Q.   Did the money get paid when it was supposed to be?

21 A.   No.

22 Q.   And did that cause problems?

23 A.   Yes, it did.

24 Q.   What kind of problems?

25 A.   Demanded the money, and we were unable to pay, and we

1    had to renegotiate with them, and I believe that --

2           THE COURT:  I'm sorry.  Yes, sir.

3           MR. PHILLIPS:  Your Honor, same objection about

4    the use of the plural pronoun "we" and "them."  It's vague.

5           THE WITNESS:  I'm sorry.

6    BY MR. SIMPSON:

7    Q.   Who was --

8    A.   It would be Lee and I, Mr. Maher and I.

9    Q.   Okay.  Who owned the plant at Clean Fuel Lakeland?

10   A.   It was a lease -- it was a -- approximately 15 year --

11   Q.   Who owned the company?  Who owned the production

12   assets?  Who owned Clean Fuel Lakeland?

13   A.   Oh, World Energy did -- well, sold it to us.

14   Q.   And sold it to -- what entity bought it?

15   A.   Clean Fuel Lakeland.

16   Q.   And who owned Clean Fuel Lakeland?

17   A.   Mr. Maher.

18   Q.   This guy?

19   A.   Right, yeah.

20   Q.   Okay.  So in terms of who was going to come up, were

21   you going to come up with the money to pay off the plant?

22   A.   No.  I had no money.

23   Q.   Who had signed the personal guarantee on it?

24   A.   Mr. Maher.

25   Q.   Okay.  And basically did y'all get a demand for

1  payment?

2  A.   Yes.

3  Q.   And did you prepare something in response that looks

4  like Government's 139?

5  A.   Yes, I did.

6  Q.   Now, first of all, it's dated April 20th of 2009.  Was

7  that actually when it was created?

8  A.   No, this document was requested in late July or August

9  by Mr. Maher.  He said, Larry, date something right after

10 the acquisition and dispute over $2 million worth of value.

11 Q.   And did --

12 A.   That's what I did.

13 Q.   And did Mr. Maher explain why you were generating this

14 document?

15 A.   To buy him time so that we could dispute the payment.

16 Q.   Was -- do you recall; was this created before or after

17 World Energy started making demands?

18 A.   It would have been after, and I'm not sure on the

19 timing whether Elbow River was involved at this point or

20 not.  I don't know.

21 Q.   Does Elbow River -- what's Elbow River's involvement?

22 A.   Elbow River was owed $21 million by World Energy that

23 we bought the plant from, and as part of that settlement,

24 World Energy gave them the note, guaranteed by Mr. Maher to

25 pay it.

1    Q.    Okay.  So Mr. Maher's debt to World Energy became a

2    debt to Elbow River?

3    A.    Yes.

4    Q.    Who is this Gene Gebolys?

5    A.    He's the president of World Energy.

6    Q.    And according to your letter dated April the 20th, what

7    was the general nature of the problems that you were having

8    with the plant?

9    A.    We have experienced a plethora of fraudulent actions,

10   safety and clean air violations with OSHA and EPA

11   implications that were not allowed for in the purchase

12   agreement, signed and funds transferred on April 15, 2009.

13   Q.    What kind of help were you asking for in regard to

14   those problems that you claimed had occurred?

15   A.    I wanted a price adjustment on the first payment that

16   was due on December 30th or 31st of the year.

17   Q.    And how much was that payment supposed to be?

18   A.    3.25 million.

19   Q.    And how much did you claim Clean Fuel Lakeland had been

20   injured by the various problems?

21   A.    2.529 million, and we were going to pursue a remedy to

22   these safety clean air and fraudulent transfer of asset

23   issues after the acquisition that has then caused us in

24   excess of 2.5 million in expense, not to mention the EPA and

25   OSHA risks.

1    Q.    Okay.  Was there anything to these claims?

2    A.    Generically, there were some small things, but it was

3    no more than one-tenth of what was claimed.

4    Q.    And whose idea was it that you write this letter?

5    A.    Mr. Maher's.

6    Q.    And did the letter go out?

7    A.    It did not go out on the date that's written on it.  It

8    went some time in July or August.  I don't remember the

9    exact date.

10   Q.    Would the letter going out appear to be what triggered

11   Government's 138?

12   A.    Yes, that's the response from World Energy, yes.

13   Q.    Does World Energy agree with your claims?

14   A.    Nope.

15   Q.    What do they say about them?

16   A.    These statements and the allegations are entirely false

17   and libelous.

18   Q.    Do they also point out specifically some problems with

19   the timing or the alleged timing of your complaints?

20   A.    Yes.  I did not complain to them verbally in the

21   interim.  This happened all several months later when we

22   sent -- actually sent the letter.  We never -- it was never

23   existed or was sent in April.

24   Q.    And, in fact, do they point out that Mr. Maher had

25   signed the personal guarantee after you supposedly had sent

1  the letter?

2  A.   Yes.

3  Q.   Now, eventually somewhere down the road, was there some

4  litigation between World Energy, Clean Fuel Lakeland, and

5  Mr. Maher -- or, excuse me, Elbow River and

6  Clean Fuel Lakeland?

7  A.   Yes, the litigation was with Elbow River.

8  Q.   Okay.  And in that litigation, were you asked to sign a

9  declaration which basically repeated what you had said in

10  the letter?

11  A.   Yes, I did.

12  Q.   You'd actually seen it getting ready for this trial?

13  A.   Yes.

14  Q.   A declaration that was filed in the U.S. District Court

15  in the Middle District of Florida?

16  A.   I perjured myself.

17  Q.   It was not true?

18  A.   Right.

19  Q.   Why did you sign that letter?

20  A.   To keep my job would be the main reason.

21  Q.   Who asked you to sign the letter -- or the declaration,

22  rather?

23  A.   Well, I'm sure it was Mr. Maher or Leigh Williams, one

24  of the two or both of them.

25  Q.   Did Mr. Maher know that the letter wasn't true?

1    A.    I'm sorry?

2    Q.    Did Mr. Maher know that the declaration wasn't true?

3    That the claims made in the declaration --

4    A.    Yes, he had to.

5    Q.    Okay.  Tell us a little about your -- did you ever get

6    charged with perjury in the Middle District?

7    A.    No, and I believe the statute of limitations has

8    expired.

9    Q.    Do you understand there's no statute of limitations

10   problem if you tell any lies in here?

11   A.    I understand that.

12   Q.    Did you have a system when you were preparing to meet

13   with Mr. Maher of organizing your thoughts so that you'd be

14   sure to cover everything you meant to?

15   A.    Yes, I always came with usually a handwritten agenda.

16   Q.    And would what has been admitted as Government's

17   Exhibit 140 be one of those agendas?

18   A.    Yes.

19   Q.    Okay.  Does it indicate a meeting on a particular day?

20   A.    January 27.

21   Q.    Of?

22   A.    2010.

23   Q.    Why does Mr. Maher's name appear in the right-hand

24   corner?

25   A.    I would usually bring two or three copies, one with his

1    name on it and one with mine, to keep notes and then leave

2    him one, if he wished.  Sometimes he kept them and other

3    times he didn't.

4    Q.   And on the second page of 140, what's the first item on

5    the second page?  I think it's Roman Numeral III.

6    A.   Florida grant.

7    Q.   Now we're in the stage of the federally funded Florida

8    grant?

9    A.   Yes, we know that they're going to be supplying the

10   money.

11   Q.   Okay.

12        And you say the keys are -- what are the keys you see?

13   A.   Prior to April 15, we need to get this done.  Budget

14   numbers and matching need to be included.  We use the

15   3.2-megawatt as backup and the Tallahassee lawyer and grant

16   wizard -- there was some consulting group that we hired

17   temporarily to help us.

18   Q.   And the next item down is loan guarantee.  What's that

19   about?  Were y'all attempting to get a loan guarantee?

20   A.   Yes, we were, but I don't remember the particulars of

21   this one at all.

22   Q.   Okay.  And then at maybe Roman Numeral V, 3.2-megawatt

23   package, does this relate to what eventually becomes a

24   Fairbanks Morse?

25   A.   Yes.  We had just bought the two small ones, and then

1  this is the big project that we were going to do mid year.

2  Q.   So at this point, it's not an essential component of

3  the Florida grant; it's for some other purposes?

4  A.   We thought it was a good idea to save money on natural

5  gas, our electric bills, make money on electricity we were

6  going to sell and be available for 1603.

7  Q.   Okay.  You get the tax credit.  You quit paying

8  electricity.  You start selling electricity.  And, I'm

9  sorry, you save money on natural gas?  How's that?

10  A.   Well, we were going to use biodiesel, which, you know,

11  we had at our cost, rather than natural gas, and we also

12  would have the amount of natural gas needed because we were

13  using the exhaust heat to produce more electricity from the

14  engine.  So it went from 35 percent efficient to 75 percent

15  efficient.  So we doubled the output using the same amount

16  of fuel.

17  Q.   And would that then relate to your e-mail, which is

18  Government's Exhibit No. 141, sent on January 28th to James

19  Atkinson and Aixa Crespo?  Who are they?

20  A.   James Atkinson was an employee for a short period of

21  time with Solar Blue.  I don't know much about him.  Aixa

22  was a secretary to Lee for a period of time also.

23  Q.   Okay.  Copying Mr. Maher.  And what exactly are you

24  asking for?

25  A.   I need drawings of the plant and the layout for the

1   3.2-megawatt for the cogen application at Lakeland,

2   additional CHP, which is combined heat power, another name

3   for cogen, and strategic advice as soon as possible.

4   Q.   I'm sorry.  Syed was what?

5   A.   Syed Jafri was our CTO, and he's a brilliant engineer.

6   Q.   Chief technical officer?

7   A.   What?

8   Q.   CTO, chief technical officer?

9   A.   Yes.  At Solar Blue we didn't have a CTO.

10  Q.   And when you addressed Mr. Maher on May the 11th of

11  2010 as shown in Government's 142, what -- you start by

12  wanting to amend your e-mail.  What are you amending?

13  A.   That we are not going to meet the time schedules I put

14  in originally, that I thought we could get things done

15  quicker, and we weren't meeting our time frame.

16  Q.   And this relates to what project?

17  A.   It's the Florida grant.  We are going after it again,

18  second time.

19  Q.   Now, you talk about some generators in here.  What do

20  you say and what generators are you talking about?

21  A.   These are the Cummins -- the two Cummins engine ones we

22  bought and didn't pay for at that time that we bought at the

23  very end of the previous year for 1603 and to show that we

24  were making electricities and we had to run them.  You

25  couldn't just turn them in and say they were there.  You had

1  to actually run them.

2  Q.   And I'm sorry.  Did you say you did or didn't pay for

3  them at that time?

4  A.   They were not paid for at that time.  Eventually maybe

5  10 or 20,000 of the 70 total was paid.

6  Q.   Now, how did -- did you have a prior connection with

7  Cummins?

8  A.   Yes.  I'd been with Cummins for 15 years and they sent

9  me to grad school on a fellowship and the gentleman who sold

10  those to me was my boss.  It was a 40-year relationship

11  which suffered greatly when we didn't pay them.

12  Q.   Did Government's 143 relate to another interaction with

13  Mr. Maher on May the 17th of 2010?

14  A.   Yes.

15  Q.   Okay.  Was this an agenda or is this just a note?

16  A.   Can you move it up a little bit, please?  I think this

17  was more of a note and particularly talking about a document

18  that I had sent him --

19  Q.   Okay.

20  A.   -- on things that he needed to look at and review.

21  Q.   Do you recall what the signed contract, 9 pages, and

22  25-page attachment is?

23  A.   I'm pretty sure that had to refer to the filing we were

24  doing for the grant on the second time.

25  Q.   And the closing statement?

1  A.   The specifics I don't remember, but it was -- by then

2  it was to meet the DOE needs.

3  Q.   I take it from the fact that so much of this is

4  handwritten you are not handy with a keyboard?

5  A.   I was not very handy at all then.  I'm somewhat better

6  now, but I was pretty bad.

7  Q.   And on May the 21st of 2010 a memo from you to

8  Mr. Maher?

9  A.   Yes.

10  Q.   And the subject of the memo is?

11  A.   The cash forecast and the key dates on major

12  initiatives, and this was trying to get the 2.5 million as

13  soon as possible.

14  Q.   So is there a section where you talk about grant

15  reimbursements?

16  A.   Yes.

17  Q.   What did you say?

18  A.   I said:  June goal 2.25.  We could get 90 percent at

19  the time of closing and get the final 10 percent when you

20  actually close.

21       And those were the documents, pretty lengthy most of

22  them, a lot of lists of equipment, 70 pages total.

23  Q.   Okay.  Are these documents that you're actually sending

24  to Mr. Maher with this memo?

25  A.   In this case, yes.  I don't know if all the documents

1  of the full 70 or maybe just the first 30 or 40.  I'm not

2  sure.

3  Q.   Okay.  In particular, do you know whether the

4  Attachment B, payment request, was included?

5  A.   I'm quite sure that had to be included.

6  Q.   And skipping ahead to 145, would this have to do with

7  the meeting with Lee Maher on or about May 24th of 2010?

8  A.   Yes.

9  Q.   And the -- what is the first item on the agenda?

10  A.   Florida contract, again, modifications, and new

11  reimbursement reports and forms, and Thursday, I had to

12  walk -- it was then called the EOG, Energy Office of the

13  Governor.  It was not under the current head of the Ag

14  Department.

15  Q.   So you are actually going to hand-deliver it?

16  A.   Yeah, go up to Tallahassee and go through it with them.

17  Q.   Okay.  Now, you use the word "reimbursement."  What

18  does "reimbursement" mean to you?

19  A.   That you've invested the money and you get paid back

20  afterwards.

21  Q.   And then there is an e-mail from yourself to Mr. Maher

22  on May the 25th, Government's 146.  The first thing is about

23  Syed and anxiety-related heart issues.  Did Mr. Jafri have

24  some --

25  A.   Yes, he had something.  I don't know whether it was

1    anxiety or serious, but he had some issues and went into the

2    hospital.  We are hoping that he could be treated easily.

3    He was a brilliant guy and we had a meeting scheduled at the

4    City of Lakeland on the private power agreement -- power

5    purchase agreement is what a PPA is.

6    Q.    Okay.  And what's this about a 1.5-megawatt generator

7    for Fenway Park?

8    A.    We also -- Mr. Maher had a contract at Solar Blue with

9    Fenway Park to provide solar panels, wind turbines, and

10   another cogen generator set, but smaller because Fenway Park

11   is not a big plant and we were going to use one there also.

12   Q.    Was that the only stadium deal Mr. Maher was involved

13   in?

14   A.    No, there were multiple.  We had a contract with the

15   Philadelphia Eagles for a larger generator than that and

16   again solar panels and wind turbines.

17   Q.    Now, did any of those projects actually work out?  Did

18   y'all actually end up installing solar panels and wind

19   turbines and so on at any of these stadiums?

20   A.    Unfortunately not.

21   Q.    And there's a reference to Eagle Biodiesel.  Why don't

22   you read through it.  What does it say under No. 4 there?

23   A.    Also send a nonbinding letter today signed by you,

24   me -- In this case, I think I actually probably signed it

25   for Lee, but I don't know for sure -- to Eagle Biodiesel for

1    a 350,000 line of credit so they can get another 150,000

2    grant from the state of Pennsylvania.  And we are going to

3    sell them fuel and Pennsylvania had a very special system

4    where they were incenting companies to sell biodiesel.

5    Q.    So a line of credit from y'all was helpful for them?

6    A.    Yes.

7    Q.    And helping them helped y'all?

8    A.    Yes.  It was reciprocity.

9    Q.    Okay.  And this part signed by you, paren, me, were you

10   signing Mr. Maher's name?

11   A.    Probably.

12   Q.    Let me ask, were there other occasions where you signed

13   Mr. Maher's name or put down his initials?

14   A.    Yes.  In the beginning on smaller accounts, I did sign

15   some of them.  Later on when I wasn't an employee anymore

16   and they were larger, I did not sign his name.  Although I

17   would occasionally, if it was a 30-page contract, put the

18   initials on each of the pages, but not do the major signing,

19   to show we read them.

20   Q.    Okay.  Jumping ahead a little, did we, in fact, show

21   you the Attachment B, request for payment, that actually

22   generated the check in this case?

23   A.    Yes.

24   Q.    And was that Mr. Maher's signature or you signing for

25   him?

1  A.   No, he signed that and I initialed the pages.

2  Q.   I'm not talking about the grant agreement.  I'm talking

3  about the request for payment.

4  A.   Oh, oh, no.  I see.  No.

5       On that particular one-page thing, there was a place

6  over to the right where you had to -- I used -- I can tell

7  when I do it because I don't do it as well as he does.  And

8  I did in that case on that one sign my name.  And then to

9  the right of it -- and I don't know what it was for

10 exactly -- was my initials for him.

11 Q.   Okay.  And 147, on May the 25th, you are talking to

12 Mr. Maher again, back to talking about Fenway?

13 A.   Yes.

14 Q.   Is it --

15 A.   Yeah.  We had a 15-year guaranteed performance contract

16 where we'd supply this electricity to them; and I was put on

17 that temporarily, along with the Eagles contract, to try and

18 save both of them and was unsuccessful.  But I did make a

19 trip to Fenway and I made one or two trips to Philadelphia

20 to the Eagles football field.

21 Q.   Where it says "15-year guaranteed performance

22 contract," are you guaranteeing that the equipment will

23 function or is -- I'm not sure what's --

24 A.   I wasn't involved in the original contract, but they

25 would be paying us for providing their electricity and I

1    don't know if it was a cost-sharing agreement or not.  I

2    never was involved in the original contract with the

3    Eagles -- or with the Red Sox.

4    Q.   And according to Government's 148, this is a 5-27-10

5    note to Lee.  I assume Lee Maher?

6    A.   Uh-huh.

7    Q.   Your handwriting?

8    A.   Yes.

9    Q.   And in particular, I want to start with -- down by

10   May 27th of 2010.  Am I thinking right this is around the

11   time of the execution of the original federally funded grant

12   agreement?

13   A.   Yes.  The first one that we didn't meet, yes.

14   Q.   Okay.  What's Item 2 on your note?

15   A.   Well, there's some bills that were never paid that we

16   were claiming and we needed to get them paid, so I'm asking

17   for --

18   Q.   Okay.  Read them out.

19   A.   Okay.  Have three exposures on the reimbursement.  Hope

20   to finesse until the final annual review.  Three major bills

21   never paid:  31,130 to Unitherm for the insulation, 40,380

22   for the genset at Lakeland -- That's the Cummins -- and

23   29,650 for the other Cummins genset at Groveland.  Total of

24   101,000 that we needed to write checks for.

25   Q.   Okay.  Now, what had Unitherm done?

1    A.   Unitherm had -- OSHA had visited our site in Lakeland,

2    and we had exposed hot pipes and tanks that needed to have

3    insulation put around them so that employees couldn't be

4    hurt, and we had to spend the money to fix that.

5    Q.   Had they done the work?

6    A.   I'm sorry?

7    Q.   Had Unitherm done the work?

8    A.   Yes.

9    Q.   Had they been paid?

10   A.   No.

11   Q.   And the two references to genset, are those the Cummins

12   genset we talked about?

13   A.   Right.  I requested the checks and I wanted them to be

14   sent.  They were never sent.

15   Q.   And what's this comment to the side?  You can read it

16   out loud.

17   A.   Yeah, I'll just read it.  I don't really understand it

18   completely.

19        Ask for forgiveness and/or pay with some of the

20   2.2 million received.  When we thought we were going to get

21   in June the money when we were applying for the federal

22   grant the second time.

23   Q.   And the third item on this note, what's that?

24   A.   Separate bank account.  I'd been telling Mr. Maher that

25   we needed a bank account that only handled the money we got

1  on the grant and show the disbursements and things that

2  happened so that it could be isolated for their further

3  review and accounting analysis that they would do later on.

4  Q.   Was this a conversation you had more than once?

5  A.   Yes.

6  Q.   Do you know if a separate bank account was ever set up?

7  A.   No, as far as I know, it was never set up.

8  Q.   Now, 149 appeared to be a communication to you -- well,

9  it appears to be real blurry.  Let me figure out.

10  A.   Okay.

11  Q.   Thank you.

12      A communication to you from a fella named Kevin

13  Lidbury.  Who was Kevin Lidbury?

14  A.   He was the sales manager that sold the engine to us and

15  negotiated the agreement that I worked with at

16  Fairbanks Morse.

17  Q.   Okay.  And it would appear that -- it would appear from

18  the text of this that June 1st of 2010 is not the first time

19  you talked to Mr. Lidbury?

20  A.   No, we had talked to him.

21  Q.   And what exactly is he saying?

22  A.   "At the risk of sounding like a used car salesman, I

23  want to let you know that one of our sales people has a

24  potential sale of the unit we have been talking about.  Are

25  you still interested?  If so, the first person to put some

1  money on the table will be the proud owner.  Please let me

2  know your thoughts and status of your grants."

3       And I told him that we were still very interested, but

4  we didn't have the money at that point.

5  Q.   But by this point you've been to Tallahassee, and

6  you've walked in the grant paperwork?

7  A.   I'm sorry?

8  Q.   By this point, you've been to Tallahassee for when you

9  walk in and drop off the grant paperwork?

10 A.   Right.  Yes.

11 Q.   Hadn't seen any money yet?

12 A.   No.

13 Q.   Okay.  There's a list labeled "action," which is

14 Government's 150, dated June the 1st of 2010.

15      Now, was this something you were keeping to yourself or

16 sharing with somebody else, or what's going on?

17 A.   Can you move it down just to see if there's anything

18 above "action"?

19      Okay.  I'm sure, because there's a date on it, that I

20 took it to a meeting with Lee, but I am not 100 percent

21 sure, but it was obviously given to him at some point

22 because we needed checks on not only the other three that

23 were mentioned earlier, but there were two others -- yeah,

24 obviously the other three were never done because it's now

25 five checks.  Wire transfer 34,000 to provide and ask for --

1    I'm sorry -- 534,000 to cover several things.

2    Q.    Now --

3    A.    The two checks mentioned at the far right.  I'm sorry.

4    Q.    There's a notation out at the side, "not Don"; is that

5    what it says?

6    A.    Yes.

7    Q.    And --

8    A.    That would mean that Lee wanted someone else and told

9    me to do it and probably because Mr. Sproat had refused to

10   do it, and so there were going to be checks that were

11   written, and I'm not sure on what accounts to -- one would

12   have been the payment to World Energy for 3.25 million.

13   Q.    Let me scoot over, because I think there's a schedule

14   in here.

15   A.    Okay.

16   Q.    Is there a specific list of checks needed?

17   A.    Yes, the three from before.

18   Q.    Okay.  Now, there are dates in here:  April of '10,

19   April of '10, March of '10.  You're already in June.  Had

20   those checks been written when they were --

21   A.    No, they weren't.

22   Q.    -- with those dates?

23   A.    No.

24   Q.    And those totaled the 101,000 as before?

25   A.    Right.

1  Q.  And then on the next page, what's this Bayhill Land

2  Company fee?

3  A.  Mr. Maher requested that I increase the purchase price,

4  which is somewhere around 7.2 million, by another $725,000

5  as a fee to be paid to one of his other companies called

6  Bayhill Land, and I don't know --

7  Q.  Let me take it in baby steps.

8  A.  Okay.

9  Q.  The time frame when this was happening, is that the

10  April 30th of '09 date?

11  A.  No, it's already past then.  It's June.

12  Q.  But, I mean, the time frame when the purchase took

13  place?

14  A.  Yes, exactly.

15  Q.  Okay.

16  A.  It's around, yeah --

17  Q.  And Mr. Maher is buying what at that time?

18  A.  That's when we were buying -- oh, '09?  Yeah, that's --

19  yeah, that would have been the buying of Lakeland.

20  Q.  Okay.

21  A.  Okay.  And that was the fee to one of his companies.

22  Q.  Okay.  How does it help Mr. Maher to raise the purchase

23  price and pay a fee even to himself?

24  A.  I don't know.  I know I was requested to do that, and I

25  added it to the purchase price and that obviously is

1  one-tenth of the purchase price.

2  Q.   And had that -- had money been paid already to that

3  entity, or was this a check that you were requesting --

4  A.   I was requesting the check to be -- to pay them.

5  Q.   In 2010?

6  A.   Yes.

7  Q.   Was it actually going to be paid, or was it just

8  something to show?

9  A.   By then probably just something to show.

10  Q.   And then the last item on that list is what?

11  A.   We needed to have a payment to World Energy for half

12  the price.

13  Q.   Well, and is that -- is that because --

14  A.   I'm guessing that was for show, too, to be honest.

15  Q.   I mean, was it -- had you had any luck getting those

16  kind of sums out of Mr. Maher --

17       THE COURT:  Sustained to the extent -- hold on.

18  He's standing up.  Sustained to the extent it calls for

19  speculation.  The witness shouldn't guess about what others

20  intended.

21  BY MR. SIMPSON:

22  Q.   Was that a sum of money which was consistent with your

23  expectations for Mr. Maher to come up with in June of 2010?

24  A.   It was needed to be paid.  I don't know whether it was

25  intended to be paid.

1  Q.    Okay.   Before the grant was amended, the time you're

2  talking about in May of 2010 --

3  A.    Uh-huh.

4  Q.    -- was the grant based on whatever upgrades y'all could

5  creatively find at Lakeland?

6  A.    Yes, that was included, yes.

7  Q.    Okay.   In order to get reimbursed, were you required to

8  come up with documentation?

9  A.    I don't know whether this was required for this or for

10  something with Elbow River or exactly what.   I really don't

11  remember what it was for.

12  Q.    Okay.   And on June the 3rd, Government's 151, are you

13  still following up on the same topic with Mr. Maher?

14  A.    Yes, the first point is we were with Orange Bank then,

15  and I wanted the accounts set up so that we could monitor

16  the funds.

17  Q.    Okay.   The second point, what do you say there?

18  A.    I think you should sign the 4.1 million in checks,

19  which would be all those five mentioned before, plus the --

20  at this point we were hoping we were going to be doing the

21  2.25 or 2.5 million almost for the checks, so you add them

22  all together in your --

23  Q.    But you've got a 3.25 check to World Energy?

24  A.    Yeah.

25  Q.    Plus $75,000 in checks to Cummins?

1  A.   101, yeah.  And then I guess the 750 to Bayhill, too --

2  or 725.

3  Q.   And that -- is that about the 4.1?

4  A.   Yeah, I believe it's those four.  It had nothing to do

5  with Fairbanks Morse at that time.

6  Q.   Okay.  And when you specifically ask him to sign, not

7  stamp, what are you talking about?

8  A.   I thought they were too important to having stamped

9  checks used, so I asked him to sign them.

10  Q.   Did he have a stamp --

11  A.   Yes.

12  Q.   -- that could be used for checks?

13  A.   Right.  The way the process worked is I couldn't

14  authorize, but I could request, and then Ms. Getto or Don

15  Sproat has his stamp, which was used for most, and they

16  would then at his approval stamp the checks, making them

17  valid and ready to send.

18  Q.   Did you have -- could you just go and use the stamp

19  without his --

20  A.   No.

21  Q.   -- without somebody's approval?

22  A.   No, I was not allowed to use the stamp.

23  Q.   Now, again, you end this with "I can drop by Hilton

24  Head as it's only 15 miles from I-95."

25       Hilton Head is in which state?

1  A.    South Carolina.

2  Q.    And for what reason was Mr. Maher at Hilton Head?

3  A.    Probably a golf -- business golf meeting.

4        MR. PHILLIPS:  Objection, Your Honor; move to

5  strike.  Calls for -- actually was speculation.

6        THE COURT:  Sustained.

7        MR. SIMPSON:  Okay.

8        THE COURT:  Ladies and gentlemen of the jury, I'll

9  direct you don't -- you should disregard any statement about

10 what somebody might have or somebody guessing about what

11 somebody intended or, in fact, did.

12 BY MR. SIMPSON:

13 Q.    Was it your understanding that someone was at Hilton

14 Head?

15 A.    Yes, Mr. Maher was at Hilton Head, but I don't know

16 why.

17 Q.    Okay.

18       And where was that in proximity to where you lived?

19 A.    Yes, it's on the way home up I-95.

20 Q.    Okay.  And 152, in the same time frame, June 3rd, is

21 that -- well, I'm jinxing it.  The Penn deal is what?  Is

22 that a biodiesel plant or something else?

23 A.    I'm not sure whether it was still alive at that point

24 in June.  So I don't know what the Penn -- we had made two

25 efforts at plants up there, and that's all I can think of.

1   It had something to do with that, but I don't remember.

2   Q.   Okay.

3        And 153 from you to Mr. Maher on June the 10th, what

4   are you telling Mr. Maher on June the 10th?

5   A.   Tallahassee called last evening confirming the grant

6   funding, et cetera.  Steve Adams from the governor's energy

7   commission will meet with me in June to go through the

8   process of disbursing funds, et cetera.  We'll get something

9   in writing at that time.  My goal is to get 1 to 2 million

10  disbursed in 90 days and all 2.5 before year end.

11  Q.   Now, at this point, we are June of '09 --

12  A.   June of '10.  I'm sorry.  I'm sorry.  You're right.

13  I'm looking at the wrong page.

14  Q.   I'm not sure --

15  A.   No.

16  Q.   I'm not sure about the dates.

17  A.   June '10, yeah.

18  Q.   Well, let me --

19  A.   Seems to me like it should be 2010, though.  I think

20  there was a typo on the year.

21  Q.   Well, I don't know if computers do typos.  So I don't

22  know.  Let's start from June of '10.

23  A.   Uh-huh.

24  Q.   You are hired on in February of '08?

25  A.   Uh-huh.

1  Q.   Sometime in '08, a state grant application is filed?

2  A.   Right.

3  Q.   Awarded but not funded in February of '09?

4  A.   Right.

5  Q.   Then you start the cycle of federal grant application

6  --

7  A.   Right.

8  Q.   -- or federally funded grant applications?

9  A.   Right.

10 Q.   So you are a couple of years in the process by now?

11 A.   Absolutely.

12 Q.   Was Mr. Maher -- when you spoke to him about grants,

13 was he content with the pace at which these efforts were

14 taking to bear fruit?

15 A.   No.

16 Q.   When you spoke to Mr. Maher about the likelihood of

17 money coming in from the grants, how did he respond?

18 A.   Well, we were batting zero at that point, so he wasn't

19 very happy.

20 Q.   Okay.  But when something happens like you actually get

21 a grant agreement signed --

22 A.   Yes.

23 Q.   -- how does he react?

24 A.   Very excited, very positive.

25 Q.   I think I'm looking at 154A, which is an e-mail June

1  the 5th of 2010, from you to Laura Burness and Shanna Getto.

2  And I'm sorry.  Who is Ms. Burness?

3  A.   She was a secretary after Deborah Ferro, I believe.

4  Q.   And what's your message to them?

5  A.   That the check dates were not correct.  My fault.

6  Q.   Go ahead and read.

7  A.   Just read it?

8  Q.   Yeah.

9  A.   Ladies, my fault for not double-checking all of them.

10  I had written the following dates on two pages I gave to

11  Laura:  Bayhill May 15, 2009; both Cummins Atlantic,

12  May 15th and May 20th; World Energy Alternatives.  When I

13  left about 4:30 p.m. Friday, I checked the top check,

14  Bayhill, to make sure it was 2009 and the numbers were

15  correct and all the rest I did not check the dates again.

16  They were all June 4th.

17  Q.   And would 154B relate to those checks -- the creation

18  of those checks?

19  A.   Yes, sir, yeah.

20  Q.   Would that be the list of dates and amounts and persons

21  to be paid?

22  A.   On three of them, yes.

23  Q.   How about on the second page?  Does that include the

24  World Energy and the Bayhill?

25  A.   Yes, we had to get the dates changed.

1  Q.   And the -- do you know what the first thing is that

2  says "closing wire" or is that just Xed out?

3  A.   It was Xed out and I'm not sure why that was included

4  with the other because it had been wired at the time of

5  closing.

6  Q.   Okay.  Would 154C be one of the checks that you sought

7  to have created?

8  A.   Yes.

9  Q.   Made out to whom?

10 A.   Bayhill Land Company.

11 Q.   Dated when?

12 A.   February -- excuse me.  May 15, 2009, and $725,000.

13 Q.   Now, what's the source of that signature?

14 A.   That's the stamp of Mr. Maher.

15 Q.   And could you authorize the use of that stamp?

16 A.   I couldn't.  Mr. Maher had to.

17 Q.   How did that stamp get on there then?

18 A.   He had to approve it.

19 Q.   Do you recall specifically how that was done or do you

20 just know he had to approve it?

21 A.   No, I just knew that I could request them both in

22 person and through finance and --

23 Q.   Are you aware whether a payment to Bayhill Land was

24 made in the spring of '09 or '10, either one?

25 A.   I don't think it was made, but I do not know.

1  Q.    How about 154D?  What's that?  Who is it to?

2  A.    World Energy Alternatives for 3.25 million and again

3  stamped by Mr. Maher, dated June 4, 2010.

4  Q.    Are you aware whether that payment was actually made?

5  A.    I know that one wasn't made.

6  Q.    And 154E -- I'm sorry.  I'm trying to hide the details.

7  A.    Cummins Atlantic, June 4, 2010, $40,380, again stamped

8  by Mr. Maher.  And I don't know whether it was sent or not,

9  but I know it was -- it could have been sent and bounced.  I

10  don't know.  But it was never paid.

11  Q.    Cummins was still owed the money?

12  A.    Yes.

13  Q.    154F?

14  A.    Same thing on the other genset, Cummins Atlantic,

15  June 4, 2010, $29,650, again stamped by Mr. Maher for

16  payment to Cummins.  Again, that amount was not paid.

17  Q.    And 154G?

18  A.    Unitherm Incorporated, 31,130, and that was for the

19  insulation, again stamped by Mr. Maher, that I'd requested.

20  And I don't know whether that was ever sent or paid or not.

21        THE COURT:  Ladies and gentlemen of the jury,

22  while Mr. Simpson is checking his notes, the courtroom

23  deputy asked me to ask do any of you need another pad

24  tomorrow.  I know sometimes the pads are thin.  If you do,

25  raise your hand so she knows if anybody needs an extra pad.

 1          All right.  Ms. Lourcey, nobody has raised their

 2  hand.

 3          If at any point you do, just raise your hand and

 4  let us know and we'll make sure you have an extra pad.

 5  Thank you.

 6  BY MR. SIMPSON:

 7  Q.   Tell us about No. 155, which appears to be a fax

 8  transmission sheet, 5 p.m. to 5:40 Saturday, June 5th of

 9  '10.  Who created this?

10  A.   That's my printing.

11  Q.   Who did you send it to?

12  A.   Mr. Maher.

13  Q.   And would that be someplace called Berkeley Hall?

14  A.   That is -- 843 is a Hilton Head/Charleston phone number

15  and Berkeley Hall is in that general area.

16  Q.   And on the left-hand side, what's this?

17  A.   Florida grant backup plan, four checks on May 10th; and

18  those were the ones we are were going through earlier.

19  Q.   Okay.  And the next thing?

20  A.   Separate checking account, which never had been set up

21  yet.

22  Q.   And the next thing?

23  A.   We had to change the check dates.

24  Q.   At the top of the second page -- read the second page

25  to us and I'll keep it moving.

1  A.    "Background:  Kelley now claims that only matching

2  counts back to April 30th not matching in grant."

3       And the reason that -- no one knew when they were

4  switching from state to federal funds when the official date

5  was going to be.  They didn't know if it was October 1st,

6  October 15th, the 20th.  And they finally settled on the

7  30th.  So a lot of the things we had done weren't going to

8  qualify.

9  Q.    Okay.  Now, she's saying -- you're saying that she says

10  the matching counts back to April 30th, not the matching

11  grant.

12  A.    Right.  Yeah.  Matching counts back to that date, but

13  everything else has to be since then.

14  Q.    Has to be new money invested?

15  A.    Yes, yes, sir.

16  Q.    And you -- what -- keep reading.

17  A.    "Totally absurd.  You can't say the program is on for

18  one item and not the other.  Reference paragraph 3 on page

19  1, which does not differentiate between match and grant, per

20  Leigh Williams."  I got her legal advice.  "I have done the

21  following to ensure we are 100 percent correct:  Found all

22  documents that confirm program start date, match, and grant.

23  All project investments after April 22, 2009, count.  Sent

24  four pages to you.  Contacted Otis Mills in Pittsburgh on

25  Friday to thank him and confirm our investments count.  In a

1  note, he plans to visit your Lakeland operation in November.

2  Contacted and met Leigh Williams for 30 minutes Friday to

3  confirm I correctly interpreted everything.  Have two 4-inch

4  binders and one 1-inch binder with invoices, check, credit

5  card verifications, et cetera, available to deliver Tuesday.

6  The challenge is the best way to correct Kelley's

7  misinterpretation short of a lawsuit.  Remember, she has

8  historically been very petulant, risk adverse, and not prone

9  to be corrected as the keeper of the money.

10      "My first choice after talking to Otis, Lee, and Matt

11  Montgomery is to go to Bob Vickers, her boss, and the head

12  of the program with the documents and a three-part message.

13      "The matching grant funds were invested simultaneously

14  and the EMG was aware we had invested over 10 million last

15  year while other winners waited or did little while we

16  worked out the contract.  The promise (sic) is you can't

17  allow match and not grant funds."

18  Q.    Premise?

19  A.    I'm sorry.

20  Q.    The premise is?

21  A.    Yes, yes, the premise.

22      "You allow both or neither based on the contract.  The

23  contract and their written communications allow match and

24  funding.  There never was a distinction in the timing until

25  the third e-mail.  We invested the 10 million based on the

1    2.5 million grant and the 1 million" -- or -- "and the $1

2    federal incentive.  That is to do with a credit that was

3    given for every gallon of biodiesel."  So it is $1.  "We

4    have no money left to operate and will have to close

5    Lakeland without the grant."

6    Q.   And you propose some alternative actions?

7    A.   Yes.

8         "Going to Kelley direct is a low probability as she is

9    not flexible or business savvy.  Pressure from DOE not good

10   as this is a state program and they are the final arbiter.

11   Risk of offending Kelley by seeing Rob is manageable and

12   much higher success probability.

13        "Number 4.  Going to Kelley and escalating through Rob

14   if she won't reason allows her a chance to build a case if

15   she wants to.

16        "Do one-on-one.  No testosterone with others around.

17        "Southern strategy.  Matt Montgomery meets often with

18   Rob.  Can use after this your thoughts on including Matt."

19        Obviously, I'm trying to work out a strategy with Lee.

20        "Lawsuit, no plus.  Discovery and delay are

21   unacceptable."

22   Q.   Okay.  Let me stop you there.

23        Suing to try to enforce the grant you are saying is

24   unacceptable?

25   A.   Right.

1    Q.    Because of what reasons?

2    A.    That I don't think you bite the hand that feeds you and

3    we would probably have lost, so a lawsuit didn't make sense.

4    Q.    And delay, it was going to take time?

5    A.    Yes.

6    Q.    And discovery?

7    A.    You know, we didn't have any time left.  We were out of

8    money.

9    Q.    Well -- okay.

10   A.    Then I say:  Better ideas:  Asking Lee.  This allows

11   you to go to Rob or Crist after me if need be.  I personally

12   think Rob will say this is fine, go ahead and correct

13   Kelley.

14   Q.    Who is this Christ you are talking about?

15   A.    That's the governor at the time.

16   Q.    And what lead you to believe that Mr. Maher could go

17   and speak to Mr. Crist?

18   A.    Several times when we were going through rejections and

19   not getting the money and other various speed bumps, he

20   said, I think I should go talk to Governor Crist about this.

21   And I told him I didn't think that was a good idea most of

22   the time.

23        "I personally think Rob will say this is fine and go

24   ahead and correct Kelley.  My only concern is she is doing

25   this with others or did everyone else sit on their ass and

1  wait, thus no issue?

2  "Larry, very delicate situation."

3  Because now we're in jeopardy of not having a lot of

4  the money we spent or borrowed, said we would spend.

5  Q.  Let me stop you a minute.  You'd indicated there was a

6  down payment spent for the assets at Lakeland.

7  A.  Right.

8  Q.  Was there some money spent to either get it running or

9  keep it running?

10  A.  Yes.  We requested about $450,000.  Mitch made the

11  list.  I approved it and went to Lee to try and get the

12  money, and we ended up getting over time about 250,000 to

13  make repairs and invest in pumps that didn't work and things

14  like that.

15  Q.  Okay.  In addition to the half-million-dollar down

16  payment and the quarter of a million dollars or so that was

17  spent in the little costs --

18  A.  Yeah.

19  Q.  -- was there anything else spent at Lakeland?

20  A.  Other than a lot of money with lawyers, no.  And we did

21  pay rent, obviously, for a period of time.

22  Q.  Okay.  Was there anything like 7 or $8 million spent at

23  Lakeland?

24  A.  No, not if the notes were not paid off.

25  Q.  Now, I take it from the fax that you sent Mr. Maher,

1  first of all, Kelley Smith or Kelley Burk had told you you

2  weren't going to get reimbursed for old money, it had to be

3  new money?

4  A.   Yes.

5  Q.   And I take it from the tenor of your letter to

6  Mr. Maher that you disagreed with her?

7  A.   Yes.

8  Q.   Who turned out to be right?

9  A.   Of course, they did because they made the rules and

10 they were changing them continually from the state program

11 to a federal to a different federal so --

12 Q.   Okay.  And whether this was fair or unfair --

13 A.   It doesn't matter.

14 Q.   -- those were the rules?

15 A.   Yeah.  And they changed and we no longer were being

16 helped by them.

17       MR. SIMPSON:  Your Honor, this is as good a time

18 as any to break for the day.

19    (This concludes the excerpt of the jury trial held on

20 the 12th day of December, 2017.)

21

22

23

24

25

1                    * * * * * * * *

2          I certify that the foregoing is a correct
*EXCERPT* transcript from the record of proceedings in the
3   above-entitled matter.  Any redaction of personal data
identifiers pursuant to the Judicial Conference Policy on
4   Privacy are noted within the transcript.

5

6   /s/ Megan A. Hague                    12/12/2017

7   Megan A. Hague, RPR, FCRR, CSR        Date
Official U.S Court Reporter

8

9

10                      **I N D E X**

11  GOVERNMENT'S WITNESSES                           PAGE

12  LARRY KENNETH LONG
Direct Examination By Mr. Simpson                    3
13                   **E X H I B I T S**

14  GOVERNMENT'S EXHIBITS              OFFERED   RECEIVED

15  123 – 228, 235, 250                   9          9

16  216A   Kenneth Long plea agreement    5          5

17  216B   Kenneth Long supplemental      5          5
           plea agreement
18

19

20

21

22

23

24

25