# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

```
UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         ) Case No: 4:16-cr-30
                               )
        v.                     ) Tallahassee, Florida
                               ) December 13, 2017
LEE JOHN MAHER,                ) EXCERPT - DAY 3
                               )
            Defendant. _____  )
```

**TRANSCRIPT OF EXCERPT OF JURY TRIAL**
**(CONTINUED TESTIMONY OF LARRY LONG)**
**BEFORE THE HONORABLE MARK E. WALKER**
**UNITED STATES DISTRICT JUDGE**
**(PAGES 1-207)**

APPEARANCES:

For the Government:    U.S. Attorney's Office
                      Christopher Canova
                      By:  MICHAEL T. SIMPSON
                           Assistant U.S. Attorney
                      michael.t.simpson@usdoj.gov
                      111 North Adams Street
                      Tallahassee, Florida 32301


For the Defendant:    A. Brian Phillips, PA
                      By:  ANDREW BRIAN PHILLIPS
                           Attorney at Law
                           CARLY MARIE NEWMAN
                           Attorney at Law
                      912 Highland Avenue
                      Orlando, Florida 32803
                      brian.phillips@phillips-law-firm.com
                      carly.newman@phillips-law-firm.com


                      Sands White Sands Pa
                      By:  KENTON VOGES SANDS
                           Attorney at Law
                      760 White Street
                      Daytona Beach, Florida 32114
                      kent@sandswhitesands.com

*MEGAN A. HAGUE, RPR, FCRR, CSR*
**Official United States Court Reporter**
**111 North Adams Street, Tallahassee, Florida 32301**
850.422.0011 * megan.a.hague@gmail.com

1                    P R O C E E D I N G S

2         (Following is an excerpt of the jury trial held on the

3     13th day of December, 2017.)

4              THE COURT:  Mr. Long, if you could stand, please,

5     and raise your right hand and be resworn since we're a new

6     day.

7              THE WITNESS:  Sure.

8         **LARRY KENNETH LONG, GOVERNMENT WITNESS, DULY SWORN**

9              COURTROOM DEPUTY CLERK:  Please state your full

10    name for the record.

11             THE WITNESS:  Larry Kenneth Long.

12             COURTROOM DEPUTY CLERK:  Thank you, sir.

13             THE COURT:  Mr. Simpson, you may proceed.

14         MR. SIMPSON:  Thank you, Your Honor.

15                    CONTINUED DIRECT EXAMINATION

16    BY MR. SIMPSON:

17    Q.   Mr. Long, to begin with, I have been scolded because I

18    tend to drop my voice sometimes, and I understand you're a

19    little hard to hear, too.

20    A.   Yes.

21    Q.   So if you'll try to be sure that the lady in pink can

22    hear you and everybody between you and her can hear you.

23    A.   I will work at it.  I'm recovering from a cold, but,

24    yes.

25    Q.   Now, when we were talking yesterday, I think we'd

1  gotten up to the point where the state was saying you got to

2  pay money upfront to get the grant, and you begin to work on

3  the expanded grant.

4      I want to back up just a little bit, though.  You told

5  us that you were hired in early 2008 as president of

6  Clean Fuels at Groveland -- or Clean Fuel at Groveland, and

7  that maybe the place was making the payroll off the grease

8  processing, but it wasn't a big moneymaker.

9  A.    No.

10  Q.    And it didn't have the potential to make any serious

11  amount of biodiesel.  Why then does Mr. Maher decide he

12  needs another bigger biodiesel plant?  What was the point of

13  that?

14  A.    The one-dollar credit from the federal government was

15  still in place, and if that stayed in place long-term, you

16  could make a lot of money.  It, of course, was dropped

17  shortly after that, but the idea was it was still a good

18  business.  It was a bad location.

19  Q.    Okay.  I want to pick up with Government's Exhibit 156,

20  which would appear to be an e-mail from you -- well, the

21  bottom is an e-mail from you to Mr. Maher on June the 17th

22  of 2010, talking about dealing with the reimbursement

23  issues.

24      Would you read to jury what you had to say to Mr. Maher

25  that day, and I'll try to blow it up a little.

1  A.    That's good:

2      Lee, after five phone calls today, including Matt

3  Montgomery and Kelley Smith, we have a way this can work.

4  I'm sending Kelley an unofficial sample tomorrow using the

5  Cummins genset as an example.  The key date is the date paid

6  for.  Thus, the logic.  Ordered December 30, delivered

7  January 3, installed May 14, paid for May 20, 2010,

8  qualifies after the May 13 date.

9  Q.    And you did actually send something like that to --

10  A.    Yes.

11  Q.    And her response to that was?

12  A.    Fine, I mean, that will work, I believe.

13  Q.    Didn't you get an e-mail back that said basically if

14  you were obligated before the grant -- before the grant

15  commenced, that that didn't count?

16  A.    In general, that was true, yes.  I don't know on that

17  particular one whether they approved it or not.

18  Q.    Well, is this, in fact, Government's 157 with cover to

19  Kelley -- isn't that the invoice you sent her as part of

20  that example with Cummins about something that had been

21  ordered before --

22  A.    Yes.

23  Q.    -- and purportedly paid for afterwards?

24  A.    Yes.

25  Q.    And that wasn't going to qualify, was it?

1  A.   On that go-around, you're exactly right.  That was the

2  second iteration with the federal.  It was not allowed.

3  Q.   And that's 157.

4       As shown by 158, did you, in fact, have a meeting with

5  the governor's energy office on or about June the 23rd of

6  2010?

7  A.   Yes.

8  Q.   And would these be your notes made in preparation for

9  that meeting?

10  A.   Yes.

11  Q.   And is this your big question for the meeting?

12  A.   Yes.

13  Q.   What's the question?

14  A.   What date, in this case, starts the clock that it

15  counts for the --

16  Q.   For reimbursement?

17  A.   For reimbursement, yes.

18  Q.   What are you talking about here?  Read it out first.

19  A.   Yeah:  The plan will need new items that vary more than

20  10 percent from the original to meet new timing; i.e., we

21  completed the original energy reduction effort.

22       What that meant is that a lot of those expenditures,

23  which may or may not have been paid for before, did not

24  count.  We had to do new; hence, the cogen Fairbanks Morse.

25  Q.   Okay.  And because it was more than 10 percent, the

1  grant was going to have to be modified?

2  A.   Excuse me?

3  Q.   Because it was more -- because the new things were

4  going to be more than 10 percent, did the grant need to be

5  modified?

6  A.   Yes, absolutely.

7  Q.   And were you, in fact, trying to get a plan to make

8  some new paperwork to amend the grant?

9  A.   Yes.  I met in Tallahassee with Ms. Stafford and Kelley

10 to work out a plan and make sure we were doing the right

11 thing.

12 Q.   Did you either go into that meeting or come out of a

13 meeting with a clear idea of the time frame for which things

14 could be reimbursed?

15 A.   Absolutely.  The guidelines that came out of the

16 meeting were items cannot be procured, ordered, or paid for

17 prior to the signing of the amendment for the grant money.

18 Matching can go all the way back to May 22, 2009.

19 Q.   Okay.  So to get money, first you've got to get the

20 grant amended, and then you got to spend the money?

21 A.   Yes, spend new money.

22           THE COURT:  What was that exhibit number again,

23 counsel?

24           MR. SIMPSON:  Exhibit number?

25           THE COURT:  Yeah.

1    MR. SIMPSON:  158, Your Honor.

2  BY MR. SIMPSON:

3  Q.   And, again, if you'd read from Items 4 and 5 in those

4  notes.

5  A.   Right.  No. 4:  Once the amendment is signed by

6  Rob Vickers with new grant budget numbers and revised match,

7  we can order the 3.4-megawatt unit and the two

8  subcontractors, July 12th to 19th.  Once the notice to

9  proceed is signed, we order and pay for the 3.4-megawatt

10  system.

11  Q.   Now, before you had this June 23rd meeting, had you had

12  communications with the defendant, Mr. Maher, about the

13  problems in getting reimbursed with the grant as it stood?

14  A.   Yes, he knew we had to spend more money.

15  Q.   Did you have communications with him after that

16  meeting?

17  A.   Yes.

18  Q.   Did there appear to be any uncertainty of his

19  understanding of the idea that you could only get reimbursed

20  for new investments?

21  A.   He understood reimbursement and that we had to spend

22  new money from that date going forward.

23  Q.   Let me take you to Government's 159, which would appear

24  to be a memo from you to Ms. Stafford and Ms. Smith on June

25  the 27th of 2010.  Is this a recap of your meeting?

1    A.   Yes.  I wanted to make sure that I wasn't making

2    another mistake.

3    Q.   And is the date of importance there at the bottom of

4    the first page?

5    A.   Yes, sir.  The official grant date is May 13, 2010.

6    The current plan is to add the following to the match total

7    for the new match percentage.

8    Q.   And does the last large paragraph on the second page

9    also summarize your understanding of the requirements?

10   A.   Yes.

11        Clean Fuel must now invest an additional approximately

12   2.5 million after the amendment date, which we expect to be

13   approximately the 15th or 20th of July.  This amendment will

14   only increase the scope of the original contract by

15   upgrading and retrofitting the original electrical

16   production capacity to approximately 3.4 megawatts.  As soon

17   as the amendment process is signed, we will invest the

18   2.5 million needed to fulfill the expanded scope and apply

19   for the 2 million plus in July 2010.

20   Q.   Now, again, step back a moment.  In your efforts to

21   raise grant money and, for that matter, other sources of

22   funding, were you keeping secrets from Mr. Maher?

23   A.   No, sir.

24   Q.   Were you -- was -- were the details of the grant widely

25   known within Mr. Maher's organization?

1  A.   Other than Don Wood, I don't think many people knew

2  much about what was going on on the grant side.

3  Q.   Was that by accident, or was that a deliberate choice

4  by someone?

5  A.   I would say a combination of both.  We didn't want the

6  others involved, and, secondly, everybody was busy.

7  Q.   And why didn't you want others involved?

8  A.   Not wanting others involved.  Didn't need to know.  At

9  that time I thought we could still potentially pay ahead of

10  time and meet the actual requirements of the grant.

11  Q.   Okay.  Were there issues in all of Mr. Maher's

12  companies regarding the payment of bills?

13          MR. PHILLIPS:  Objection; foundation.

14          THE COURT:  One moment, please.  Sustained.

15  BY MR. SIMPSON:

16  Q.   Did you participate in discussions with Mr. Maher and

17  Mr. Maher's other employees about the ongoing issues in the

18  business?

19  A.   Yes, we had a lot of past-due payments with many

20  suppliers, certainly Clean Fuel and occasionally, when I was

21  involved, with Solar Blue.

22  Q.   And was there pressure from different employees to try

23  to get money to take care of what they thought were priority

24  issues?

25  A.   Yes.

1   Q.   Were there pressures, for instance, from Mr. Knight at

2   Clean Fuel Lakeland to try to improve the equipment and the

3   processing there?

4           MR. PHILLIPS:  Objection; leading.

5           THE COURT:  Sustained.

6   BY MR. SIMPSON:

7   Q.   Were there a number of people asking for money?

8   A.   Yes.

9   Q.   Would the thought -- if the idea got out that a large

10  sum of money might be coming in, how might that affect those

11  pressures?

12          MR. PHILLIPS:  Objection; calls for speculation.

13          THE COURT:  Sustained.

14  BY MR. SIMPSON:

15  Q.   You said at that time you thought you might be able to

16  buy the genset upfront?

17  A.   Yes.

18  Q.   Did there come a time when that was not going to be

19  practical or possible?

20  A.   As we moved into the fall, I was having my doubts that

21  we would have the funds available to pay ahead of time.

22  Q.   And in the actual event, did you have the funds

23  available?

24  A.   No.

25  Q.   Were there issues --

1      THE COURT:  Mr. Simpson, if you could ask a

2  clarifying question.  When we say fall or time periods, if

3  you could clarify as to the year that we're talking about so

4  it's clear.

5  BY MR. SIMPSON:

6  Q.   In 2010, as you approached the filing of the payment

7  request for the reimbursement of the grant, were you able to

8  get Mr. Maher to spend the money to buy the genset upfront?

9  A.   No.

10 Q.   Had it become generally known that the company was

11 seeking reimbursement for something it hadn't bought, did

12 you anticipate problems?

13      MR. PHILLIPS:  Objection; calls for speculation

14 and compound.

15      THE COURT:  Sustained as to "generally known" for

16 a variety of reasons.

17 BY MR. SIMPSON:

18 Q.   Did you want people knowing about the grant as it

19 was -- the payment request as it was actually executed?

20 A.   No.

21 Q.   Why?

22 A.   Because there was a reasonable probability that we

23 weren't going to comply with the rules as they were based on

24 the current cash flow.

25 Q.   And if you didn't comply, were there potential

1  consequences?

2  A.   Absolutely.

3  Q.   For instance?

4  A.   We would be committing fraud if we didn't -- if we

5  collected the money and didn't pay for it ahead of time.

6  Q.   Was that something you wanted widely known in the

7  company?

8  A.   No.

9  Q.   Now, I've got an e-mail from you to Lee Maher,

10 Government's 235, on May the 29th of 2010.  So I still

11 haven't got my dates quite lined up.

12      What's the subject?

13 A.   They've agreed to things; hence, "The eagle has landed"

14 statement --

15 Q.   Okay.

16 A.   -- or happy.

17 Q.   "Eagle" meaning money is on the way?

18 A.   Yeah, it should be, although, as you see the date,

19 things got delayed a lot after that --

20 Q.   Okay.

21 A.   -- for various reasons.

22 Q.   And what actually do you say to Mr. Maher?

23 A.   Perfectly done for the filing.  Please review for

24 accuracy.  We now have 100 percent of the documents and

25 numbers done for a 2.4-million-plus filing.  Once Shanna has

1  made copies of the invoices and checks or credit card docs

2  this weekend, we are ready to file once you and I review.

3  And there's a word missing.  Will be close to ten pounds

4  when compiled this hard copy.  It was very thick books with

5  all this documentation.

6  Q.   You're talking about the supporting documentation as

7  the grant was originally written?

8  A.   Yes.

9  Q.   And did that include those checks we were talking about

10 yesterday to Bayhill and World Energy and Cummins and

11 Unitherm?

12 A.   Some of those were in.  I'm not sure that all of those

13 were in.

14 Q.   Okay.  I'm sorry.  I've got my time sequence seriously

15 out of whack here.

16     Government's 220 appears to be an e-mail to you from

17 Bob Nave in February of 2010, so before the original grant

18 agreement.  And Bob Nave was who or what?

19 A.   Bob Nave was a person that lived in Tallahassee that

20 had written grants and interacted with the government.  I

21 don't know all his relationships, and we hired him to do

22 some work to help me get this done.

23 Q.   Was he getting paid?  You know, was it a salary or a by

24 the piece, or how was it done?

25 A.   It was a commitment by the piece for the project.  I

1  believe -- I won't speculate, but I think it was 10,000, but

2  I don't know or remember.

3  Q.   Who did Mr. Nave have to look for for payment?

4  A.   I'm sorry?

5  Q.   Who would Mr. Nave look for for payment?  Who decided

6  whether he got a check or not?

7  A.   Oh, the money would have to be approved by Mr. Maher.

8  Q.   Now, Government's 161 would appear to be an e-mail --

9  well, the main e-mail is from Kevin Lidbury to you on July

10  the 29th.  The reference is action on a 3.2-megawatt system.

11      What's going on here?

12  A.   This is the final negotiations to purchase and sign a

13  contract with Fairbanks Morse to buy the unit; and if you'll

14  notice, the installation is twice the cost of the engine,

15  and the engine is more than just engine generator sub-base.

16  It includes controls and mechanical auxiliary equipment.  So

17  the total is in the 7- to $800,000 range for the engine

18  itself.

19  Q.   Okay.  So the first -- the hardware components are

20  something like 900-plus-thousand dollars?

21  A.   Approximately, yes.

22  Q.   And then you've got electrical installation, mechanical

23  installation, rigging.  And the total price is?

24  A.   At that point around 2.24 million.  I think it goes up

25  slightly as we finalize everything.

1  Q.   And as of July the 29th, are you actually working on

2  the amended grant that would deal with this?

3  A.   Yes.

4  Q.   And, actually, was Mr. Lidbury responding to your

5  previous questions?

6  A.   Yes.

7  Q.   And what exactly had you asked him?

8  A.   I'm asking him to reallocate the way the money is

9  listed on the actual contract for us.

10 Q.   So that's why you have a breakout?

11 A.   Yes.

12 Q.   Would Government's 162 be another one of your sets of

13 agenda notes for August the 4th?

14 A.   Yes.

15 Q.   And looking at the topics on this, particularly topic

16 No. 2, would that look like August the 4th of 2010?

17 A.   Yes.

18 Q.   Who are you meeting with?

19 A.   Lee.

20 Q.   And actually would this be -- whose copy of your notes

21 would this be?

22 A.   This happens to be Lee's.

23 Q.   What did you tell Mr. Maher about the expansion of the

24 grant on August the 4th?

25 A.   And may I add at this point, Mr. Simpson, that these

1   were generally off-site meetings at a restaurant in the

2   greater Orlando area.  We tended not to meet -- Lee had a

3   lot of other things he was doing, so I would go meet him

4   some place.

5   Q.   Was there a particular time of day these happened?

6   A.   Usually, they were mid to early morning.

7        With Kelley, the comments were -- and this is

8   August 4th.  Kelley agreed to all amendments for expanded

9   scope Monday.  Fast track supposedly in place.  Key is

10  managing process without pissing Kelley and the EOG off.

11  Must tee up Fairbanks Morse process without spending money.

12  Q.   Okay.  Let's go to that last line:  Must tee up

13  Fairbanks Morse process without spending money.  Does that

14  reflect the state you were in as far as the likelihood of

15  buying the grant -- buying the genset upfront?

16  A.   Yes, I was getting to the point of believing that we

17  were going to not pay ahead of time and get reimbursed.

18  Q.   Well, let me ask you, Mr. Long, if you buy a genset --

19  or, excuse me, if you get reimbursed by claiming you've

20  bought the genset and you don't buy it, doesn't that lead to

21  a likelihood of serious problems in the future?

22  A.   Yes, it does.

23  Q.   How were you going to avoid those problems?

24  A.   The plan was to, in the first 30 to 60 days after we

25  received the money, use it or some other money to buy and

1    commit to everything that we had said we'd already done, and

2    no one would be the wiser.  It would be, if you will, a

3    white lie.  The timing was a little off, but if we got it

4    done, then that was going to be okay.

5    Q.   Do you remember who came up with this

6    buy-it-on-the-back-end idea?

7    A.   I'm sure it was a joint agreement.  I can't be exact on

8    the timing or who said what.  It's been a long time, 7

9    years, but it was an agreement by both of us that the plan

10   would be to get reimbursement money and then buy the gensets

11   and finish the installation.

12   Q.   And would Government's 163 be a memo to Kelley Smith

13   with copies to Mr. Vickers and Mr. Maher, reference:  Fast

14   track status for Clean Fuel, grant expanded scope - addendum

15   approval and execution?

16   A.   Yes.

17   Q.   And according to what you're telling the state, when do

18   you want to buy the genset?

19   A.   If we did not initiate the procurement of the expanded

20   system in August time frame, we have a high probability of

21   not finishing the installation in 2010 and losing millions

22   of dollars of necessary operating incentives for fuel

23   purchases for the next decade.

24   Q.   What were you asking from the state?

25   A.   We need your help in accelerating the approval process

1  and reimbursement of grant funds so that we can achieve your

2  objectives and the DOE's objectives.  The final benefit of

3  ARS 005 will stimulate jobs, energy efficiency, and savings

4  while reducing carbon emissions for the state of Florida.

5  Q.    Okay.  So as you understood it, in the approval

6  process, who actually had to approve it?

7  A.    The payments, of course, was Mr. Maher, but it was

8  Vickers and the group, the EOG, in Tallahassee had to

9  approve this.

10  Q.    Excuse me.  That was a vague question.  Who had to

11  approve the expansion of the grant?

12  A.    The EOG, I believe, and maybe the DOE, too.

13  Q.    And you're trying to push that along?

14  A.    Yeah, right.

15  Q.    It appears that Government's 164 is a memo or a letter

16  from you to Kelley Smith.  And do you specify what the

17  expansion of the grant is going to involve?

18  A.    Absolutely.

19  Q.    Would you read it for us?

20  A.    Yes.  No. 3:  Finally, we then were to layer in the new

21  2.5 million in grant expenditures in the G & H summaries,

22  which were columns in the actual application and sections,

23  plus move 100 percent of the old grant detail except

24  salaries to the match detail.  The new grant expenses will

25  be put in the detailed budget section and 95 percent

1   equipment.  The final new budgets were going to be as

2   follows versus the old totals noted below.

3        So that first line is the grant that was the original

4   May 13th, 7 million, and we were at 9.5.  New expanded --

5   Q.   So this figure just gets pushed over into this figure?

6   A.   Yes.  And then we add 2.5 million, and what qualified

7   for the match was the 8.98 million for a total of

8   11.48 million total under the new guidelines.

9   Q.   And what was the new component?

10  A.   95 percent of the new number was for the turnkey

11  3.2-megawatt renewable energy electrical system to convert

12  in excess of 15 percent of the biodiesel fuel to electricity

13  rather than the original 1 percent in the original plan.  So

14  then there was some other items that were the other 5

15  percent that made the 2.48 million.

16  Q.   Was the original 1 percent -- was that for the smaller

17  Cummins generators?

18  A.   Yes.

19  Q.   Okay.  Now, Government's 165 is a drafted but, at least

20  on this copy, unsigned letter purportedly from Kelley Smith

21  to Lee Maher dated August the 8th of 2010.  Did this

22  actually originate with Kelley Smith or somewhere else?

23  A.   No, I wrote this for Kelley's signature and asked her

24  if she would do this to help us in some funding we were

25  doing.

1  Q.   Okay.  And was part of that some kind of representation

2  about the likelihood of you getting funding?

3  A.   Yes.

4  Q.   Which was?

5  A.   The 2.5 million in grant funds can be reimbursed within

6  30 days of the receipt of the expanded scope 3.2-megawatt

7  electricity amendment documenting the expenditures.  It

8  should be noted that Kelley did not ever sign that or agree

9  to it.

10  Q.   Well, whose idea was it for you to draft this letter?

11  A.   Mr. Maher.  He wanted other sources of funds besides

12  the 2.5 million and this was to gain some time.

13  Q.   So this was the equivalent, maybe, of a commitment from

14  the state?

15  A.   Yes, what we would call a soft letter saying they were

16  getting money so that we could get other people to start

17  working on -- whether it was investors or whatever.

18  Q.   And as Government's 166, we have what appears to be a

19  fax transmission dated September the 6th to Lee Maher, who

20  created and sent this?

21  A.   Me, that's my printing.

22  Q.   And there's various attachments to it.  What's your

23  Item No. 1 on there?

24  A.   Five pages of e-mails to read or reference later, plus

25  the cover.

1    Q.    Okay.    One of those e-mails would appear to be from

2    yourself to Lee Maher on September the 5th of 2010.

3    Subject, proof of purchase.    Would you read that to the

4    jury.

5    A.    Yes.

6    Q.    I'm sorry.    I've pulled the wrong one of these out.

7    Shorter, too.

8          Again, an e-mail from yourself to Lee Maher on

9    September 5th, reference housekeeping.    Would you read that.

10   A.    Yes.

11         Lee, we will need the new checks the week of

12   September 13th to facilitate the projects I'm working on.

13   Thank you, Larry Long.

14   Q.    What checks are you talking about?

15   A.    The checks that would be used showing that we paid

16   for -- I believe, these would be only for that, but they may

17   have been for some others -- paid for the Fairbanks Morse

18   equipment.

19   Q.    And would Government's 167 be an e-mail from you -- to

20   you from Kelley Smith dated September 17th, 2010?

21   A.    Yes.

22   Q.    Providing you an update on where you are with the

23   process?

24   A.    Yes.

25   Q.    Was anyone besides you copied with that?

1    A.   Mr. Maher.

2    Q.   And would Government's 168 be an e-mail from yourself

3    to Mr. Maher dated September 22 of 2010?

4    A.   Yes.

5    Q.   What's the subject?

6    A.   The subject is getting together with them coming down

7    to Orlando and there was a new director named Alexander Mack

8    replacing --

9    Q.   What exactly is typed in that line?

10   A.   I'll read that then:

11       Talked with both new director Alexander Mack and Kelley

12   about dinner and visit to our office next Monday as their

13   monthly meeting is in Orlando.  They are doing remotely thus

14   a nonstarter.  The good news is their own administration --

15   admin and legal reviewed our grant.  I answered their three

16   questions and they are 100 percent satisfied and done.

17   Second part is better.  They have their big call with Otis

18   tomorrow and will lead off with the ARS 005 with the three

19   minor changes from today and we should be done again.  I

20   can't think of another -- any other delay, and we order the

21   Fairbanks Morse equipment next week and start reimbursement

22   the following week.  Thank God, Larry.

23   Q.   And it appears that Government's 169 is an e-mail --

24   well, one copied to you eventually, but an e-mail from you

25   to Lee Maher on October the 13th of 2010.  What is the

1  subject line?

2  A.   Grant officially resigned with amendment.

3  Q.   And what's the text of that?

4  A.   Lee, this will be scanned on your desk at 9 a.m.

5  tomorrow.  This means we can have the 2.25 million in your

6  account before Thanksgiving.  Kelley just called.  Thought

7  we could bridge this for a much lower interest rate just to

8  hedge against payment delays.  Hard copy being overnighted

9  tomorrow.  I'm quite sure I can do this with some of my

10 previous investors.  Anyone I should contact on your side

11 while you are in Italy?  Congratulations again or is it deja

12 vu again.

13 Q.   Okay.  The "is it deja vu again" meaning what?

14 A.   That we have often thought this was closed and done and

15 the money was coming, and this was another belief that that

16 had happened.

17 Q.   Okay.  So is Mr. Maher, to your knowledge, actually in

18 Italy at the time?

19 A.   Yes.  He went to Italy at some point during that time

20 period in October.

21 Q.   Okay.  And when you're talking about bridging this and

22 using your previous investors, what are you talking about?

23 A.   That with it officially approved, we can send them a

24 copy, that some people would loan us money in the interim

25 while we're waiting on the government check.

1  Q.   Government's 170 dated October 14, 2010.  It appears to

2  be a letter from Alexander Mack to yourself.  What was

3  Mr. Mack telling you?

4  A.   Enclosed with this letter is an executed grant

5  agreement ARS 005 and the Attachment A1 between Clean Fuel,

6  LLC and the Florida Energy and Climate Commission.  Please

7  retain a copy in your files.

8  Q.   And attached to that is a second page.  Would that, in

9  fact, be the amendment to the grant agreement?

10 A.   Yes.

11 Q.   And on the bottom left-hand corner, who signed it?

12 A.   Mr. Maher.

13 Q.   Now, is that you signing for Mr. Maher?

14 A.   No.

15 Q.   Is that a signature stamp?

16 A.   No.  I believe that's his actual signature.

17 Q.   And would Government's 171 be a further communication

18 from Mr. Lidbury to yourself dated October 25, 2010?

19 A.   Yes.

20 Q.   Is there, again, a breakout of budget figures?

21 A.   Yes.

22 Q.   For the genset?

23 A.   Yes.

24 Q.   Are they the same or are they different?

25 A.   They've changed slightly.  I'm not sure all of the

1   reasons and don't remember, but it's moved around slightly

2   based on discussions with Fairbanks Morse.

3   Q.   And what was the total number now?

4   A.   2.480 million.

5   Q.   And how good -- how long was this offer good for?

6   A.   Only till December 1st of 2010.

7   Q.   Was there also a proposal attached which is what is

8   being summarized in the e-mails?

9   A.   Yes.

10  Q.   With, again, a breakdown of figures for the purchase?

11  A.   Yes, broken down differently but the total was the

12  same.

13  Q.   And actually I'm not sure where these records came

14  from.  Would this appear to be an executed copy of that

15  proposal?

16  A.   Yes.

17  Q.   Who signed for Clean Fuel?

18  A.   Mr. Maher.

19  Q.   Did you sign for him?

20  A.   Nope.

21  Q.   Was that a stamp?

22  A.   It's close, but I think it's an actual signature.

23  Q.   Who witnessed it?

24  A.   Myself.

25  Q.   Now, it appears to be dated October 21st.  Do you know

1  whether that was actually the date it was signed?

2  A.   I don't think it was the actual date.  I had signed it

3  and prepared it and because of his travels it may have

4  been -- his signature may have occurred at a different day.

5  Q.   Well, in fact, according to Mr. Lidbury's e-mail, when

6  did he send you the revised proposals?

7  A.   25th.

8  Q.   Could you sign it four days before you got it?

9  A.   No.

10        MR. SIMPSON:  If I could approach the witness a

11  moment, Your Honor?

12        THE COURT:  You may.

13  BY MR. SIMPSON:

14  Q.   Mr. Long, I'm going to show you what are marked as

15  Government's Exhibit 206B, 206A and B, 7, 8, 9, 10, 11, 12,

16  13, 14A and B, and -- I'm sorry, 206 through 213A and B, and

17  214A, B, and C, just examine those for a moment.

18        THE COURT:  If everybody can pause for one moment,

19  please.

20      (Pause in proceedings.)

21        THE COURT:  My apologies, ladies and gentlemen of

22  the jury, we have a technical issue, but we'll correct that

23  on our next break.

24        Mr. Long, you were getting ready to say something

25  in response to Mr. Simpson, you all can proceed.

1    BY MR. SIMPSON:

2    Q.    Let me -- have you had a chance to look through this?

3    A.    Yes, sir, uh-huh.

4    Q.    Okay.  Are these photocopies of something?

5    A.    Those are originals.

6    Q.    And original what?

7    A.    The original checks that were to have been sent to

8    Fairbanks Morse.

9    Q.    Okay.  So would each of them actually have a

10   perforation where the bottom part, the detail part, can be

11   torn off from the check?

12   A.    Yes.

13   Q.    Now, 206A is a photocopy, is there any detail other

14   than a signature on that check?

15   A.    No, there were some blank checks in there with just

16   signatures, all of them were stamped.

17   Q.    Well, for a moment, 206A.

18   A.    Okay.

19   Q.    And look at 206B.  Do they have the same check numbers

20   on them?

21   A.    Yes.

22   Q.    Do they have the same signatures on them?

23   A.    Yes.  I didn't realize that.

24   Q.    Okay.  Would they be the same check signed but

25   otherwise blank and then filled out?

1  A.   It would appear I made copies of the checks before they

2  were actually filled out.

3  Q.   Okay.  Now, were you normally in the position of

4  filling out checks for Clean Fuel?

5  A.   No.

6  Q.   Did you have access to or control of that signature

7  stamp?

8  A.   No.

9  Q.   How did these checks come to be in your possession?

10  A.   Mr. Maher, and I agreed with him, did not want the

11  checks filled out by people in Orlando.  We wanted to use an

12  off-site source.  And I am not very good with computers and

13  was not capable of filling those out by myself.

14  Q.   Okay.  Was there a accounting or payroll or accounts

15  payable and accounts receivable personnel in Orlando?

16  A.   Yes, sir, Shanna Getto was.

17  Q.   Okay.  Were there people there who were perfectly

18  capable of creating whatever checks were --

19  A.   Of course.

20  Q.   -- used in the business?

21  A.   Yes.

22  Q.   Why was it that Mr. Maher did not want the staff in

23  Orlando to take part in creating these checks?

24  A.   I assume it was to keep people from knowing exactly

25  what was going on, but I don't know that for sure.

1  Q.   Okay.  You didn't want people to know what was going

2  on, did you?

3  A.   No.

4  Q.   And what's the date on Government's 206 -- oh, I'm

5  sorry.  I'm getting ahead of myself.

6       So how did you go about getting check stock to create

7  these checks with?

8  A.   I requested them from Ms. Getto, and she said that she

9  could not give them to me without Lee's approval and

10 authority.

11 Q.   Do you recall, did you ask her one time or more than

12 one time?

13 A.   More than once, and she would not do it.

14 Q.   Because, in effect, this is the -- this is a blank

15 check?

16 A.   Absolutely.  And there were a lot of blank checks.

17 Q.   And when Ms. Getto wouldn't give you the checks, what

18 did you do?

19 A.   Called Lee and said, you have to call Shanna and tell

20 her to give me the checks in nonconsecutive order.

21 Q.   Why nonconsecutive order?

22 A.   I wanted it to appear that we had paid these over a

23 period of time to Fairbanks Morse.

24 Q.   Were you then able to get the checks?

25 A.   Yes, I was given the checks.  And since I was limited

1    on my capabilities with the computer and we'd had a

2    gentleman who I did work with in Greenville, South Carolina,

3    named Mr. Griswold, he filled the checks in for me.  And he,

4    in fact, would do the modified monthly reports with the

5    changes I put on because I was not capable of redoing that,

6    either.  And I -- we paid him to do this although he had

7    never done checks before of this magnitude.

8    Q.    Well, let me stop you.  You say he would help with the

9    monthly reports.  Weren't there people -- administrative or

10   secretarial support staff in Lakeland that could have done

11   that?

12   A.    Certainly.

13   Q.    Were there things in those reports you didn't want

14   generally known?

15   A.    Yes.

16   Q.    Okay.  Now, when you and Mr. Griswold sat down to

17   create these checks, some of them were some pretty spiffy

18   numbers?

19   A.    Yes, sir.

20   Q.    Did that raise any concern?

21   A.    Yes.  Bill, very, very ethical person, and he had done

22   valuations for all the companies --

23   Q.    Well, let's -- let's stick with the checks.

24   A.    Okay.  So Bill said, Larry, I trust you, and I see the

25   stamped signature.  I need to talk to Mr. Maher to get his

1    approval.

2    Q.    What did you do?

3    A.    We called Lee's cell phone.  I believe he was in an

4    airport, but I'm not 100 percent sure, and they had met

5    fleetingly once at the office.  But, he answered the phone,

6    you know, Lee Maher.  And Bill asked if these checks were

7    approved by him, these amounts that, you know, that totaled

8    approximately $2.48 million.  And he said, yes.  We were on

9    the speaker phone.  And then Bill Griswold filled them in.

10   Q.    So 206B is made out to whom?

11   A.    Fairbanks Morse.

12   Q.    For how much?

13   A.    $124,000.

14   Q.    On what date?

15   A.    October 18th.  That was the down payment.

16   Q.    Okay.  So, how does that date correspond to the date on

17   which the proposal was purported to be signed?

18   A.    It's prior to.

19   Q.    Okay.

20   A.    We'd been asked to pay prior to, also, but we hadn't

21   signed the actual agreement yet.

22   Q.    Okay.  So it appeared that it -- so the result was it

23   appeared that a down payment was made before the proposal

24   was signed?

25   A.    Yes.

1    Q.    And 207B was made out to whom?

2    A.    Fairbanks Morse Engine.

3    Q.    For how much?

4    A.    $459,505.

5    Q.    And dated?

6    A.    October 22, 2010.

7    Q.    After the contract, after the proposal was purportedly

8    signed?

9    A.    Right.

10   Q.    And 208B was made out to whom?

11   A.    Fairbanks Morse Engine.

12   Q.    For how much?

13   A.    $134,196.

14   Q.    And dated when?

15   A.    10-26-2010.

16   Q.    Government's 209B was made out to whom?

17   A.    Fairbanks Morse Engine.

18   Q.    For how much?

19   A.    $282,846.

20   Q.    And dated when?

21   A.    October 26, 2010.

22   Q.    Government's 210B was made out to whom?

23   A.    Fairbanks Morse Engine.

24   Q.    For how much?

25   A.    $37,704.

1    Q.    And dated when?

2    A.    October 28th, 2010.

3    Q.    Government's 211B was made out to whom?

4    A.    Fairbanks Morse Engine.

5    Q.    For how much?

6    A.    $723,763; October 28, 2010.

7    Q.    Government's 212B was made out to whom?

8    A.    Fairbanks Morse Engine.

9    Q.    For how much?

10   A.    $653,280; October 29, 2010.

11   Q.    And Government's 213B, to whom?

12   A.    Fairbanks Morse Engine.

13   Q.    For how much?

14   A.    $64,706 on October 29, 2010.

15   Q.    By the way, do you know how it is that the originals of

16   these checks came into the government's hands?

17   A.    Yes.  I gave them to you when I first met you in, I

18   believe, May or something.  It would have been, whoa, I

19   don't know if it was 2013 or '14 to be honest, but it was my

20   first visit to Tallahassee.

21   Q.    Did you -- and you'd indicated there had been -- that

22   there were e-mails before about the check dates or needed

23   new checks.  Did you take a precaution in case you messed

24   one of these up?

25        MR. PHILLIPS:  Objection to leading.

1        THE COURT:  Sustained.

2   BY MR. SIMPSON:

3   Q.   Well, let me -- let me show you Government's 214A,

4   214B, and 214C.  Did you have those checks as well?

5   A.   Yes.  I had some checks that were unstamped, also.

6   Q.   Why did you have extra checks -- well, actually,

7   there's a -- there appears to be at least one stamp.

8   A.   Yeah, there was.  Originally, I think there was

9   supposed to be nine checks, not eight.

10  Q.   Did you also have these?

11  A.   Yes.

12  Q.   Did you also give these to the government?

13  A.   Yes.

14  Q.   Did you get those separate from the other checks or all

15  in a bunch?

16  A.   I believe all in a bunch.

17  Q.   Okay.  Now, the amounts of those checks, if you total

18  them, may end up being 2,480,000 on the contract, but the

19  breakout is not the same?

20  A.   Correct.

21  Q.   The Fairbanks Morse proposal has -- looks like seven

22  different items on it.  You've got eight checks.

23  A.   Yes.

24  Q.   And the payment schedule includes a down payment and

25  then some subsequent payments.  Why do you put different

1  numbers on the checks?

2  A.   Because if you'll see the dates on these, they carry

3  out through 2010 and would have been indicative that we were

4  paying for the units after we got the money.  So that, in

5  fact, this page had to be changed in their agreement.

6  Q.   Okay.  The page in the agreement had to be changed?

7  A.   That we sent to the state.

8  Q.   So they got a different breakdown?

9  A.   Yes.  It matched up with the checks.

10 Q.   Okay.  And were the checks made to match up with the

11 breakdown that the state got or the breakdown that

12 Fairbanks Morse had?

13 A.   To what the state got.

14 Q.   I may have gotten ahead of myself.  Would Government's

15 221 be an e-mail from yourself to Mr. Maher dated

16 October 28?

17 A.   Yes.

18 Q.   You know if he was back from Italy by then?

19 A.   I don't really recall if he was back from Italy.  I

20 don't think he was.

21 Q.   Okay.  And is there a specific reference to eight

22 checks?

23 A.   Yes.  I believe the original checks were all

24 sequential, and we wanted them nonsequential.

25 Q.   Okay.  So what are you telling Mr. Maher about?

1  A.    I needed eight new checks.

2  Q.    So since these checks that we have are nonsequential,

3  they may have actually been created after this e-mail, after

4  October 28?

5  A.    Yes.

6  Q.    And would Government's 172 be another set of your

7  agendas for a meeting on December the 4th of 2010?

8  A.    Yes.

9  Q.    And who were you meeting with?

10 A.    Mr. Maher.

11 Q.    What's item No. 4 on your agenda?

12 A.    Fairbanks Morse, 124K.

13 Q.    Which meant what?

14 A.    That we'd never made the down payment, and to keep that

15 contract valid, we had to make the down payment.  And so, I

16 wanted that check approved and paid.

17 Q.    Okay.  And what's the further comment there?

18 A.    Well, I think it's misspelled.  "Two mored used zero

19 hour."  And I'm really lost for exactly what that means.

20 Q.    Were y'all talking about any other projects that might

21 involve such gensets?

22 A.    Yes, we did have others that we wanted to do, but I

23 don't know if it was being done concurrently.

24 Q.    Okay.  Would Government's 173 be an e-mail from

25 yourself to Lee Maher on December the 5th of 2010?  Sorry,

1    I'll move it down a little.

2    A.   Yes.  On December 5th, yes.  I can read this and I'd

3    probably need to explain one or two things on it, too.

4              MR. SIMPSON:  Okay.  First of all, Madam Clerk,

5    will you help us with the focus a little bit?

6              THE COURT:  Pam?

7              MR. SIMPSON:  Can you help us with the focus a

8    little bit?  Thank you.

9              THE WITNESS:  Okay.

10   BY MR. SIMPSON:

11   Q.   Okay.  First of all, what's the subject?

12   A.   Appreciate the time yesterday and best week yet coming,

13   meaning money was on its way.

14   Q.   Okay.  Walk us through and stop as you come to an item

15   to explain what you're talking about.

16   A.   Okay.

17        Lee, although last week was quite good, the one coming

18   up will set records.  The grant deposit.

19   Q.   Meaning?

20   A.   2.232 million, I believe, from -- in one check from the

21   state to reimburse us for the 90 percent of the money we had

22   theoretically spent.

23   Q.   But had not actually spent?

24   A.   Exactly.

25   Q.   Okay.  Go on.

1   A.    No. 2, the 800,000K on Groveland plus the 35K on

2   Thermex microwave resale.

3   Q.    Okay.

4   A.    The 800,000 is we sold the Grease operation, which was

5   still at Groveland, for $800,000 and some stock that was

6   basically worthless but they gave us stock, too.  And I

7   received a check for 1 percent, $8,000 of that, in the same

8   month, and we sold GreaseTec off and got not all that money

9   right away.  I think we got a quarter of a million in

10  December and the rest in January and February, and then we

11  sold a microwave that we didn't need for 35,000.

12  Q.    Okay.

13  A.    And we made a major proposal No. 3 to Michelin for a

14  $15 million project to take the extra rubber at a retread

15  plant and turned it into electricity, and we never won that

16  contract.

17      And No. 4, Interstate electricity wheeling rates and

18  details for out of state sales, which never happened.

19      And No. 5, esoteric 50-cent feedstock incentive of Bill

20  Freeman, was a gentleman we were trying to work something

21  out with to raise money and it didn't happen.

22      And No. 6, the real answers on the state 75 percent

23  credits for '07 and '09, Florida was giving out money to

24  people for various things that they did in the renewable

25  clean energy field and, again, that was unsuccessful.

1    Q.    Okay.  Would Government's 174 be an e-mail from you to

2    Lee Maher on December the 7th, 2010?

3    A.    Yes.

4    Q.    And what's the 1603 you refer to in the caption?

5    A.    That's the tax credit, the one that where we got the

6    cash back if it was done in 2001 -- or 2010, I'm sorry, and

7    that was the 30 percent of any investments made in the clean

8    energy segment.

9    Q.    Okay.  Well, what was the requirement if you wanted it

10   to count -- to count in 2010?

11   A.    Five percent of the cost must be incurred or paid for

12   before the end of the year.

13        Or physical work of a major nature has begun.  This is

14   paraphrased from the federal tax documents.

15        Only 20 percent can be used or not original use, i.e.

16   Groveland was only tested in Groveland and installed in

17   Orlando with new owners.

18        The Fairbanks 2.48 million should qualify for Fenway,

19   and that's because we were thinking about doing another

20   similar engine for up there.

21        Caterpillar Engine order should make the cut for the

22   Eagles, too.

23   Q.    And the Eagles is the Philadelphia Eagles?

24   A.    Yes, sir.

25   Q.    Let me ask you, when you suggested proposals that might

1  get money, grants, tax credits or otherwise, did Mr. Maher

2  show any interest?

3  A.    Yes.

4  Q.    Was it just a casual passing interest?

5  A.    No.  It was very interested in all the 1603, any grants

6  or any investors we could find to fund all the different

7  things.  At that time, remember, there was a major effort

8  with baseball stadiums and with NFL football stadiums to get

9  long-term contracts to provide their power, and I was pulled

10 over and did some -- a little bit of work on Fenway and the

11 Eagles for Mr. Maher.

12 Q.    I'm going to take you to 175.  This would appear to be

13 an e-mail from yourself to Mr. Maher on December the 9th of

14 2010.  What's the e-mail about?

15 A.    Important payables reminder.

16 Q.    And what did you actually tell Mr. Maher on December

17 the 9th?

18 A.    There's a lot of people we owe money to, and I'll

19 highlight it and read it, but I was trying to get money to

20 pay various vendors.

21       Although much cash is coming in, there are a few that

22 top of mind short time -- there are a few that are -- and I

23 left out "are" -- top of mind short term needs.  I will

24 expand and formalize the list from last Saturday for the big

25 infusion.  Finally, my last meeting on the bridge is at noon

1 Monday lunch with Matt, Michael, and Tom Ruggie, somewhere

2 around Winter Park.

3     And then the three things that I wanted paid were:

4     $1,275 to get current with some refiling work with

5 Groveland.

6 Q.    Who's Bill?

7 A.    I'm sorry?

8 Q.    You said "get Bill current," Who's Bill?

9 A.    Oh, I'm sorry, that was Bill Griswold, paying Bill for

10 some valuations he'd done.

11 Q.    Okay.  Go on.

12 A.    No. 2, $8,000 balance, still 5K for Elliott Davis to

13 take hold off the Groveland refiling.  There's typos again.

14 The five thousand finally paid Tuesday after two weeks of

15 effort was September's past due.  8,000 is October's past

16 due.  Would like both Monday and theoretically use the 85

17 inflow from earlier e-mail.

18 Q.    And I'm sorry, what was Elliott Davis owed for?

19 A.    They were helping us file the 1603 tax credit.

20 Q.    Okay.

21 A.    They were an accounting firm in Greenville, South

22 Carolina.

23 Q.    And what's No. 3?

24 A.    No. 3:

25     The big one is the 124K for Fairbanks Morse that

1    clinches the 1603 for Lakeland and Fenway Park.  This is

2    obviously dependent on the state grant.  Thanks, Larry.

3         So I wanted to make the down payment so that we had

4    that option to keep the Fairbanks Morse Engine available.

5    Q.   And that was going to clinch the 1603 for Lakeland --

6    first of all, were you both going to try to get reimbursed

7    from the state and try to get a tax credit for that genset?

8    A.   Yes.  And I believe that was allowed, that you could do

9    both.

10   Q.   And were you going to be able to use the same genset at

11   Fenway or what's going on there?

12   A.   That has me a little confused because I don't know that

13   we could use the same engine, but I think there was a

14   potential to use a similar one thought of at that time and

15   it turns out that it needed to be much smaller, so I'm not

16   sure what that really meant.

17   Q.   And would 176 be an e-mail from yourself to Lee Maher

18   on December the 9th, 2010?

19   A.   Again, the subject is short term new cash flow:

20        To finish last night's discussion on new cash.

21        50,000 today, deposit Groveland account.

22   Q.   Are you saying there is 50,000 or you're asking for

23   50,000?

24   A.   I'm asking for it.

25   Q.   Okay.  Go ahead.

1  A.    35K from Thermex Friday or Monday 13th, electronic

2  Lakeland.

3  Q.    So that's coming in or going out?

4  A.    That would be coming in.

5  Q.    Okay.

6  A.    250K minimum, 450 maximum on December 14/15 in

7  Groveland account.  And now --

8  Q.    You're asking for or you're --

9  A.    No, that's coming in, and I should correct myself.

10  It's been several years I guess.

11       The 50,000 was a deposit on the people buying

12  Groveland.  Okay.  I'm pretty sure that would -- and then

13  they were to make another payment, minimum 250 or maximum

14  450 towards that $800,000 sale.

15  Q.    Okay.

16  A.    And obviously big one any day.  Trevor Yelverton should

17  give us precise guidance today.  He must have been a finance

18  person with the state or something.

19  Q.    And what's the big one?

20  A.    The big one is the 2.232 million.

21  Q.    Would 177 be another set of your pre-meeting notes?

22  A.    Yes.

23  Q.    For December 13th of 2010?

24  A.    Yes.

25  Q.    Who were you meeting with?

1  A.    Lee Maher.

2  Q.    And what's the fourth item on your agenda for December

3  the 13th?

4  A.    Key payments Tuesday and Wednesday.  Pay Fairbanks

5  overnight.

6        I'm still after the 124,000 deposit.

7  Q.    Seven years ago today.  Today's the 13th.

8  A.    I guess it is.

9  Q.    Would Government's 178 be yet another set of meeting

10 notes for 12-14 of 2010?

11 A.    Yes, with Mr. Maher.

12 Q.    Who were you meeting?

13 A.    Yeah.

14 Q.    Okay.  And what's the first item on your agenda?

15 A.    Final decision, separate account.  Let money go in

16 Lakeland, then transfer the 2.2 million, wherever you want

17 it, but I wanted it in an account so that there could be a

18 clear accounting later on.

19 Q.    You wanted what in a separate account?

20 A.    The money from the state, excuse me.

21 Q.    And when you go down to Item No. 3, what are you

22 talking about?

23 A.    Three payments that I wanted him to make.

24 Q.    And what are they?

25 A.    Global Scientific, which is the name of Bill Griswold's

1   company for the $1,275 he was owed, and I was requesting a

2   wire transfer.  Bill was many months past due.

3        The second was Elliott Davis, to continue their efforts

4   on the 1603 for 8,000.

5        And the third was to pay me my 1 percent on the

6   Government grant check.

7   Q.   $22,230?

8   A.   Yes.  Yeah, 1 percent.

9   Q.   Okay.

10  A.   And that was on anything.  It wasn't just for the

11  grant.  It was anything I did to raise money.

12  Q.   And what's Item No. 6?

13  A.   Overnight Fairbanks Morse check, still trying to get

14  the 124 deposit so we could actually buy the units in the

15  first quarter.

16  Q.   What's the notation I've -- at the side here, if you

17  know or remember?

18  A.   Well, it's Fenway Clean Air.  I think that they had a

19  60 DBA, which is decibels.  It's a special rating system for

20  sound, and they needed 85A attenuated and 60 at some

21  distance from it to meet there.  So I threw in a note that

22  really has nothing to do with Fairbanks Morse there.

23  Q.   Okay.  Would Government's 179 be another meeting

24  agenda, this time for December the 17th of 2010?

25  A.   Yes.

1   Q.   With whom?

2   A.   Lee Maher.

3   Q.   And whose copy is this?

4   A.   It's his.

5   Q.   And midway through Item No. 3, what's this remark and

6   what's this about?

7   A.   First payment to Elbow River needed to be made.

8   Q.   Who was Elbow River?

9   A.   They are the people that had been assigned the debt

10   from World Energy from whom Lakeland had been purchased.

11   Q.   So they were owed the money for the plant?

12   A.   Yeah, right.  It'd been transferred to them as part of

13   a settlement in a bankruptcy in a fraudulent issue World

14   Energy had with them.

15   Q.   Okay.  And what's the next reference?

16   A.   Small 3.2-megawatt electric plan.

17         THE COURT:  Ladies and gentlemen of the jury, my

18   apologies.  We've heard a little bit of banging.  It's -- it

19   hasn't impacted my ability to hear.  Has it impacted any of

20   your ability to hear?

21         Let the record reflect all the jurors have

22   indicated no.  If you hear a bang, and it keeps you from

23   hearing something, as I've told you before, just ask

24   Mr. Simpson to repeat his question, or the witness to repeat

25   the answer.  The individual that should be going upstairs

1    and reminding them what we're doing is not in his office, so

2    I have Ms. Lourcey following up, so my apologies.

3             Mr. Simpson, you may proceed.

4             MR. SIMPSON:  Thank you, Your Honor.

5    BY MR. SIMPSON:

6    Q.   Mr. Long, is the 3.2 and the next line about

7    Fairbanks Morse, is that the same item or two different

8    items?

9    A.   No, we must have gotten to the point where we're going

10   to have to have two engines, Fairbanks, for Fenway as well

11   as Lakeland.

12   Q.   And let me ask you, I've been going through these

13   agendas.  Do these reflect meetings which actually took

14   place?

15   A.   Normally, I could get through a half to two-thirds of

16   the subjects, yes.

17   Q.   Okay.  Well, first of all, do they reflect that you and

18   Mr. Maher actually met?

19   A.   Yes.

20   Q.   When you and Mr. Maher actually met, were you able to

21   get through everything on the agenda?

22   A.   Not always.

23   Q.   If you didn't get through something that you thought

24   was important, did you just forget about it?

25            MR. PHILLIPS:  Objection; leading.

1        THE COURT:  Sustained.

2    BY MR. SIMPSON:

3    Q.    What did you -- what did you do?

4    A.    It showed up in the next agenda usually.

5    Q.    You've had several agendas here where a payment to

6    Fairbanks Morse or a down payment to Fairbanks Morse showed

7    up.  Why did you give that a priority?

8    A.    I still strongly believed that even though we had

9    violated the reimbursement clause, that we were going to buy

10   the engines in the first quarter, January or February, and

11   get that done.  And to maintain that ability, we had to give

12   them their down payment or they could sell it to anybody.

13   Q.    And if you didn't get it done?

14   A.    They could go on the open market and we could lose the

15   engine, and then we had a different set of problems on

16   fulfilling the grant.

17   Q.    Okay.  The Government's 180 is a document titled,

18   "December Cash Flow (Larry Long Perspective)."  Is this your

19   personal cash flow or business cash flow?

20   A.    This is the business cash flow.

21   Q.    The top part is:  Source of Funds.  I assume that's

22   incoming?

23   A.    Yes.

24   Q.    Okay.  Who's Freedom Environmental?

25   A.    They're the group to brought the Groveland GreaseTec

1    operation.

2    Q.    And Thermex?

3    A.    Was a company that repurchased a microwave unit from us

4    that we had that we didn't need.

5    Q.    ARS-005?

6    A.    That's the grant payment.

7    Q.    Another reference to Freedom Environmental, is that the

8    same thing as FE?

9    A.    Yeah.  Second payment and the third payment on the

10   $800,000 sale.  There was a lot of money coming in in

11   December.

12   Q.    Then you've got:  Uses.  We've talked about Elliott

13   Davis already.  What's money for Syed Jafri?

14   A.    We needed Syed to do something, and I don't know why he

15   got paid separately from -- although I think he was a

16   consultant at that time like I was, so that there was money

17   owed to Syed to help me.  He was a brilliant man.  He was

18   our CTO.

19   Q.    Okay.  The same money to Mr. Griswold?

20   A.    Yes, that I've been referencing earlier.

21   Q.    Still trying to get Frazier Barnes paid?

22   A.    Yes.  Notice:  14 months past due.  That's at least

23   giving some money to Cummins Atlantic, because the checks

24   that were written originally either weren't sent or bounced;

25   I don't know which.

1   Q.   Bob Nave?

2   A.   He was the consultant helping on the revision, and it

3   goes back to May of '09 --

4   Q.   Yourself?

5   A.   -- although the money was spent, I believe, and owed in

6   2010, but it had to do with the revision of the '09

7   agreement.

8   Q.   You're talking about Mr. Nave?

9   A.   Yes.

10  Q.   Okay.  And the amounts to yourself?

11  A.   Yes.  Two amounts, 22,230 for me for the 1 percent on

12  the Fairbanks Morse, and then 8,500 for the 1 percent on the

13  sale of the operation in Groveland.

14  Q.   And this item?  Sir, what's that item?

15  A.   Oh, I'm sorry.  That was another request for 124,000

16  for the down payment on the Fairbanks Morse unit.

17  Q.   Let me take you back to Government's 206B.  Did you

18  already have a check for 124,000?

19  A.   We probably would have had to replace this one, but

20  that was the one that was supposed to have been sent, yes.

21  Q.   Okay.  Well, what's the check number on your funds use?

22  A.   2315, which would imply we were going to use that

23  check.  It obviously had been held.

24  Q.   Well, who was holding it?

25  A.   I should probably fully answer that question and say I

1  kept all the checks off-site so others couldn't see them,

2  and because I was beginning to worry that I might need them

3  to protect myself later on.

4  Q.    Protect yourself from what respect?

5  A.    From potential legal problems as we were continuing

6  this charade.

7  Q.    And the charade being?

8  A.    That we didn't spend the money, and we got the funds as

9  if we had.  So it was the fraud on the grant.

10  Q.    Would Government's 181 --

11          MR. PHILLIPS:  Your Honor, may we approach?

12          THE COURT:  Certainly.  Ladies and gentlemen of

13  the jury, you can stand and stretch and talk amongst

14  yourself as long as it's not about this case.

15          (Following conference held at sidebar at 10:17 a.m.)

16          MR. PHILLIPS:  Your Honor, the last several

17  minutes, Juror 12 has had his head down and his eyes closed

18  and is motionless.  The same -- it's the one that I --

19          THE COURT:  And I got to tell you, I was just

20  looking at you.  When you say the last several minutes, that

21  suggests to me that he's done that for five minutes, and I

22  was just looking at him.  So I noticed earlier today he

23  jerked his head once, and I saw him take notes immediately

24  thereafter.  I've got to admit, I'm completely flummoxed

25  because I was just staring right at him when you asked to go

1    sidebar.  So, how in the world it was for several minutes

2    since I was looking right at him, I observed something

3    totally different.

4            But you can ask to approach sidebar again, but I

5    was just looking at him, and I'm -- we're all talking about

6    the same gentleman with the same beard, and I was just

7    looking right at him, and he didn't have his head down for

8    several minutes.

9            So I don't know if we're looking -- if we have a

10   different line of sight, but he was, several minutes ago,

11   within the last five minutes, he was stroking his beard.

12   I've been taking very detailed notes about his actions, and

13   not only was he taking notes, he was stroking his beard, he

14   raised his eyebrow once.  I don't know if he was looking at

15   me or somebody else.  He actually raised his right eyebrow

16   as if to gesture or respond, so I'm -- I've got to say I'm

17   flummoxed.

18          MR. PHILLIPS:  Your Honor, and I appreciate the

19   Court's observations on that.  My personal observations,

20   I've seen him with his head down, and just saw it again as

21   Ms. Newman indicated it to me at the same time.  That's when

22   I rose and asked to approach.

23          Your Honor, in candor, I don't have a unit of

24   measure for how long he was, to my mind, nonparticipant, but

25   it was not an instantaneous head jerk.  I don't know what

1   the right adjective would be, but extended, short, or

2   whatever, but there was a period of time for which he was

3   head down, eyes closed, and motionless.  That was what my

4   personal observation was, Your Honor.

5           THE COURT:  I understand.  Mr. Simpson, anything

6   further?

7           MR. SIMPSON:  Your Honor, I've tried to scan the

8   jury from time to time, and I haven't observed -- I have not

9   observed a problem.

10          MR. PHILLIPS:  Your Honor?

11          THE COURT:  I'm almost inclined to have his notes

12  copied and made part of the record because I've seen him

13  taking notes this morning, and so we can match up his notes

14  to what's being testified to, but I'm not suggesting that no

15  one in the jury has put their head down for 20 seconds or

16  less today, because I'm not staring at the jury nonstop.

17  But I have closely observed the jury today, particularly

18  Jurors No. 12 and 7.  I have not seen Juror No. 7 do

19  anything at all today other than keep her eyes open and

20  focus on the witness.

21          As to No. 12, I simply have been looking at him,

22  and there's no way, other than a brief head nod, which I'm

23  not discounting that that could have occurred since I

24  haven't been staring at him the entire time.

25          I will make the affirmative finding on the record

1  that no juror, particularly No. 12, has had their head down

2  for minutes.  And by that I mean two minutes or more.  It is

3  possible that somebody had their head down for less than a

4  minute, because I, again, have not constantly been observing

5  every juror.  But I will, based on my observation this

6  morning in light of the discussions yesterday afternoon,

7  there had -- none of these jurors have had their head down

8  or their eyes closed for more than whatever time it would

9  take for me to look back and forth to the juror face to

10  face.  And so --

11       MR. PHILLIPS:  Your Honor, I'm sorry.  Please, I

12  didn't mean to interrupt.

13       THE COURT:  Go ahead.

14       MR. PHILLIPS:  Your Honor, in light of the Court's

15  observation yesterday that, sometimes, parties endeavor to

16  inject issues in the record, that is absolutely not our

17  intention here.  We were chided yesterday for not bringing

18  it to the Court's attention as promptly as we ought, and I

19  wanted to make sure that at every instance I observe it, I

20  will bring it to the Court's attention, so I don't want it

21  to be a problem.

22       THE COURT:  Absolutely --

23       MR. PHILLIPS:  I'm not trying to be a problem.

24       THE COURT:  -- and I'm not suggesting -- that's

25  why I said, all I'm suggesting is I didn't take exception

1    with your view that he may have nodded his head.  I can't

2    affirmatively say nobody nodded their head.

3         What I took exception was when we start talking

4    about minutes, if we, as we often do during closing

5    arguments, they may say, they said it took two minutes,

6    everyone close their eyes for two minutes, and hit the

7    stopwatch.  Two minutes is an extended -- so to say

8    "minutes" suggests at least more than one.  And two minutes,

9    120 seconds, is an extended period of time.

10        And my only finding was that there was no way,

11   anyone, for 120 seconds, was looking down at any point today

12   because there was no period for which I did not observe the

13   jury within that time frame.

14        MR. PHILLIPS:  In that case, Your Honor, if it

15   recurs, we would ask that the Court have an in-camera

16   colloquy with No. 12 as well just to make sure we're not

17   misinterpreting anything.

18        THE COURT:  Sure.  And if it comes back, I'm

19   not -- I said yesterday, I specifically said in the

20   afternoon I saw him briefly jerk his head twice and pop back

21   open -- his eyes back open and take a note.  So, I didn't

22   suggest that your suggestion or observation yesterday that

23   he didn't jerk his head twice didn't occur.  My only thing

24   was it only occurred a couple of times and it was very brief

25   and he immediately was engaged.

1          MR. PHILLIPS:  Your Honor, he may have a neck

2     injury.  That may be how he normally behaves.  I have no

3     idea.  But it's also indicative of other behaviors.

4          THE COURT:  No, I understand.  And again, I wasn't

5     taking umbrage with the suggestion that he was tired and he

6     jerked his head, and that prompted him to wake up.  But the

7     question is, is somebody missing testimony and how long were

8     they out?

9          I was not suggesting you shouldn't come sidebar.

10    You did exactly what I suggested.  Although I must admit, I

11    was looking right at the jury right when you objected and

12    asked to go sidebar, and I hadn't seen anybody jerk their

13    head.  But, be that as it may, the finding I was making was

14    an affirmative finding that he had his head down for an

15    extended period of time.

16         The jury is asking for a break, so we'll take a

17    break.

18         MR. PHILLIPS:  Thank you.

19      (Sidebar concluded at 10:23 a.m.)

20         THE COURT:  Ladies and gentlemen of the jury, I

21    should have just had you take a break while we were doing

22    that.  We'll go ahead and take our morning break.  My

23    apologies.

24         Please leave your notes in your chair.  I'll

25    remind you not to discuss this case; and again, as I said

1   repeatedly I believe during voir dire and I said repeated --

2   at least once during preliminary instructions, the reason

3   why that's so is you must not rush to judgment.  You must

4   not form any opinions or rush to judgment until you have

5   heard all the evidence, my instructions on the law, and the

6   closing arguments of the lawyers.

7            Thank you.  You may now retire for your break.

8        (Jury out at 10:24 a.m.)

9            THE COURT:  Please take your seats.

10            Anything further before we take our break?

11            MR. SIMPSON:  No, sir.

12            MR. PHILLIPS:  No, Your Honor.

13            THE COURT:  All right.  Thank you.

14            Court is in recess for 10 minutes.

15        (Recess taken at 10:25 a.m.)

16        (Resumed at 10:51 a.m.)

17            THE COURT:  Please take your seats.

18            Is the government ready to proceed?

19            MR. SIMPSON:  Yes, sir.

20            THE COURT:  All right.

21            Let's bring in the jury.

22        (Jury in at 10:51 a.m.)

23            THE COURT:  Please take your seats.

24            Mr. Long, you are still under oath.

25            And, Mr. Simpson, you may proceed.

1    BY MR. SIMPSON:

2    Q.   Mr. Long, on the screen, we have Government's Exhibit

3    181, which is an e-mail from yourself to Lee Maher on

4    December the 18th of 2010.  The subject is December cash

5    flow.  Is this your e-mail?

6    A.   Yes.

7    Q.   Okay.  There also are some handwritten notes on it.

8    Are those your handwritten notes?

9    A.   Yes.

10   Q.   Beginning at the top of the handwriting on the

11   left-hand side, it appears to say "12-20 final answers"?

12   A.   Yes.

13   Q.   Does that reflect a conversation with someone else?

14   A.   No.  I believe what it reflects is that I must have

15   gone home on a Saturday and we are going to have a phone

16   call and either we had it and there was an amended call on

17   the 20th, Monday, or I didn't have the Saturday and we did

18   it on Monday by phone or something.

19   Q.   Okay.  A call with whom?

20   A.   With Mr. Maher to get the --

21   Q.   And are the other handwritings a reflection of what was

22   decided in that call?

23   A.   Yes.

24   Q.   Okay.  Let me start off.  What's Item No. 1?

25   A.   $3,000 bonus for Long on sale.  Wire please because of

1    holidays.

2    Q.    Do you remember which sale that had to do with?

3    A.    That would have had to do with the Clean Fuel -- or the

4    Groveland sale.

5    Q.    The Freedom Energy purchase.

6    A.    Yeah, the Freedom Energy purchase, yeah.

7    Q.    Okay.

8    A.    And to finish that, it says:  Thought on the 28th there

9    would be another 200K and you may want to combine to a 5,000

10   as it is only 10 days away.

11       Obviously, with money coming in, we are trying

12   redistribute some to people.

13   Q.    Okay.  And your cash flow was hurting?

14   A.    Yes.  And below when I originally started out by half,

15   so I'm in trouble.

16   Q.    Okay.  And the next item, No. 2?

17   A.    That was Syed Jafri and this says what it was for.  He

18   wrote a consulting letter on the Cummins biodiesel.  I had

19   an independent company for the ITC filing saying that it

20   qualified.

21   Q.    Okay.  And the checkmark indicates what?

22   A.    That he was going to do it as written rather than

23   adjust it.

24   Q.    He who?

25   A.    Mr. Maher.  Excuse me.

1    Q.    Okay.  And Item No. 3?

2    A.    500 for Eric and Kelly, who are keeping Lakeland open.

3          Aaron's suggestion as a Christmas bonus to them.  They

4    were -- the plant was basically not being occupied, but we

5    had to have some people there just so it didn't

6    disintegrate.

7    Q.    And what's the -- I can't quite read it.  What's this

8    notation at the center?

9    A.    Yeah, it -- I can't tell whether the number was changed

10   or not, but it's something for each.  And even with my

11   glasses, I can't tell what it is.  It looks like 200 instead

12   of 500.

13   Q.    Okay.  And Item No. 4?

14   A.    Was $3,000 for Frazier Barnes instead of 6.  Still owe

15   17,000.

16         And the number that was approved was 2,000.

17   Q.    Okay.  What's the stuff on the right-hand side?

18   A.    I think that would be the new updated amount owed,

19   2,000 from 17 and just be -- 15 would be the balance.

20   Q.    Item No. 5?

21   A.    10,000 for Cummins engine, for those two gensets.  They

22   were a year old and we still owe 60,000.  And my note:  I'm

23   totally embarrassed with 40-year friendship with them.

24   Q.    Did you get any money from Mr. Maher for Cummins?

25   A.    I really don't know.  I don't remember.

1  Q.   Is there a reflection of an amount there?

2  A.   Yeah, it looks like we were going to pay them 7,500,

3  but I don't know if it was sent.

4  Q.   Okay.  And Item No. 6?

5  A.   3,000 for Bob Nave in Tallahassee, instrumental in the

6  second winning of grant, the consultant, and 2,000 was

7  approved.

8  Q.   No. 7?

9  A.   5,000 for Southern Strategy lobbyists, a year old and

10  we need their help on the three $5 million

11  Enterprise/Opportunity Fund filings in the first quarter of

12  2011.

13      There were additional monies available.  This is a

14  group that does a lot of lobbying in Tallahassee, and we'd

15  owed them 10,000 for a year.

16  Q.   It looks like not all, but most of these were -- your

17  proposed figures were cut a significant amount.

18  A.   Yes.

19  Q.   If you didn't like Mr. Maher's decisions on this, who

20  could you appeal to?

21  A.   No one.  I would bring it up again, but there was no

22  appeal.  I mean, he controlled all the funds for all the

23  companies.

24  Q.   What's No. 8?

25  A.   It's the big one.  For the tenth time, we need to

1   overnight the 124K to Fairbanks for the Fenway ITC, Lakeland

2   grant and to ensure we don't lose the grant.

3       And if you read that carefully --

4   Q.   Don't lose the?

5   A.   Grant.  I'm sorry.

6   Q.   Look at the screen, sir.

7   A.   I'm sorry.

8   Q.   Don't lose the?

9   A.   Genset.

10  Q.   Okay.  Go ahead.

11  A.   I have this check and only need to send.  Gave Shanna a

12  copy.

13      And it appears there had been a request to potentially

14  use that payment for Lakeland ITC, as well as the Fenway.  I

15  don't think anything ever happened there, but by listing

16  both of them, it would be the double use of the same check.

17  Q.   Well, let me ask you.  You are talking about this

18  check, the $124,000 check --

19  A.   Yes.

20  Q.   -- with Mr. Maher's signature stamp made out to

21  Fairbanks Morse.

22      When you -- and I'm assuming you must have -- since

23  you've got notes all the way to the bottom of the page, that

24  you must have in this call made it through this agenda this

25  time.

1  A.   Yes.

2  Q.   When you got to the part where you told Mr. Maher that

3  you had the $124,000 check written on his bank account, did

4  he express surprise?

5  A.   No.

6  Q.   Did he ask you how you came to get one of his checks

7  for $124,000?

8  A.   No.

9  Q.   Did he ask you to give him the check back so that

10  nothing happened with it?

11          MR. PHILLIPS:  Objection to leading.

12          THE COURT:  Sustained.

13  A.   No.

14          THE COURT:  Sustained.

15  BY MR. SIMPSON:

16  Q.   Did Mr. Maher express any concern or protest in any

17  form when he found out that -- when you told him that you

18  had the $124,000 check?

19          MR. PHILLIPS:  Objection to leading.

20          THE COURT:  Overruled.  You can answer.

21  A.   He knew that I had the check and we were still planning

22  on sending them.  This was December again and there was a

23  reasonable chance --

24          THE COURT:  Mr. Long, the question was did he

25  express --

1     THE WITNESS:  I'm sorry.

2     THE COURT:  -- in any form.  It calls for a yes or

3  a no.  The lawyer can ask a follow-up question if the answer

4  is yes.

5     THE WITNESS:  Excuse me.

6  BY MR. SIMPSON:

7  Q.  Did he express any --

8  A.  No.

9  Q.  Okay.  Was this the first time he learned that you had

10  the checks?

11  A.  No, he knew I had the checks.

12  Q.  And would Government's 182 be an e-mail from yourself

13  to Mr. Maher on December 31st of 2010, reference agenda for

14  11 a.m. call today?  I guess the last day of the year.

15  A.  Yes.

16  Q.  First item, tell us about that.

17  A.  Reduce payroll.  Carolyn and David -- two employees --

18  off Lakeland payroll starting Monday.  Other seven off

19  GreaseTec a week ago.  And I can't quite see the far right

20  of it, but -- thus Friday's arrears payment is the last.

21  Q.  Had there been a problem making payroll?

22  A.  Yes, we had been late a little.

23  Q.  And employees were being let go?

24  A.  Yes.

25  Q.  Well, you sold GreaseTec; right?

1    A.    Yes.

2    Q.    And what's going on at Lakeland?

3    A.    Very little.  Could have been processing possibly some

4    glycerin, but no biodiesel.

5    Q.    Well, by the end of 2010, did you have access to the

6    plant?

7    A.    I don't remember exactly when we were prohibited.  I

8    believe it was before the end of the year we were not

9    allowed on the premises.

10   Q.    And who was it that wouldn't let you on the premises?

11   A.    Bob Stanley, who was the landlord and owned the

12   property.

13   Q.    Now, further down there's -- tell us about Item No. 6,

14   please.

15   A.    I think it refers to the previous one.

16   Q.    First of all, tell us what it is.

17   A.    Oh.  Okay.  Fairbanks Morse kills three birds with one

18   stone.

19         We believe -- the potential use of the two ITCs as the

20   5 percent down payment you needed to make during the year,

21   as well as insuring that we have the genset for delivery.

22   Q.    And then at No. 9, can you give us a little better

23   understanding of what that has to do with?

24   A.    Yes.  And this would confirm that we weren't allowed on

25   the site.  It's says:  Stonewall.  Brazilian holding 355,000

1   of lab equipment.

2        That would be a reference to Dower Drummond; and since

3   we weren't allowed on, we did not know if our lab equipment

4   had disappeared, which was owned by Clean Fuel Lakeland

5   and --

6   Q.   Okay.  And 183 is a document labeled "Priorities that

7   Maximize Value in 2011 and Leverage Larry Long's skills for

8   Lee Maher's 'Renewable Energy Business.'"

9        Who created this?

10  A.   I did.

11  Q.   And did it reflect your plans and opportunities at the

12  end of the year, the beginning of 2011?

13  A.   Yes.

14            MR. PHILLIPS:  Objection.  Leading, Your Honor.

15            THE COURT:  Sustained.

16            MR. PHILLIPS:  And move to strike the witness's

17  answer accordingly.

18            THE COURT:  Ladies and gentlemen of the jury, I've

19  sustained the last objection.  I'll direct you to ignore the

20  last response.

21            But, Mr. Simpson, you can reask the question.

22            MR. SIMPSON:  Yes, sir.

23  BY MR. SIMPSON:

24  Q.   What's the first opportunity that you are talking about

25  here?

1  A.   Monetize the Eagles contract.  If closed and executed,

2  then you can borrow against the future earnings because it's

3  a power purchase agreement with a company that's bona fided

4  and so there was a chance to leverage that into a

5  considerable amount of money.

6  Q.   And the next one?

7  A.   Fenway contract in January.  I'm not sure.  I guess the

8  downside we didn't know and the upside is the 5 to

9  $10 million if you monetized it possibly.

10  Q.   And the third item?

11  A.   Someone had brought up a PPA in Hawaii and I obviously

12  didn't know any details, but put question marks that it was

13  a possibility to do something.

14  Q.   Let me ask you did any money come out of the Eagles or

15  Fenway or Hawaii?

16  A.   No.

17  Q.   The fourth item?

18  A.   Lakeland restart and monetization.  Sell for

19  $10 million.  5-megawatt PPA could go for 20; and if you had

20  a 10-megawatt PPA, it could go for $40 million.  And

21  monetize those contracts with the Lakeland utility.

22  Q.   Okay.  Number V?

23  A.   Three Florida NFL stadiums.  Discussions about three

24  times $5 million 'opportunity fund.'  Need a feasibility

25  analysis.

1      This is when -- this is a wish list of all the things
2 that could happen and that were on the target for the next
3 year.
4 Q.    Okay.  Did it actually work out, any of the three
5 Florida NFL stadiums?
6 A.    No.
7 Q.    What's No. VI that's already circled on your agenda?
8 A.    Ensure we keep the state grant and the 3.2 million in
9 ITC funds, which meant execute and buy the equipment from
10 Fairbanks Morse so that we could go ahead and fulfill that
11 agreement.
12 Q.    I'm going to go to Government's Exhibit 184.  Would
13 this also be a product of your work?
14 A.    Yes.
15 Q.    The first item is listed as Lakeland.  What are you
16 talking about here?
17 A.    We needed to go forward with the 3.2 megawatt so that
18 we didn't have to repay, point No. 1, the grant because I
19 knew if we didn't do it we had to repay the money.
20 Q.    Okay.  What's the second reason?
21 A.    It's -- there's another Enterprise Fund available from
22 DOE money that we could go after that was a $5 million
23 opportunity.  So we needed an operating plant to do that.
24 Q.    Okay.  What's the third reason?
25 A.    Wheel electricity to a higher cost area.

1    It was a potential opportunity that may have not been

2  legally approved.  We were going to find out.  But it would

3  be to wheel the electricity to another site other than just

4  Lakeland that was higher cost.

5  Q.   You find some place where electrical rates were higher?

6  A.   Yes, sir.

7  Q.   Okay.  Number 4?

8  A.   And the fourth thing:  When you sell an operating

9  plant, you get a lot more money than a shut down plant.  My

10  comment.

11    Number 5 --

12  Q.   I take it you didn't think Florida was a good place to

13  be in this business?

14  A.   No, because -- I won't go into anything else.  No, it

15  was not.

16  Q.   And was 185 a list of your priorities for meeting with

17  Lee Maher on January the 4th of 2011?

18  A.   Yes.

19    THE COURT:  Mr. Simpson, give me one more minute.

20    (Pause in proceedings.)

21    THE COURT:  You may proceed.

22  BY MR. SIMPSON:

23  Q.   And what is Item No. IV in this meeting early in the

24  new year with Mr. Maher?

25  A.   Pay Fairbanks Morse.

1    Q.    And give us the details -- your reasons why to pay

2    Fairbanks Morse.

3    A.    Get the $900,000 1603 tax credit and it's immediate

4    cash.

5              MR. PHILLIPS:  Your Honor, may I approach?

6              THE COURT:  You may.

7         (Following conference held at sidebar at 11:10 a.m.)

8              THE COURT:  Yes, sir.

9              MR. PHILLIPS:  Your Honor, I literally was just

10   elbowed by Mr. Sands, turned my head.

11             THE COURT:  And this is an angle problem.  He is

12   writing with his pencil.  That's what I indicated earlier.

13   Y'all keep saying he's looking down and he's looking down.

14   From where I'm sitting, he's writing notes.

15             MR. SIMPSON:  He's got a notepad on his right knee

16   and his right hand is right on it.  His eyes are actually

17   open, although they are not open very far.

18             THE COURT:  It's the angle.

19             So I understand from -- so the record is clear, I

20   understand why from the -- so the record will be clear,

21   defense counsel's -- co-counsel were shaking their head yes

22   when I was saying he had a pencil.  I'm just going to ask

23   and encourage you to object and come to sidebar.  But that's

24   what I was observing earlier when I said he's got his notes.

25             And I realized when I was just looking at him that

1    if you were looking at him, his head looks like it's down;

2    and when he takes notes, he takes them for an extended

3    period of time.  So when you said "minutes," I now

4    understand why you said it could have been a minute and a

5    half because before when I was observing him, he was taking

6    notes.  He was writing vigorously for an extended period of

7    time, and that could entirely be what you were observing.

8          MR. PHILLIPS:  From my seated position, I can only

9    tell what I see --

10         THE COURT:  And so it's clear now, that's why I

11   said it may have been the vantage point when we were at

12   sidebar before.  It now makes sense to me, based on when you

13   stood up. I said, okay, that's exactly what it was before,

14   that it wasn't that you didn't see something, it was down

15   for an extended period of time.  You and I were just looking

16   at two different things from two different angles, and he

17   was definitely writing.  That's why I said, when we had the

18   record before, we can get his notes and follow them and

19   track them, because I saw how many notes he was taking

20   today.

21         MR. SIMPSON:  I was -- I happened to be looking at

22   the juror before and after the defense, and he was both

23   times taking notes.

24         THE COURT:  But I want to make plain, this is

25   different than late yesterday afternoon what defense counsel

1    observed, because this Court did observe, as defense counsel

2    did, this juror on two occasions do the head nod when you

3    jerk yourself awake.  That definitely happened yesterday

4    twice.  I said that on the record last night, and I'll

5    repeat, it certainly happened, but this extended period of

6    time looking down is he's taking notes.

7            MR. SIMPSON:  I would also note that I believe the

8    juror is at least as old as I am, white hair and retired,

9    and I know that as one ages, one's eyelids tend to get

10   closer to each other, and I think even when his eyes are

11   open, they're not open very far.

12           THE COURT:  Well, I definitely saw him nod his

13   head yesterday.  I just didn't see that today.  It now makes

14   total sense what defense counsel was observing earlier, and

15   the second you objected and asked to come sidebar, I'm like

16   now I understand because I was staring directly at him and

17   he was writing notes.  He does -- he is bending forward and

18   you see no movement up top.  I can see, through, from the

19   side, he's got his hands, and he's taking notes on his lap.

20           MR. PHILLIPS:  Excellent.  And, Your Honor, I

21   won't belabor the point, but if I see it again, I --

22           THE COURT:  Absolutely.  I don't want you to

23   interpret anything.  I want you to come sidebar, and if it's

24   a head jerk, I'll note it's a head jerk.  If it's him taking

25   note, I'll note it's him taking notes.

1          MR. PHILLIPS:  Absolutely, Your Honor.  Thank you.

2          THE COURT:  Thank you.

3      (Sidebar concluded at 11:14 a.m.)

4          THE COURT:  Counsel, you may proceed, I'm sorry.

5          MR. SIMPSON:  Thank you, Your Honor.

6  BY MR. SIMPSON:

7  Q.   And would Government's 186 be your notes reference

8  decisions required 1-5-11, January 5th 2011?

9  A.   Yes.

10 Q.   Now, one of the -- it says locks off storage/lab

11 equipment.  What's that about?

12 A.   I believe that was in relationship to the earlier

13 comment about the 355,000 worth of equipment that might be

14 gone, and I believe it means that he took the locks off so

15 that someone like Aaron could go visit and inspect to see if

16 the equipment was still there, but I am not 100 percent sure

17 on the recollection.

18 Q.   Okay.  Was that -- who were you talking to about these

19 items?

20 A.   Mr. Maher.

21 Q.   And would Government's 187 be an agenda for a meeting

22 with Mr. Maher about January the 11th, 2011?

23 A.   Yes.

24 Q.   What's Item No. 3 on this agenda?

25 A.   No. 3, Fairbanks Morse to avoid 2.5 million repo and

1  save $2 million.

2  Q.   And I'm sorry, what's the 2.5 mill repo?

3  A.   That's if we don't go ahead and spend the money, we're

4  going to lose the money.

5  Q.   Which money?

6  A.   The grant money if we don't move forward.

7  Q.   And the saving 2 million is that --

8  A.   That's the amount of electricity we save over a period

9  of time, and I don't remember the amount of time it refers

10  to.

11  Q.   Government's 188 appears to be notes reference Tuesday

12  schedule 1-18-11.  What's this 8:45 to 10 a.m. meeting?

13  A.   Really don't remember.

14  Q.   Well, who was it a meeting with?

15       MR. PHILLIPS:  Objection, Your Honor; he said he

16  doesn't remember.

17       THE COURT:  Sustained.

18       THE WITNESS:  It would imply --

19       THE COURT:  Hold on, hold on, he can ask another

20  question.

21       THE WITNESS:  Okay.

22  BY MR. SIMPSON:

23  Q.   Does your schedule tell you who you were meeting at

24  8:45?

25  A.   Mr. Maher.

1  Q.  And there's a notation after his name.  What does that

2  tell you?

3  A.  The location, that which -- there's a place across the

4  street from our main office.

5  Q.  Okay.

6  A.  It doesn't mean that the meeting took place.  These are

7  made daily schedules every day, and I'm sure that they're

8  somewhere.  This is just a daily schedule that I put

9  together.

10  Q.  Did you at -- I'm sorry, let me -- and would

11  Government's 190 be an e-mail from yourself to Mr. Maher on

12  the 21st of January of 2011?

13  A.  Yes.

14  Q.  And what's the subject?

15  A.  We'd like to sell the facility potentially.

16  Q.  Is there some significance to the handwritten note at

17  the top?

18  A.  Not that I can recall.

19  Q.  Okay.  But at least by January of 2011 there were

20  discussions about selling the Lakeland facility?

21  A.  Yes.

22  Q.  What's the first thing you have to take care of to sell

23  the assets?

24  A.  We have to get on site and we owed several months'

25  rent.

1   Q.   What's the second thing you need?

2   A.   New valuation from Frazier Barnes, 9,000 now and 10,000

3   for them to reevaluate.

4   Q.   I take it this would be different from the valuations

5   you already had from Frazier Barnes?

6   A.   Right.

7   Q.   And different in what respect?

8   A.   Higher, hopefully.

9   Q.   Other than paying money to Frazier Barnes, had anything

10  been done to create a greater value in the Lakeland

11  facility?

12  A.   Some minor things but nothing major.

13  Q.   What's No. 3?

14  A.   Appearance we are running.  May require software fix to

15  control room.  Most of the automated control software was

16  not working.  And then if the genset is too small to run

17  enough equipment, may need to spend 60,000 with the

18  utilities to restart.

19       That was past due payments to Lakeland Electric, I

20  believe.

21  Q.   Okay.  And the genset, you had a genset that might give

22  you enough electricity?

23  A.   Yes, to run a scaled-down operation.

24  Q.   What was the point in the appearance we are running?

25  A.   That if you're not running, the value of the plant is

1    considerably lower, and that would have affected both the

2    Frazier Barnes appraisal and also any opportunity to

3    potentially sell the plant.

4    Q.    Okay.  And you said you were needed to pay Lakeland --

5    if you couldn't run it off the genset, you needed to pay

6    Lakeland $60,000?

7    A.    Right.

8    Q.    Owing Lakeland $60,000 worth is still giving you

9    electricity?

10   A.    No, we were cut off I believe at that time.

11   Q.    And what' this about permits?

12   A.    Because Mr. Stanley had been notified -- and this is

13   after I wasn't involved with the plant, but he was notified

14   that it was going to be closed by Mr. Drummond, he had the

15   EPA come out, and when they come out, you always get to

16   spend money on things like some soil and water samples and

17   other things to get everything back up to snuff.

18   Q.    And what's the reference to get RFS-2 for RINS, I'm

19   lost in the abbreviations.

20   A.    The RINS were a currency like carbon credits that you

21   got for every gallon that -- the fuel that you sold, and the

22   government gave you a credit or paid you the money, and they

23   were traded, and we needed to get an RFS-2 rating and

24   Frazier Barnes could do that for $5,000.

25   Q.    Okay.  And what's the $1 incentive?

1  A.   You also have to have that to get the dollar incentive

2  from the federal government.

3  Q.   Would 189 be an e-mail to yourself and to Mr. Maher

4  from Aaron Knight?

5  A.   Yes.

6  Q.   On -- reference an e-mail on January 20th reference a

7  meeting with the FDEP on January 20th?

8  A.   Right.

9  Q.   Would that involve the same kinds of items you -- the

10 same problem with the DEP you were talking about?

11 A.   Yes, right.

12 Q.   Would Government's 191 be an agenda for a meeting with

13 yourself and Mr. Maher on January 17th of 2011?

14 A.   Yes.

15 Q.   And what, if anything, did you bring up with Mr. Maher

16 about Fairbanks Morse in that meeting?

17 A.   $124,000 down payment.

18 Q.   And did you have reasons why this was a good thing?

19 A.   All the aforementioned reasons, that it allowed us to

20 keep the unit, do the ITCs, et cetera.

21 Q.   Did there come a time that you were made aware that you

22 were going to have some official visitors?

23 A.   Yes, approximately around that January time of those --

24 some of those meetings.

25 Q.   And who's coming to call?

1  A.   The Department of Energy out of their Pittsburgh office

2  and Kelley from Tallahassee.

3  Q.   Was this a meeting you -- did you look forward to

4  seeing them at the plant?

5  A.   We wanted them to visit the plant, but we wanted the

6  plant open, and it was not open at that time.

7  Q.   Would this be reflected in Government's 222, beginning

8  with an e-mail from yourself to Nancy Hennessey copying

9  Lee Maher, Annette Moreau and Aaron Knight on February 16th?

10  A.   Yes.

11  Q.   And -- well, what were you advising Ms. Hennessey?

12  A.   We needed to fix the control room for the visit for the

13  tour.

14  Q.   What you call the show and tell?

15  A.   Yes, sir.  And we needed to make sure that the genset

16  is working.

17  Q.   Now, this isn't the Fairbanks Morse genset?

18  A.   No, this is the Cummins, the smaller one.

19  Q.   Okay.

20  A.   Or we could make a major payment to Lakeland Electric

21  to get the electricity back on.

22  Q.   And did this trigger a response from Mr. Knight?

23  A.   Yes.

24  Q.   And what particular concern did he raise with you?

25  A.   He's asking if we had worked out something with

1   Mr. Stanley for the fitting on the property, and obviously,

2   the answer was no.

3   Q.   And Government's 223, an e-mail from yourself to Jack

4   Brandon, Jennell Scott, copy Lee Maher, was that an effort

5   to deal with Mr. Stanley?

6   A.   Yes.

7   Q.   Okay.  It's not -- doesn't talk about a site visit.  It

8   talks about a buyer visit.

9   A.   Yes.

10  Q.   First of all, who were Jack Brandon and Jennell Scott?

11  A.   Jennell Scott was his daughter, and I'm not sure who

12  Jack -- I don't remember who Jack -- I don't think it was a

13  real estate person.  I'm not sure.

14  Q.   Okay.  And do you offer -- is there any incentive for

15  Stanley's people to let y'all on the property in your

16  e-mail?

17  A.   Yes, that they could get paid and we'd get current, and

18  they potentially could sell the property, too.

19  Q.   So if you could sell the plant, what happens?

20  A.   Then the plan or one of the plans we talked about was

21  potentially, you know, buying the actual land and buildings,

22  which we didn't own.  We had, I think, about a 10-year lease

23  left at that point.

24  Q.   Okay.  But if y'all get money, there's a potential that

25  they get money?

1   A.   Yes.

2   Q.   And are there particular items you wanted them to take

3   care of prior to the visit?

4   A.   Yes.  There was an effort to make it appear to be

5   working more than it was.  Have 10 people on, have the

6   genset up and running, we remove the closed signs, et

7   cetera.  You want me to read all those?

8   Q.   Well, and you're giving them some assurances they're

9   not going to take stuff away?

10  A.   Right.

11  Q.   And would 224 perfect -- reflect conversations then

12  on -- excuse me.  An e-mail then from yourself to

13  Aaron Knight on February the 20th of 2011 about the same

14  March 1st show and tell?

15  A.   Yes, same issues, trying to work with Aaron, who did

16  have a more collegial relationship with Bob Stanley than we

17  did.

18  Q.   Okay.  And what are you telling Aaron Knight that you

19  need to do for the show and tell?

20  A.   Electricity to the office and computer/control room.

21  Kelly and Eric for their -- possibly four or five laborers

22  in Clean Fuel shirts.

23  Q.   Now, would these be regular Clean Fuel employees or

24  somebody just brought for this purpose?

25  A.   Could have been a combination of both, and there may

1    have been people that we just brought in.

2    Q.    Okay.  Go on.

3    A.    Closed signs removed and approval for visit with

4    Stanley and Brandon, my responsibility.

5          Tour of energy efficiency work and layout of the

6    Fairbanks Morse genset location.  Depending on the time in

7    which DOE people attend, we may need a Siemens solution for

8    the control room, Mitch for a tour, who was no longer with

9    the company, and lab equipment be returned.

10   Q.    Did you know at that time whether or not lab equipment

11   had been removed?

12   A.    No, that was -- we didn't know, but it should be

13   returned if it wasn't.

14   Q.    And did you copy Mr. Maher with the request to

15   Aaron Knight?

16   A.    Yes.

17   Q.    Did Mr. Knight respond to you?

18   A.    Yes.

19   Q.    Was Mr. Maher copied with Mr. Knight's response?

20   A.    Yes, he was.

21   Q.    Now, did there come a time when a woman named Nancy

22   Hennessey came to work for Mr. Maher?

23   A.    Yes.

24   Q.    And what position was she in?

25   A.    CFO.

1   Q.   Chief Financial Officer?

2   A.   Yes.

3   Q.   Did you have some conversations with her concerning the

4   accounting issues resulting from the grant that -- the

5   reimbursement grant you received?

6   A.   Yes.

7   Q.   Okay.  Would Government's Exhibit 268, dated March 21st

8   of 2011, be a copy of your notes prefaced to that meeting?

9            THE COURT:  One moment.

10           THE WITNESS:  Yes.

11   BY MR. SIMPSON:

12   Q.   Did you actually have a meeting?

13           THE COURT:  268 has not been admitted at this

14   time.

15           MR. SIMPSON:  It has not?

16           THE COURT:  At this time, I believe you've

17   admitted 123 through 228 this witness, 235, and 250.

18           MR. PHILLIPS:  Your Honor, we have no objection.

19           THE COURT:  Without objection, 268 is admitted.

20       (GOVERNMENT EXHIBIT 268:  Received in evidence.)

21   BY MR. SIMPSON:

22   Q.   Did you have a meeting with Ms. Hennessey?

23   A.   Yes, and I wrote her this note to help her.

24   Q.   Okay.  Let me ask you, was there anywhere in that note

25   where you pointed out to her that the $2.32 million was

1   obtained upon false representations?

2   A.   No.

3   Q.   Was there anywhere in the note where you said that you

4   and Mr. Maher committed fraud?

5   A.   No.

6   Q.   And were -- was Government's 192 some notes you made in

7   April of 2011?

8   A.   Yes.

9   Q.   Now, the top says -- is that "protection letter"?

10  A.   Yes, it does say that.

11  Q.   Okay.  Who were you trying to protect from what?

12  A.   Is that the entire write-up?  And it was in April?

13  It's shorthand for we need to get everything resolved,

14  either the purchase of the Cogen system from Fairbanks Morse

15  and get on the land and execute, or as I'd noted in the

16  earlier message to Ms. Hennessey, that we needed to return

17  the money if we didn't do this.

18  Q.   And would Government's 193 be a document you created

19  called, "Lakeland Value Creation"?

20  A.   I'm just reading it.  Excuse me.

21  Q.   And I think there's some initials and an August 1st,

22  '11 date in the bottom right corner.

23  A.   Yes.  And we needed to do those other items to resolve

24  issues there.

25  Q.   Okay.  And are these three items here potential

1  problems that you have to deal with?

2  A.    Exactly.    The Elbow River settlement of 6.5 million

3  spread over six years, 500,000 every six months, I think,

4  had been negotiated at one point.    I wasn't involved in

5  that.

6  Potential payment of 500,000 to a million to

7  Bob Stanley for building and land.    Gain access to the

8  property for execution of all options other than bankruptcy.

9  And then, finally, the repayment of the 2.232 million

10  to the State of Florida for the ARS-005 if build out never

11  executed.

12  Q.    And further in that document, what's the first set of

13  items that you have to do to create value?

14  A.    We have to get the electrical offtake agreement worked

15  out with Publix, get the unit, 3.2-megawatt Fairbanks power

16  unit in place.    We need to bypass Lakeland Electric and use

17  the rail right-of-way if it's about 300 yards away and go

18  along the railroad.

19  Work with Doug Milu, who had met with myself and

20  Syed Jafri, and he was the energy product manager for

21  Publix, and it requires $3 million to get all of that done,

22  most of it being the purchase of the Fairbanks unit.

23  Q.    And the very last of this document, do you evaluate

24  what your realistic options are?

25  A.    All options that include sale of assets, moving to

1  Pennsylvania, or bankruptcy have indirect consequences

2  relative to ARS-005 and the Elbow River settlement that

3  preclude these options as viable.

4  Q.   What kind of indirect consequences were you talking

5  about?  Why couldn't you just declare bankruptcy and walk

6  away?

7  A.   Because you would then be discovered as having

8  committed fraud on the grant.

9  Q.   Now, while we're in December -- while we're in 2011,

10  would Government's 250 be a copy of one of these Frazier

11  Barnes evaluations?

12  A.   Yes.

13  Q.   And according to the second page, what kind of

14  evaluation did Frazier Barnes put on Clean Fuel Lakeland?

15  A.   62.37 million, and that was an aggregation of three

16  different methods of evaluating the operation.

17  Q.   Did all of those methods assume that the plant was

18  operating?

19  A.   Yes.

20  Q.   And producing biodiesel?

21  A.   And glycerin, both.

22  Q.   To your knowledge, did anyone ever offer a quarter of

23  that for Lakeland?

24  A.   No.  We never got an offer at all.

25  Q.   Would it be fair to say that Frazier Barnes' appraisal

1  was optimistic?

2  A.   Yes.

3  Q.   And into 2012, would Government's 194 be an agenda for

4  a meeting between yourself and Mr. Maher on March the 20th

5  of 2012?

6  A.   Yes.

7  Q.   And among other things, talking about investment,

8  potential investors and potential sales opportunities?

9  A.   Yes.

10  Q.   Now, there's some mention here of Brits.  At some point

11  in 2012, did you become involved with some people who were

12  trying to buy the plant from Mr. Maher?

13  A.   Yes, it was probably late 2012.  The three of us got

14  together to try and raise money as one exit strategy for

15  Lee.  Mark Western and Michael Miksch and the three of us

16  put together a plan called Biotek to try and buy the plant

17  and two others.

18  Q.   Is that B-i-o-t-e-k?

19  A.   Yes.

20  Q.   And, I'm sorry, Michael -- what's the last name?

21  A.   Miksch, M-i-k-s-c-h.

22  Q.   And did y'all have any money?

23  A.   No, not to speak of.

24  Q.   Was that effort successful?

25  A.   No.

1  Q.   Were you still on Mr. Maher's payroll at the time?

2  A.   I was a consultant, nonexclusive consultant.  So he

3  knew I was doing -- in fact, he knew I was working on Biotek

4  to try and buy Lakeland along with two other plants.

5  Q.   Did you actually speak to him about what y'all were

6  doing to try to buy Lakeland?

7  A.   We occasionally had discussions about it, yes.

8  Q.   Okay.  So he was aware you were involved in it?

9  A.   Right.

10  Q.   Now, did there come a time when the state sent

11  Mr. Maher a letter, probably sent you a copy, too, saying

12  that y'all had to show that substantial progress was being

13  made, and they weren't happy with the way the grant was

14  going?

15  A.   Right.

16  Q.   Let me show you what's admitted as Government's 195.

17  Is that a draft of a response to that letter?

18  A.   Yes.

19  Q.   Would you please -- who drafted it?

20  A.   I drafted this.  That's my writing.

21  Q.   Who did it go to for final approval?

22  A.   Most likely Mr. Maher.  I may have sent it without

23  final approval.  I'm pretty sure he looked at it, though,

24  and gave me -- in fact, he did -- these are changes he gave

25  me now that I see this.

1  Q.    Okay.  196 would be a final letter with changes?

2  A.    Yes.  I had this typed up, and then Lee had reviewed it

3  and made some changes.

4  Q.    When we're looking at the handwritten, 195, it appears

5  that some of it's in blue and some of it's in black.  Is

6  this the same author or different authors?

7  A.    No, those would have been notes later on in the black,

8  I think the blue is the original, and then the things that

9  are inserted are notes or additions.

10  Q.    And in the draft towards the end, what's -- what do you

11  say there in the draft?

12  A.    I wanted to put in a statement that we would return the

13  funds.

14  Q.    Well, read what you --

15  A.    Okay.  Excuse me.

16        Finish with.  If we do not have the 3.2-megawatt system

17  commissioned and running before November 1, 2012, we return

18  the grant funds.  I think this last statement could clinch

19  the delay required.  Question is tactics.  They can claim

20  anyway, and I'm not quite sure what that --

21  Q.    They could demand the funds back anyway?

22  A.    Yes, I guess that would be what I was trying to say

23  there.

24  Q.    Now, there's some lines drawn through it.  Whose

25  decision was it to draw the -- to take that out?

1  A.   I'm sure they were Mr. Maher's.

2  Q.   Would Government's 196 be a copy of the letter that was

3  actually generated in response to the substantial progress

4  letter?

5  A.   Yes.

6  Q.   And whose signature would it have gone out under?

7  A.   Mr. Maher.

8  Q.   In general, did this letter ask for more time?

9  A.   Yes.

10 Q.   Okay.  I think we've actually got the state's copy of

11 that, so I won't go further.

12      Did you and Mr. Maher eventually get a letter notifying

13 you that the state of Florida had terminated the grant?

14 A.   Yes.

15 Q.   And would that have resulted in Government's 197,

16 including an e-mail from yourself to Kelley Burk on

17 July 26th of 2012?

18 A.   Yes.

19 Q.   What do you tell Kelley Burk?

20 A.   Kelley, thanks for having Steven Hall call and explain

21 the process.  We will be requesting an appeal and believe we

22 finally have solved all the funds problems to complete the

23 project in October.  Wanted to confirm that we received both

24 the electronic and hard copy on July 12th.  Thus, 21 days is

25 August 1st for the formal request.  Please confirm my math

1  is correct.  Thanks, Larry Long.

2  Q.  Did you and Mr. Maher have some discussions as to how

3  to deal with the termination?

4  A.  Yes.

5  Q.  And would Government's 198, labeled "Action Grant

6  17628," reflect the things you were discussing with

7  Mr. Maher after the termination letter?

8  A.  Yeah, we had two options.

9  Q.  Okay.  Tell us about them.

10  A.  Very little time to achieve either, but we have to go

11  with a formal or an informal hearing, which would be set up

12  for July 23rd, and then the options were

13  reinstatement/finish project, get the final 268, no return

14  of the 2.232 and the DOE funds, because, in fact, the

15  project was completed.  That assumed that there was no audit

16  that would have uncovered the timing of everything.

17  Q.  Okay.  Your second option?

18  A.  Retention of past funds, site visit audit, move forward

19  with no further funds.

20  Q.  When you say finish the project, what do you mean?

21  A.  You know, have it up and running, but we didn't get the

22  final 268,000, and I'm not sure why I said that.

23  Q.  But the project you're talking about is the genset?

24  A.  Yes, uh-huh.

25  Q.  No. 3?

1  A.    Return funds if lose hearing and appeal.

2        Four, if we do bankruptcy, there'd be an audit,

3  long-term problems and debarment from future state and

4  federal grants nationwide.

5  Q.    And your thoughts as to how to decide to proceed?

6  A.    We needed formal legal advice on what to do.

7  Q.    Did you discuss these things with Mr. Maher?

8  A.    I'm sure I did.

9  Q.    Would Government's 199 reflect discussions between

10 yourself and Mr. Maher looking forward to an informal

11 hearing?

12 A.    Right.  I was working on the project to -- and I don't

13 see a date on this, but it was getting ready for a hearing

14 for an extension.

15 Q.    Okay.  Walk us through what you discussed -- the topics

16 you discussed with Mr. Maher.

17 A.    Should a lawyer or me represent you at the informal

18 hearing?  We wanted legal advice from Lamar, and I'm not

19 sure what lawyer that refers to, and others.

20       And I wanted a representation letter that I was there

21 representing Lee at this event.

22 Q.    When you say a "lawyer or me," "me" being you?

23 A.    Yes.

24 Q.    Representing you, "you" being?

25 A.    Lee Maher.

1    Q.    And what decision was made on that?

2    A.    I ended up going to the meeting that I remember by

3    myself with a letter saying that I was representing Lee.

4    Q.    Okay.  The second part of this is?

5    A.    Yeah, that we had to send in an actual response

6    overnight, and I don't remember the details of that.

7    Q.    Okay.  And the third item?

8    A.    Avoid a formal administrative judge and lawyers and

9    talking to other terminated groups, you know, that we wanted

10   to avoid doing that.

11   Q.    What's the fourth item about key timing issues?

12   A.    We had by this time lost the Fairbanks Morse Engine.

13   It was gone.  There were exactly the same engines available

14   in California, and I was trying to come up with some stock

15   gap to buy more time for us and for Lee Maher by getting

16   another engine because the original one never existed

17   anymore.  Someone else had bought it finally.

18   Q.    Well, let me break this into pieces.  You said it was

19   an identical engine.  It wasn't the same engine?

20   A.    No.  It was the same model and design.

21   Q.    Okay.  And were these engines recently overhauled

22   Fairbanks Morse engines with all the technical specs that

23   had been in the proposal that had originally been signed, or

24   was it a version in some condition that it started out as

25   the same engine?

1  A.   It was the same starting out, and I requested that

2  Aaron Knight, or one of his people, go visit the site and

3  make sure the engine could run.

4  Q.   Okay.  I'll get back to that.  Was the price the same

5  or different?

6  A.   Considerably lower.

7  Q.   Okay.  So the first item is making a deposit on such an

8  engine?

9  A.   Right.

10  Q.   And the second item?

11  A.   Invest 25- to 50,000 to repair a foundation for August

12  delivery, which would mean pouring concrete foundations to

13  hold the engine because it weighed about 20 tons.

14  Q.   And the third?

15  A.   Invest 400,000 to have the engine shipped in August,

16  withhold 20 percent until installed and running.

17  Q.   Does the 400,000 represent the -- just the freight or

18  is that the purchase price as well, or what are we talking

19  about?

20  A.   I'm not exactly sure.  It clearly included a lot of

21  freight, which I know was over 100,000, and then I don't

22  know that we ever got a final price on the engine.  There

23  may be some documentation that I'm not aware of.

24  Q.   Okay.  And the D part?

25  A.   Then invest another 200- to 500,000 to finish the

1  installation and commissioning, and we would have spent most

2  likely a million dollars rather than the original 2.48 that

3  we projected.

4  Q.   But at least you could point out there and tell the

5  State of Florida there was a genset sitting there?

6  A.   It was running, yes, sir.

7  Q.   And would 200 -- Government's 200 actually be a Notice

8  of Rights and Hearing Request Form?

9  A.   Yes, we received that.

10 Q.   And was an informal hearing requested?

11 A.   Yes.

12 Q.   And who signed the request for a hearing?

13 A.   Both myself and Mr. Maher.

14 Q.   Now, is that a signature stamp for Mr. Maher?

15 A.   Looks like a actual -- because of where the one line

16 is, it looks like it's his actual signing, not a stamp.

17 Q.   You are talking about this upswept line?

18 A.   Yeah.  Yes, sir.

19 Q.   Did Mr. Maher know that an informal hearing was being

20 requested?

21 A.   Yes.

22 Q.   Did he know that you were going to appear at the

23 hearing?

24 A.   Yes.

25 Q.   And would Government's 201 be e-mails back and forth

1  between you and the state in reference to the upcoming

2  informal hearing?

3  A.    Yes.

4  Q.    What did they want you to bring to the meeting?

5  A.    Documents verifying the purchase of the property has

6  been completed, as well as confirmation that the genset is

7  on site at the Lakeland facility.  If these documents are

8  not provided, please be prepared to discuss the return of

9  the grant money to the state.

10  Q.    What date was the meeting set for?

11  A.    October 1st.

12  Q.    Now, in connection with this genset, did you deal with

13  a fella named John Manning and a fella named Lashley?

14  A.    Yes, although most of the work with them was actually

15  Mr. Knight.  But, yes, I was aware we were using them to

16  visit the site and look at the engine.

17  Q.    Okay.  And would Government's 202 be an e-mail from

18  Kait Doulou to yourself and Aaron Knight with reference to

19  travel documents?

20  A.    Right.  So they could go out to California, yes.

21  Q.    Who is Kait Doulou?

22  A.    She was Lee's administrative coordinator.

23  Q.    Would these include total fees of about $764?

24  A.    For the flight, yes.

25  Q.    To leave on September 24th and return on

1  September 25th?

2  A.    Right.  And visit the units.

3  Q.    Going to?

4  A.    Los Angeles.

5  Q.    Now, would 9-27 still be before the October 1st

6  meeting?

7  A.    Yes.

8  Q.    Would the Government's 203 be more of your notes

9  getting ready for that meeting?

10  A.    Yes, but a lot of them aren't related to that event

11  particularly.

12  Q.    The first notation on the second page, would that be

13  relating to that event?

14  A.    Yes.  I wanted a picture of the engine itself in its

15  container and the serial number of the engine/genset.

16  Q.    Would Government's 204 be e-mails back and forth after

17  the October meeting starting on October -- after

18  October 1st, starting on October 2nd?

19  A.    Yes.

20  Q.    Okay.  What do you tell Mr. Sheehan on October the 2nd?

21  A.    Patrick, thanks to you and your staff for the patience

22  to date with Clean Fuel and Mr. Maher's efforts to remedy

23  the nonperformance to date.  I did want to confirm the

24  23.7 million replacement cost for Lakeland in the third

25  paragraph of page 32.  I trust the extra 90 days will be

1  granted.  I am traveling.  As soon as I return, I will get

2  the confirmation of the location for the genset that does

3  save $1 million per year in energy costs and thousands of

4  tons of carbon emissions annually when installed.

5  Q.  And would Government's 231 be an e-mail from yourself

6  to Mr. Manning?

7       THE COURT:  Are you seeking to admit ECF Document

8  231 and likewise?

9       MR. SIMPSON:  Yes, Your Honor.  I thought we

10  already had.  If not, I offer it.

11       MR. PHILLIPS:  No objection, Your Honor.

12       THE COURT:  Without objection, ECF Document 231 is

13  admitted.

14       (GOVERNMENT EXHIBIT 231:  Received in evidence.)

15  BY MR. SIMPSON:

16  Q.  Is 231 an e-mail from yourself to John Manning?

17  A.   Yes.

18  Q.  And tell the jury -- the same John Manning that flew

19  out to California?

20  A.   Right.

21  Q.  Tell the jury what you told John Manning in that

22  e-mail.

23  A.   First, thank you for getting your people out to

24  California last week.  It does seem like there have been

25  some hiccups the last 48 hours, but everything appears to be

1  on track now.

2      I have a very strange request.  I need this for a 1603

3  filing that was turned in last weekend to meet a filing

4  deadline.

5      They need a street address where the genset is sitting.

6  Don't need landowner's name or anything like that, just the

7  address where your technician went.  A picture of the

8  interior of the container would also be helpful.  Showing a

9  crankshaft cover or head cover removed would be a bonus, but

10  not essential.

11      I need to file this amendment over the weekend to meet

12  their response time.

13      I will call your cell later to follow up.  Thanks again

14  and we look forward to working with PowerTeam.

15      Larry Long.

16  Q.   Are we actually looking for the address for a 1603

17  filing or were you trying to get the state happy?

18  A.   Both.

19  Q.   Would Government's 225 be responsive e-mails -- or a

20  responsive e-mail, rather, from John Manning on October the

21  7th to you?

22  A.   Yes.

23  Q.   And did he provide you that address?

24  A.   Yes.

25  Q.   What was it?

1  A.   2951 North Ventura Avenue, Ventura, California.

2  Q.   That was not a Fairbanks Morse address, I take it?

3  A.   No.  It was just a site where the engine was being

4  kept.

5  Q.   Would Government's 226 be a series of e-mails beginning

6  on October the 11th of 2012?

7  A.   Yes.

8  Q.   Okay.  Who was -- who was Roger, L-a-n-t-e-i-g-n-e,

9  Lanteigne and what is Marine Diesel LTD?

10  A.   They were a group that bought up used engines and

11  resold them around the country, all types.  I believe he was

12  the actual owner of the unit that was in California.

13  Q.   Okay.  What is he asking Mr. Knight for?

14  A.   He wants the deposit to go ahead and start the process

15  for shipping.

16  Q.   And what does Mr. Knight say in reference to the

17  payment?

18  A.   That he was working with me.

19       Thank you for the tracking number.  The contract is

20  with Clean Fuel ownership at this moment.  I expect to hear

21  back soon.  I have carbon copied Mr. Larry Long, COO and

22  project lead, on this correspondence as he will be

23  authorizing the deposit once the contract comes back.

24  Q.   So don't look to Aaron Knight for money, look to

25  Larry Long?

1   A.   Yep.

2   Q.   227, thereafter, is further correspondence between the

3   Marine Diesel representative and Mr. Knight on October 11th,

4   2012?

5   A.   Yes.  The freight rate and delivery.  You are talking

6   about the lower one with all the details about price?

7   Q.   Yes.

8   A.   $350,000 cargo insurance included in the rate.

9        Truck is emptying in North Dakota tomorrow.  It is

10  available to load next week in Ventura.

11       It took a special truck to move a 40 -- or 20-ton

12  engine and, in fact, probably took two trucks.

13       The following rate is based on availability to load end

14  of next week.  This rate includes all charges for permits,

15  route surveys, escorts, police, and fuel surcharges that are

16  required for this move.  The rate is based on -- based on

17  dimensions and weights provided by customer.  If different,

18  than stated rate is subject to change.

19  Q.   Okay.  So this is at least an effort to get ahold of

20  this substitute genset?

21  A.   Yes.

22  Q.   And eventually Mr. Knight responds to you and you

23  respond to Mr. Knight on October the 12th.  And what do you

24  tell him?

25  A.   I tell him, in summary, I can't believe that they never

1   got there.

2       I feel like we are dealing with an eel.  Very concerned

3   about the quality of the engine with no inspection.  We have

4   to go get local third party or something before closing.

5       Think about it.

6       Car wreck, flight cancellation, who's the owner, rail,

7   then truck, et cetera.

8       Basically, they didn't turn the engine over as

9   requested.

10  Q.   Somebody had a car wreck and flights got messed up?

11  A.   Yes, yes, yes.

12  Q.   So what did you actually know about the worth and

13  viability of the engine at this point?

14  A.   Not enough.  We really didn't know if it would run.

15  Q.   And would 228 be some further communications between

16  California, Aaron Knight, and yourself in October of 2012?

17      Sorry.  First, what is the Marine Diesel guys telling

18  Aaron Knight?

19  A.   That there's an alternative buyer, I believe, for the

20  three gensets next week in Ventura, meaning get the deposit

21  in.

22  Q.   And do you relay this information to anybody?

23  A.   Yes, to Lee Maher and a Marco Genio that worked with

24  him and copied Aaron Knight.

25      We need to keep -- go ahead.  I'm sorry.

1    Q.    Go ahead.

2    A.    Gentlemen, we need to keep this unit and make a deposit

3    of 35,000 in the next five days to save the 2 million on the

4    grant and potentially 3 million versus a new engine on

5    either Wyndham, St. Thomas or the Albany House.  Remember,

6    it has to be the exact model for the state grant.

7          Thanks, Larry.

8    Q.    What had to be the exact model?

9    A.    The genset.

10   Q.    And why was that?

11   A.    Because we were going to use it as a stand-in for the

12   one that was never purchased.

13          THE COURT:  If I could see counsel at sidebar,

14   please.

15          Ladies and gentlemen of the jury, you can stand

16   and stretch and speak so long as it's not about this case.

17        (Following conference held at sidebar at 12:12 p.m.)

18          MR. SIMPSON:  Your Honor, this would be a great

19   time to break for lunch.  I'm approaching the end of my

20   direct, but I've got a few things I need to sort through

21   before I do that.

22          THE COURT:  Okay.  Thank you.

23          MR. PHILLIPS:  Excellent.

24        (Sidebar concluded at 12:12 p.m.)

25          THE COURT:  Ladies and gentlemen of the jury, we

1   are going to go ahead and break for lunch at this point.

2   Mr. Simpson has informed me that he's getting close to the

3   end of his direct examination, but it will actually expedite

4   things if he has the lunch to be able to go through his

5   notes and make sure so we don't have to take a break on your

6   time.  So we'll break for lunch now.

7           I'll remind you not to discuss this case.  I'll

8   again remind you that the reason why you are not discussing

9   this case is you must not rush to judgment, but must wait

10  until the very end of the case once you've heard all the

11  evidence, my instructions on the law, and the closing

12  arguments of the lawyers to begin your discussions to begin

13  forming an opinion regarding the ultimate facts and your

14  ultimate decision in this case.

15          It's now 12:15.  I was going to break until 1:30.

16  Is an hour and 15 minutes enough time?

17          All right.  We'll break until 1:30.  Please leave

18  your notes in your chair.  I hope you have a pleasant lunch.

19          All rise for the jury.

20      (Jury out at 12:13 p.m.)

21          THE COURT:  All right.  The jury is coming back at

22  1:30, so I need everybody else back at 1:25.

23          Anything further from the government?

24          MR. SIMPSON:  No, sir.

25          THE COURT:  Anything further from the defense?

1          MR. PHILLIPS:  Your Honor, we had discussed

2    yesterday the issue of taking a couple of witnesses out of

3    order at the close of the government's direct.  I don't know

4    if that's still our plan or not.

5          MR. SIMPSON:  I would like to do that.

6          MR. PHILLIPS:  Absolutely.  We are in favor of it,

7    Your Honor.  I'm just making sure that's the schedule.

8          THE COURT:  I'll let the jury know when we come

9    back from lunch.  Thank you.

10          I'll see everybody back after lunch.

11    (Recess taken at 12:14 p.m.)

12    (Mr. Tadlock and Ms. Rodriguez testified, but their

13    testimony is not requested to be transcribed at this time.)

14    (Resumed at 3:04 p.m.)

15          THE COURT:  Please take your seats.  Mr. Phillips,

16    are you ready?

17          MR. PHILLIPS:  I am, Your Honor.

18          THE COURT:  All right.  Let's bring in the jury.

19    (Mr. Long entered the witness stand.)

20    (Jury in at 3:06 p.m.)

21          THE COURT:  Please take your seats.

22          Mr. Long, you are still under oath.  Mr. Phillips,

23    you may proceed with your cross-examination.

24          MR. PHILLIPS:  Thank you, Your Honor.

25

1        CROSS-EXAMINATION

2    BY MR. PHILLIPS:

3    Q.    Afternoon, Mr. Long.

4    A.    Thank you.

5    Q.    There were, relevant to your testimony, four grants in

6    which you were involved at Clean Fuels; right?

7    A.    Yes, maybe more that were unsuccessful.

8    Q.    Okay.  Let's stay with the last ones, then, because we

9    have the one that there was an amendment of; right?  So we

10   had the amendment later, and then the original grant; right?

11   A.    Uh-huh.

12   Q.    Remember that?  You have to answer with a word, please.

13   A.    Yes.

14   Q.    Thank you.  There was the -- before that was the grant

15   where Clean Fuels came in sixth out of five; do you remember

16   that?

17   A.    Yes.

18   Q.    And then there was a state grant before that that

19   Clean Fuels didn't get anything out of; do you remember

20   that?

21   A.    Yes.

22   Q.    All right.  You testified on direct that the government

23   kept changing the rules on you during these different

24   iterations of the grants; right?

25   A.    Yes.

1  Q.   That first state grant, what you put in for in the

2  grant where you came in, what, sixth out of five –– no, my

3  apologies.  In the grant in this case, those costs would

4  have been reimbursable and appropriate in that first grant;

5  right?

6  A.   Yes.

7  Q.   That was –– so it was something of a surprise to you

8  when you got the grant, the one that's at issue here, and

9  then you didn't get any money; right?

10 A.   Right.

11 Q.   Your expectation was that you were going to be paid

12 based on what you had submitted; right?

13 A.   Yes, in the beginning, right, you didn't have to make

14 any new future purchases.

15 Q.   Correct.  That's with respect to the grant that's at

16 issue here; right?

17 A.   No, on this one, it was always reimbursement when we ––

18 Q.   All right.

19 A.   –– they renegotiated it.

20 Q.   Let's make sure we're perfectly clear.  I treat the

21 amendment as a separate item.  So we have the amendment is

22 the last thing that happens; right?  Yes?

23 A.   Yes.

24 Q.   And before that, there is the grant itself, which is

25 the one signed off on by everybody; right?

1    A.    Right.

2    Q.    Before that, there was the grant where Clean Fuels came

3    in sixth out of five; you remember that?

4    A.    I believe it was sixth out of 125 --

5    Q.    Very well.

6    A.    -- minor.

7    Q.    Five got awards, you were six?

8    A.    Yes.

9    Q.    And then there was a state grant before that where

10   Clean Fuels also got nothing?

11   A.    Right.

12   Q.    Right.  Okay.  That state grant where Clean Fuels got

13   nothing, the materials you submitted for the grant that you

14   won but got nothing for, the third item, that would have

15   been okay with that one, with that part of it; right?

16   A.    Right, the rules changed.

17   Q.    The rules changed.  It was a different deal, if you

18   will; right?

19   A.    Correct.

20   Q.    You didn't discover it was a new or different deal,

21   though, until after Kelley Smith Burk informed you that you

22   weren't going to get any money on the grant that was awarded

23   Clean Fuels; right?

24   A.    Which one are you talking about, please?

25   Q.    Very well.  I'll make it easy.  I'm going to show you

1    the first page of what was previously admitted into evidence

2    as Government's Exhibit 30.  There we go.  Do you remember

3    this one?

4    A.    I believe this is the first one that we didn't get

5    anything on.

6    Q.    Well, let me see if I can refresh your recollection a

7    little bit then.  Take a look at the date on the signature.

8    A.    Oh, okay.  No, that's --

9    Q.    All right?

10   A.    Uh-huh.

11   Q.    You now know which grant -- the grant that I'm talking

12   about is the grant that Clean Fuels was awarded in May of

13   '10?

14   A.    But not paid.

15   Q.    That you didn't get any money from --

16   A.    Right.

17   Q.    -- right?  When this was signed in May of '10, your

18   expectation was that money was going to flow; right?

19   A.    Yes.

20   Q.    And Kelley Smith Burk later informed you to the

21   contrary; right?

22   A.    Correct.

23   Q.    Congratulations, you've been awarded a grant, and

24   you're going to get nothing; right?

25   A.    Okay.

1  Q.   Was that -- that was a surprise to you; was it not?

2  A.   Yes, on that one, correct.

3  Q.   While we're there, I'm going to show you Government's

4  30I.  Can you see that document there in front of you, sir?

5  A.   Yes.

6  Q.   Whose handwriting is that right below the exhibit

7  sticker where it says:  None?

8  A.   That's mine.

9  Q.   Now, this is the non-lobbying disclosure for the grant

10  that Clean Fuels was awarded but got no money under; right?

11  A.   I believe so.  I don't know if it's AR-005 -- or AR --

12  whatever the number is.

13  Q.   Let me help you out with that.

14  A.   Okay.  It is.

15  Q.   See it there?

16  A.   Yep.

17  Q.   That's the one.  Now, back to the bottom of the page,

18  that is not Lee Maher's signature, is it?

19  A.   No, that's mine.

20  Q.   That's your handwriting purporting to be Lee Maher's

21  signature; right?

22  A.   Yes.

23  Q.   I'm going to show you Government's Exhibit 31.  This is

24  your handwritten note to Ms. Burk of May 12, 2010.  Do you

25  recognize your handwriting?

1    A.    Yes.

2    Q.    Read the part I've striked there in purple a little

3    bit.  Read that aloud for me, please.

4    A.    Lee signed everywhere it was appropriate including the

5    lobbying and disbarments sections as well as initialing

6    every other page at the suggestion of our lawyers.

7    Q.    That's a lie, isn't it?

8    A.    The -- certainly that one.  I don't know about the

9    initialing of the pages.

10   Q.    Mr. Long, from the time that grant was awarded, the ARS

11   005 grant, from the time it was awarded, until it was

12   terminated, you were required to -- and did, in fact,

13   prepare monthly reports; right?

14   A.    Correct.

15   Q.    Now, you didn't always prepare them, sometimes

16   Mr. Griswold prepared them or whatnot, but you were always

17   the one who submitted them or signed them or was responsible

18   for them; right?

19   A.    Actually it was a three-part process.  I would make the

20   changes from the previous month --

21   Q.    Uh-huh.

22   A.    -- send it to him, he would then type it in --

23   Q.    Him being?

24   A.    Bill Griswold, and then I would send it in.

25   Q.    This is because you were not a particularly adept

1    typist or computer operator?

2    A.   Right.

3    Q.   It's fair to say that those monthly reports, all of

4    them, during the entire life of the grant, fall into two

5    groups; those before the amendment, and those after the

6    amendment; right?

7    A.   Okay.

8    Q.   Is that fair?

9    A.   Yes.

10   Q.   Okay.  Before the amendment there's almost nothing to

11   report; right?

12   A.   Correct.

13   Q.   So they're fairly generic and there's nothing going on

14   type reports.  After the amendment, though, they report all

15   sorts of things that did not, in fact, occur; right?

16   A.   Correct.

17   Q.   And these ones post-amendment were ones that you also

18   marked up or edited, sent to Mr. Griswold for his technical

19   skills and then caused to be submitted to the state of

20   Florida; right?

21   A.   Correct.

22   Q.   Is it your testimony that Mr. Griswold had no input in

23   the substance of those reports?

24   A.   That's correct.

25   Q.   He had no material input other than being a mere

1    typist; right?

2    A.   With computer skills, yes.

3    Q.   Well, typist or computer user or whatever; right?

4    A.   Correct.

5    Q.   He didn't give you the thoughts or supply any of the

6    substantive information --

7    A.   Right.

8    Q.   -- that appears there; right?

9    A.   Right.

10   Q.   When did you tell Mr. Griswold that the information he

11   was typing for you was false?

12   A.   Not until we were really approached by the government,

13   that we were suspended and in trouble.

14   Q.   Let's go back.  Who is "we" in that sentence?

15   A.   Mr. Maher and I, you know, were both, I don't know if

16   the correct term is indicted, but I didn't tell Bill

17   anything other than he knew we couldn't get on, but he

18   didn't realize we'd never bought the equipment and were

19   fraudulently reporting monthly.

20   Q.   Let's go back to my narrow question.  With respect to

21   the preparation of the monthly reports, you didn't even tell

22   Mr. Griswold that the information was false until after you

23   were contacted by the government; right?

24   A.   Correct.

25   Q.   How many times, since you were contacted by the

1  government, have you communicated with Mr. Griswold?

2  A.   We're business partners in Greenville, and we don't

3  talk about -- once the other -- he was contacted by an

4  individual from your side, that we talked about various

5  things, but he knew when I let him know that I'd been

6  indicted and there were problems, but he did nothing after

7  that for us.

8  Q.   Mr. Long, I want to clarify something, you've not, in

9  fact, been indicted, have you?  You pled guilty to an

10  information; right?

11  A.   I don't know what you're saying.

12  Q.   All right.  Are you aware that people are charged

13  criminally in the United States in federal court by one of

14  two means; an indictment returned by a grand jury --

15  A.   Oh, okay.

16  Q.   -- or an information signed only by the U.S. Attorney's

17  Office; right?

18  A.   It's the latter then.

19  Q.   Exactly.  You worked out an agreement to plead guilty

20  to an information and then your plea agreement, which we'll

21  talk about in a minute; right?

22  A.   Yes.

23  Q.   Okay.  How -- let me make sure I get this right.  Did

24  you discuss what went on at Clean Fuels with Mr. Griswold

25  after he was contacted by, as you say, someone from our

1    side?

2            MR. SIMPSON:  Excuse me, if I may interrupt a

3    moment.

4        (Pause in proceedings.)

5        (Discussion was held off the record.)

6            MR. PHILLIPS:  Your Honor, Mr. Simpson has been

7    kind enough to help me correct something I just asked.

8    BY MR. PHILLIPS:

9    Q.   You were charged by indictment, were you not?

10   A.   I don't know to be honest.

11   Q.   Simple enough.

12   A.   If Mike says that, he's right usually, so I'm guessing

13   that I was indicted and not --

14   Q.   Very well.  And you pled guilty to only one of the two

15   counts with which you were indicted; right?

16   A.   I believe so, yes.

17   Q.   Okay.  We got that part right, though; right?

18   A.   Correct.

19   Q.   Okay.  Anyway, back to Mr. Griswold.  How much -- or

20   did you discuss with Mr. Griswold the case or the matters

21   involving the case after he was contacted by, as you said,

22   someone from our side?

23   A.   No, we stopped because we were told not to talk about

24   the case.  We had to talk about business daily.

25   Q.   So from the date Mr. Griswold was contacted by somebody

1  from our side, to today, you've had absolutely no

2  communication with him whatsoever about this case or the

3  issues involved herein; right?

4  A.   He would know when I was coming down here.  We didn't

5  discuss the substance of the case.  He knew I had to come

6  down here for various meetings or whatever, and he then was

7  aware that we weren't supposed to talk about substantive

8  things that had to do with trial as potential witnesses.

9  Q.   So at no time, between the time Mr. Griswold was first

10 contacted by someone from our side and today, have you and

11 he discussed the substance of this case at all; right?

12 A.   We've tried not to, right, correct.

13 Q.   Well, have you succeeded in that effort?

14 A.   I believe so.

15 Q.   You believe you have never discussed anything

16 substantive of this case with Mr. Griswold during those two

17 points in time I've previously described for you?

18 A.   Other than when he reminded me that this individual had

19 brought up that we called Lee, I'd actually forgotten about

20 that call, and he brought that up and he said the

21 prosecution -- or the defense wanted me to be a witness, and

22 I think that changed after that comment, so that was -- he

23 told me that I'm probably going to be involved, and so there

24 was that discussion, yes.

25 Q.   When did that discussion take place?

1    A.    I have no idea.  It was after he was contacted by your

2    private investigator.

3    Q.    Okay.  So to your understanding, at some point after

4    somebody from our side contacted Mr. Griswold, Mr. Griswold

5    indicated to you that there was some issue about the case

6    that triggered in you the recollection that there was this

7    phone call that you testified about on direct this morning?

8    A.    Correct.

9    Q.    You had completely blanked that event, the event being

10   the phone call, out of your mind from the time it occurred

11   until you were later triggered by Mr. Griswold?

12            MR. SIMPSON:  Objection, repetitive, argumentative.

13            THE COURT:  Overruled.

14            THE WITNESS:  It had been six years, and I didn't

15   remember everything that had happened until he reminded me

16   and I said, you know, I do remember the call then and

17   getting the checks because they were so large.

18   BY MR. PHILLIPS:

19   Q.    From the time you were first contacted by Ms. Beyer,

20   right, you have that date in your mind, that time?

21   A.    Some time I believe in March of April of 2013.

22   Q.    Of '13, to today, how many times have you met with the

23   government to discuss your case?

24   A.    Five or six, I believe.

25   Q.    You were interviewed by, I guess, Detective Balser at

1   one point; right?

2   A.   There was a gentleman before Travis, I don't know --

3   remember his name.

4   Q.   Travis Eisenhauer, does that ring a bell?

5   A.   It's the gentleman that's here.  I don't know his last

6   name.

7   Q.   He's the one out there with you guys; right?

8   A.   Right.

9   Q.   Okay.  Five or six times.  During which of these

10  meetings did you tell the government about the phone call

11  you testified about on direct this morning?

12  A.   I don't know which one.  I don't remember.

13  Q.   None of them; right?

14  A.   I don't know why you'd say that.

15  Q.   You never told them, did you?

16  A.   I suspect I did.  I don't really recollect.

17  Q.   You don't recall in which of the five or six meetings

18  you had with the government before testifying in which of

19  those meetings you told the government about that phone call

20  you testified on direct this morning; right?

21  A.   Correct.

22  Q.   But it is your recollection you did disclose it?

23  A.   I'm sure I did.

24  Q.   You're certain?  Why are you certain you did?

25  A.   Because it was important and I'm sure I did, but I

1  don't remember every word that we talked about in those

2  different meetings.

3  Q.   All right.  Let's talk about the logistics of you and

4  Mr. Griswold and the documents.  You testified on direct

5  exam that there were a number of checks, Mr. Simpson showed

6  them to you, about -- I'm sorry -- about the checks and how

7  they were created; right?  Do you remember that part?

8  A.   Yes.

9  Q.   As I recall your direct, you wanted blank checks from

10 the Clean Fuel's office; right?

11 A.   Correct.

12 Q.   You asked, I won't say pestered, but asked

13 Shanna Getto, the bookkeeper/accountant, to give them to you

14 and she refused; right?

15 A.   Yes.

16 Q.   That's when you solicited Mr. Maher's assistance to

17 have them given to you; right?

18 A.   Given to her to give to me once they were stamped.

19 Q.   Good point.  They were originally blank check stock and

20 she affixed the payment stamp, the signature stamp; right?

21 A.   Correct.

22 Q.   And then gave them to you --

23 A.   Correct.

24 Q.   -- right?  During this process there was an e-mail

25 where you indicated you needed them in a nonsequential

1  fashion.  Do you remember that part?

2  A.   Yes.

3  Q.   The idea you said was to spread out the checks to make

4  them look like they were paid at different times; right?

5  A.   Correct.

6  Q.   How far apart were they in date?  When they were

7  actually finally printed, how far apart were they in date?

8  A.   Oh, I think 10 or 14 days, maybe, somewhere between the

9  18th and the 29th, I believe, of October, but I'm not

10 exactly sure.

11 Q.   Let's go with two weeks; right?

12 A.   If you say so.

13 Q.   So -- well, it's your recollection that they were

14 about --

15 A.   Yes.

16 Q.   -- 14 days?  That would be --

17 A.   You're the one that just said that.

18 Q.   -- about 2 weeks, is that fair?

19 A.   Yes.

20 Q.   Okay.  That's not a particularly long time to spread

21 out 2.32 million in payments; is it?

22 A.   That's judgment.  I have no idea whether it's a long

23 time or a short time.

24 Q.   Mr. Long, this is one of those checks, Exhibit 206A;

25 right?

1    A.    Correct.

2    Q.    This is the condition in which you received this whole

3    lot of checks, or this whole block of checks, except for the

4    last two which do not have the stamp on them; right?

5    A.    I don't know if there was one or two, but there were at

6    least one that didn't have a stamp.

7    Q.    Gotcha.  But the rest of them came to you in this form

8    roughly?

9    A.    Right.

10   Q.    Now, as I understand your direct testimony, you then

11   had these shipped or transported them yourself to South

12   Carolina.  Which one?

13   A.    I would come home every weekend, so I brought them with

14   me.

15   Q.    You took them en masse and block from the Clean Fuel's

16   office to your home in South Carolina?

17   A.    To the office in South Carolina.

18   Q.    To your office in South Carolina.  Does Mr. Griswold

19   share that office with you?

20   A.    Yes, he does.

21   Q.    You had a conversation with Mr. Griswold about what you

22   wanted in terms of the -- how you wanted the checks

23   formatted or printed?

24   A.    Right.

25   Q.    The call gets made.  Mr. Griswold does what you ask him

1  to do?

2  A.   Correct.

3  Q.   All right.  Once he's done what he does with the

4  checks, you use them to send to the State of Florida and

5  then you kept that same set of checks --

6  A.   Right.

7  Q.   -- personally; right?

8  A.   Yes.

9  Q.   You brought them back to Orlando; right?

10  A.   Nope.  I kept them in South Carolina.

11  Q.   But you brought them to the government for your first

12  meeting; right?

13  A.   Yes.

14  Q.   And you had kept them this whole time because of a fear

15  that maybe you might have to explain that one day?

16  A.   No.  Initially, it was because I planned on sending

17  them.  I was figuring that it would get funded and, in the

18  first couple of months after the fraudulent filing, that we

19  would send the money and go ahead and do the whole project.

20  So I kept them initially for that.  Later I kept them

21  because I didn't know what would happen to them if they were

22  in Orlando, so I kept them.

23  Q.   When did the worm turn?  That is to say, when did you

24  go from "I'll keep these because we're actually going to use

25  them and send them out" to "I don't want anything to happen

1  to them"?

2  A.    Exactly -- I'm sure it was, like -- I hate to use an

3  example -- a lobster being boiled.  In the first couple of

4  months, I was pretty sure that it was going to happen; and

5  the more months that went by, the less certain I was that

6  we'd do it and then we'd have to pay the money back.  And so

7  over time they became more important for protection.

8  Q.    And you had that perspective that you were going to

9  have to either buy the generator or pay the money back

10  throughout this entire process; right?

11  A.    Yes, a couple of years.

12  Q.    I'm going to show you Government's 103.  Do you

13  remember looking at that?  Do you need me to move it up for

14  you?

15  A.    Yes, please.

16  Q.    Certainly.

17  A.    I do remember requesting time.

18  Q.    This is a document from February of 2012.  That's not

19  really one what my question is.  At the top there is a

20  handwritten notation "ARS005 correspondence," I think;

21  right?  Do you see that?

22  A.    Yes.

23  Q.    That's your handwriting, isn't it?

24  A.    Boy, it doesn't look like it, but it could be.

25  Q.    How about on the Lee Maher signature?  That's your

1  handwriting again, isn't it?

2  A.  Yes.

3  Q.  Let me show you Government's 104.  Do you remember this

4  letter?

5  A.  Yes.

6  Q.  That's not Mr. Maher's signature, is it?

7  A.  That's the stamp.

8  Q.  That's the stamp.  That's exactly right.

9     Let me ask you one more question about that.  This is

10  the letter that you drafted and on which Mr. Maher had some

11  input and then you put in final form; right?

12  A.  I probably on something like that did get input from

13  him, not always 100 percent, but most often we did, yes.

14  Q.  Let me make it easier.  You drafted it for his review

15  and execution; right?

16  A.  Yes.

17  Q.  I'm sorry.

18  A.  Yes.

19  Q.  You testified on direct that you are a graduate of the

20  Harvard School of Business.

21  A.  Correct.

22  Q.  You have a master's in business administration, an MBA,

23  from Harvard in Boston, Massachusetts; right?

24  A.  Cambridge actually, but yes.

25  Q.  Fair point.  A suburb of Boston; right?

1   A.   Yes.

2   Q.   What class?

3   A.   1970.

4   Q.   You worked for a period of time with Cummins Engines?

5   A.   Yes.

6   Q.   And ultimately ended up being involved in the Groveland

7   property or project?

8   A.   With Mr. Maher, yes.

9   Q.   Correct.  Mr. Maher had acquired the Groveland

10  property; right?

11  A.   Right.

12  Q.   You were referred by a person involved in the Groveland

13  property before its sale to Mr. Maher?  You were referred to

14  Mr. Maher by that person to run it?

15  A.   Correct.

16  Q.   How long did you run Groveland?

17  A.   Actively probably less than a year, I think.  We wanted

18  to move and get to Lakeland as soon as we could.

19  Q.   By "we," you mean you and Mr. Maher wanted to get to

20  Lakeland as soon as you could?

21  A.   I would -- yes.  He realized we needed a plant with

22  much more volume that was safer.

23  Q.   Let's go back to my question.  When you said "we" a

24  minute ago, we wanted to get to Lakeland, you meant you and

25  Mr. Maher; right?

1  A.   And some of the team also.

2  Q.   So who brought the Lakeland deal to Mr. Maher in the

3  first place?  You did, didn't you?

4  A.   We tried in --

5  Q.   Hold on.  You did, didn't you?

6  A.   Yes, yes.  We were looking for another facility.

7  Q.   You found Lakeland and you brought the deal to

8  Mr. Maher; right?

9  A.   Correct.

10  Q.   When you first came on board, you went over with the

11  government -- I'm sorry.  During your direct exam, incident

12  to your initial hiring, you brought -- you came on board

13  with Mr. Maher and you had this compensation package; right?

14  A.   Correct.

15  Q.   All right.  In the far right column where it says

16  "Larry" and we talk about fundraising bonus, do you see the

17  25 and the 40 with the little superscript 2 and that sort of

18  thing?

19  A.   Uh-huh.

20  Q.   Do you see that?

21  A.   Yes.

22  Q.   Thank you.

23       Now, that first fundraising item is "Fundraising Bonus

24  (CFE)".  Clean Fuel?  That's what CFE means?

25  A.   Yes.

 1   Q.    I'm sorry.  You drafted this; right?

 2   A.    Yes.

 3   Q.    Did you give this to Mr. Griswold to type up, too?

 4   A.    No, I don't know who typed it up.  That may have been

 5   someone else.

 6   Q.    But did you type it up?

 7   A.    No.  I couldn't make charts like that.  I had an

 8   occasional typist I used up there.

 9   Q.    "Up there" meaning South Carolina?

10   A.    In South Carolina; correct.

11   Q.    Gotcha.  So CFE means Clean Fuel to your mind; right?

12   A.    Yes.  And the other -- SB is Solar Blue.

13   Q.    And then CFE again; right?

14   A.    Correct.

15   Q.    Okay.  Over your entire tenure in your involvement with

16   Mr. Maher, how many bonuses did you get?  For fundraising

17   that is.

18   A.    Very few.

19   Q.    Two?

20   A.    Two.  It would be the sale of the company and then the

21   grant that we were successful on.

22   Q.    The grant you got 1 percent, 23,000 and change; right?

23   A.    22,000 and change.

24   Q.    22,000 and change.  And the other one was roughly an

25   $8,000 bonus on the sale of one of the entities?

1  A.   Right.  It was a commission, a 1 percent commission.

2  Q.   Those are the only two you got the entire time you were

3  there; right?

4  A.   We got a commitment on a $10 million investment in

5  Canada, but it was never consummated.  It was turned down by

6  the CFO and Mr. Drummond, and they convinced Lee not to take

7  the money.

8  Q.   So back to my question, two, right --

9  A.   Correct, those two.

10  Q.   -- you got paid on?  You worked on a plethora of

11  potential transactions.

12  A.   Right.

13  Q.   You didn't get your severance either there, did you?

14  I'm still showing you, by the way, Government's 123, second

15  page.

16  A.   No.  And the reason was:  When I was fired as

17  president, everyone's contractual agreements were null and

18  void; and you accepted, in my case, the consulting; and then

19  other people had to give up their agreements also.

20  Q.   You testified on direct and we saw some documents where

21  the business operations at Groveland were not smooth.  Is

22  that a fair description?

23  A.   Correct.

24  Q.   Somewhere between unpleasant and disastrous; right?

25  A.   Disastrous when it came to biodiesel and unpleasant

1    when it was just yellow grease.  We didn't make payroll with

2    yellow grease.

3    Q.   You had an employee steal 4,000 in petty cash on your

4    watch; right?

5    A.   Mine and Mark Mroczkowski, yes.

6    Q.   He reported to you, did he not?

7    A.   That was questionable.  I think he reported more to

8    Mr. Maher than he did me.  Although I was the theoretical

9    head of Groveland, he didn't take much direction from me.

10   Q.   You also had the title of president of Groveland;

11   right?

12   A.   In the beginning, yes.

13   Q.   So on your watch, four grand goes out the door in petty

14   cash; right?

15   A.   Correct.

16   Q.   The -- one of the employees runs up, what is it, 42

17   cell phones and whatnot?

18   A.   Right.  She repaid -- Melissa reported, excuse me, to

19   Ed Neal for financial reasons, so she didn't directly report

20   to me.  Ed Neal was supposed to be watching her and then

21   they brought in Mark to do the same thing.

22   Q.   When you were running Groveland, you were residing

23   there periodically when you were actually running the place;

24   right?

25   A.   Yes.  There was an apartment there.

1  Q.  And you were commuting from South Carolina to

2  Groveland, Florida, on the weekends, I guess, or during the

3  week?

4  A.  Yeah.

5  Q.  When -- at what point during your tenure at Groveland

6  did you determine it was not survivable, that you needed to

7  move, as it were?

8  A.  I believe it was in the first three to six months.

9  Q.  So pretty quickly after you got there?

10 A.  For both safety and production reasons, yes.

11 Q.  This was the issue of having a form of alcohol too near

12 a location with children; right?

13 A.  Yes.

14 Q.  So the thought was let's find another location; right?

15 A.  Correct.  And the building and the production facility,

16 what I inherited, was not very proven is a polite way to say

17 it.

18 Q.  Not very?

19 A.  Proven.

20 Q.  Proven.  It was experimental?

21 A.  It didn't make much biodiesel.

22 Q.  When the Groveland assets were sold in December of

23 2010, what happened to the facility?

24 A.  It was leased.  The facility was -- and it was

25 multipurpose.  There was also a church in the same building

1  with the methanol.

2  Q.  So there was nothing left for Clean Fuel Groveland to

3  have with respect to that facility once the equipment was

4  sold; right?

5  A.  Right, once we sold all the equipment that could refine

6  yellow grease.

7  Q.  Now, the problem, though, with the Groveland property,

8  why it wasn't viable to your mind at the time was that there

9  wasn't a railroad connection there; right?

10  A.  That contributed, but it was not a major factor.

11  Q.  Not a major factor at all?

12  A.  No.  If we were running high volumes, it would have

13  made a big difference, but the plant was not built for high

14  volume.

15  Q.  Lakeland has a railbed, though, doesn't it?

16  A.  Absolutely.

17  Q.  I'm sorry.  A rail siding I think is the term; right?

18  A.  Yes, it has the siding.

19  Q.  Let's talk about the acquisition of the Lakeland

20  property.  You discovered this opportunity in Lakeland;

21  right?

22  A.  Yes, but I don't remember the precision of how it was

23  discovered, but it came on the radar.

24  Q.  The nature of Lakeland as an acquisition is the

25  business had a lease with the Stanleys; right?

1    A.    Yes.

2    Q.    Any potential acquirer would have to come in as a

3    tenant under that lease; right?

4    A.    Right.

5    Q.    There were some assets there, right, in place?

6    A.    Major assets, yes.

7    Q.    For the production of?

8    A.    Biodiesel and glycerin.

9    Q.    The plant was operational at acquisition; right?

10   A.    Yes.

11   Q.    How big a piece of property did it sit on?

12   A.    There were other tenants besides us, but it was 8.2

13   acres completely, and I believe about three of it was the

14   actual part that was used by Lakeland Clean Fuel.

15   Q.    By Clean Fuels.  On that three acres, how many

16   buildings?

17   A.    Actually, three.  There was the glycerin building to

18   the right, a control and office -- the office building was

19   connected to that.  Then there was, like, a separate -- you

20   walked over, maybe, 20 feet, and it was control room area

21   and the boilers and things like that.  And then you went

22   further to the left, and there was a three-story very proven

23   high-volume biodiesel facility.

24   Q.    These three buildings are of some size; are they not?

25   A.    Yes.

1  Q.  These there not little two-person offices, these are

2  large, industrial buildings; right?

3  A.  Right.

4  Q.  And they're populated with large, industrial equipment;

5  right?

6  A.  Correct.

7  Q.  And all the supporting things that go with that kind of

8  stuff; right?

9  A.  Yes.

10  Q.  You testified on direct that to acquire this basket of

11  assets in Lakeland, the original concept was to pay

12  $5 million in cash?

13  A.  Correct.

14  Q.  That was a number that you had negotiated with the

15  seller --

16  A.  Yes.

17  Q.  -- and had come to present to Mr. Maher as an

18  opportunity to purchase the assets for cash --

19  A.  Right.

20  Q.  -- right?  During the time that you were doing your due

21  diligence -- I'll stop there.  You know what the phrase "due

22  diligence" means; right?

23  A.  Yes.

24  Q.  It's the efforts one has to do, the diligence, before

25  one makes a decision involving finance or assets or any

1    other important decision?

2    A.    Correct.

3    Q.    You have to do your homework; right?

4    A.    Yes.

5    Q.    While you were preparing and negotiating this

6    transaction, you went to the property; right?

7    A.    Correct.

8    Q.    You walked through and looked at the buildings and the

9    equipment and all that stuff; right?

10   A.    Yes, and interviewed the plant manager.

11   Q.    And did that more than once; didn't you?

12   A.    Yes.

13   Q.    The $5 million, you testified on direct, was not an

14   attractive deal to Mr. Maher, and I want to make sure I

15   understand your testimony clearly.  Mr. Maher's feedback to

16   you was that 5 million in cash was unattractive, but

17   seven -- ultimately, 7-1/2 million over time was attractive;

18   is that fair?

19   A.    That's not the way it happened.  What happened is I

20   negotiated a $5 million purchase with Gene Gebolys, the

21   president of World Energy, who owned it.  He did not want --

22   or he wanted cash and would not go for anything less.  So we

23   walked away from it for multiple months, and I don't know

24   whether it was three or four or five, but we walked away

25   because he wanted cash, and Lee didn't want to pay cash.

1    So I came back, and we decided we wanted it, but we

2   were going to offer more.  And I suggested to Lee that we

3   could do it for $6 million, and I was pretty sure Gene would

4   take that because he was really not running the biodiesel

5   and only doing the glycerin.  And Lee said, let's make sure

6   we get this, paraphrasing, and we ended up paying 7.25.

7   Q.   By "we," you mean you paid 7.25?

8   A.   No, Mr. Maher did.

9   Q.   Mr. Maher --

10  A.   Clean Fuel paid for it, yes.

11  Q.   There we go.  You didn't buy this at all; right?

12  A.   No.  I had no money in the company.

13  Q.   You had no investment, no equity, no nothing in this

14  transaction at all; did you?

15  A.   No.  I had equity, which, you remember, was taken away

16  when the contract was --

17  Q.   When did the Lakeland purchase close?

18  A.   In April of 2009.

19  Q.   Prior to closing, you interfaced with Leigh Williams at

20  the Stump, Dietrich, Spears & Callahan firm; right?

21  A.   Sure.

22  Q.   You've met Ms. Williams on a number of occasions;

23  right?

24  A.   Yes.

25  Q.   You were involved in the document drafting and

1   preparation for closing; right?

2   A.   Right.

3   Q.   And it was your idea that Mr. Maher personally

4   guarantee that 7.25 payment; right?

5   A.   It was not my idea.

6   Q.   Not your idea at all?

7   A.   It was Mr. Gebolys's idea.  He wanted because -- he

8   wanted a guarantee with someone with assets since they were

9   taking a note for approximately $7 million.  So it was not

10  my idea.  I transferred, and Lee agreed to it, against the

11  advice of his lawyers and Deborah Ferro.

12  Q.   So once he signed, he's on the hook; right?  Right?

13  A.   True, yes.

14  Q.   Now, before he signed, in doing your due diligence, you

15  had gone through and inventoried all of the assets he was

16  buying there; right?

17  A.   We had a list of all the assets, yes.

18  Q.   That wasn't my question, though; was it?  You created

19  an inventory of all the assets as part of your due

20  diligence; right?

21  A.   Yes, they gave us the list.

22  Q.   Well, again, that wasn't my question.  You, as part of

23  your due diligence, created a list of the assets that were

24  there; right?

25  A.   We had to depend on them to give us the list.  No one

1  walked through and wrote down everything.

2  Q.    You didn't do it, nobody did; right?

3  A.    There was a list that was given to us by World Energy

4  and attested the fact that it was accurate.

5  Q.    They just gave you a list and you took their word for

6  it; right?

7  A.    I'd had many interviews with Mr. Bishop about what was

8  there, but if 100 percent of it was there, we did not know.

9  Q.    Mr. Long, let's go back.  You've brought a 7.25 or

10  $5 million, whatever dollar value deal it is, for three

11  acres of land, roughly, the lease interest in it at least,

12  some giant buildings, and a boatload of equipment.  And what

13  you did as your due diligence is you took the list the other

14  side gave you, the seller; right?  Right?

15  A.    Yes.

16  Q.    And said, okay, good enough, thanks; right?

17  A.    What --

18  Q.    That's what you really did, isn't it?

19  A.    What are you implying?  I don't understand your point.

20  Q.    Well, you went to the Harvard Business School; right?

21  A.    Yes.

22  Q.    You have an MBA from Harvard; right?

23  A.    Yes.

24  Q.    We've established that.  You're bringing together a

25  multimillion dollar real estate improvements, inventory,

1    assets of a producing factory, right?  So far -- are you

2    with me so far?

3    A.    Yes.

4    Q.    That's what you're doing.  But you didn't independently

5    look and inventory what was actually being sold.  You took

6    the seller's word for it; right?  Isn't that what you did?

7    A.    Yes.  That happens in business.

8    Q.    Because the -- you don't do that because the risk is

9    maybe they didn't tell you the truth; right?

10   A.    What's your implication?  I don't understand what

11   you're trying to achieve.

12   Q.    Based on your Ivy education and experience, when you

13   don't do the due diligence, you take a tremendous risk that

14   you're not getting what you paid for; right?

15   A.    That's possible, yes.

16   Q.    That's what happened here; right?  You didn't do the

17   due diligence; right?

18   A.    We basically got what we paid for with some minor

19   exceptions.  And it was Mr. Maher, then, that chose to

20   challenge it after the fact to delay payment.

21   Q.    How long after Lakeland closed did you get removed as

22   president?

23   A.    It was probably only three or four months.  It might

24   have been a little more.

25   Q.    Part of your duties and responsibilities from the

1   start, though, was to get grants.

2   A.    It was always to raise money and run the plant, both.

3   Q.    So raise money, which has a number of components to it.

4   Grants is one of them; right?

5   A.    Certainly.

6   Q.    Investors?

7   A.    Correct.

8   Q.    Borrowing?

9   A.    Right.

10  Q.    What else?

11  A.    The personal infusion from the owner, but I didn't

12  raise that.  That would be him doing that himself.

13  Q.    And, at the same time, you were supposed to be also

14  running Lakeland?

15  A.    Correct.

16  Q.    On that point about personal investments from the

17  owner, you testified on direct examination that the

18  corporate structure among the Maher companies was pretty

19  loose; right?

20  A.    Yes.

21  Q.    You'd come out of a fairly structured corporate

22  environment; right?

23  A.    Yes.

24  Q.    Okay.  Cummins is a big company and has a lot of people

25  that do a lot of little things and whatnot --

1  A.   Yes.

2  Q.   -- is that fair?

3  A.   Yes.  But I hadn't been with Cummins for over a decade.

4  I'd been with other companies that were larger that you

5  followed GAAP rules and you paid attention.

6  Q.   And were even more organized and structured?

7  A.   Correct.

8  Q.   At Clean Fuels -- or I'll make it a little more

9  general.  At the companies that were under the Maher

10 umbrella, it was not uncommon, was it, to move money among

11 the accounts to pay bills?

12 A.   Yes, there was a lot of interco movement between the

13 companies?

14 Q.   A lot of it; right?

15 A.   Yes.

16 Q.   Because ultimately, it's, I guess, all Mr. Maher's;

17 right?

18 A.   100 percent ownership, yes.

19 Q.   In all of the entities?

20 A.   Correct.

21 Q.   You testified on direct examination that one of the

22 points of allure in this Fairbanks Morse genset was that it

23 had two purposes, one, the State of Florida grant

24 compliance; and what you called a 6103 -- I'm sorry -- a

25 1603 tax credit; right?

1  A.   Yes.

2  Q.   And at every moment in time from the first moment you

3  understood this to this day, you have no doubt that using

4  the same asset for both purposes is legitimate; right?

5  A.   No.  None of the accountants told me we couldn't do it,

6  so I assumed it was okay.  There were other reasons, though,

7  to do the genset.  Remember, it was to sell electricity to

8  Publix, and it was also to save anywhere from a half to a

9  million dollars a year in electricity and natural gas if it

10 was running.

11 Q.   Let's talk about the 1603 tax issue for just a second.

12 I want to make sure I clarify something you said on direct.

13 During one year, the 1603 deal was that the entity that

14 qualified for a 1603 got a tax credit; right?

15 A.   Yes.

16 Q.   And then the following year, they got some sort of

17 deduction or whatever?

18 A.   Well, there was -- it was the period where, one year,

19 and I don't remember which year it was, you were getting

20 cash back.  You would get cash back that particular year.

21 It was trying to stimulate the country with the ARRA

22 programs that were going on then.

23 Q.   That's the credit component?

24 A.   Right.

25 Q.   A tax credit gives you a check back if you qualify?

1    A.    Right.  But normally, tax credits are for future years

2    against future earnings, not a cash rebate immediately.

3    That was the unique thing about the 1603.  And that related

4    to renewable energy projects.

5    Q.    The next year, however, the government changed the

6    rules?

7    A.    Of course.

8    Q.    And the qualifying taxpayer got a different, less

9    valuable deal --

10   A.    Yes.

11   Q.    -- is that fair?

12   A.    Correct.

13   Q.    That was years '09 and '10; right?

14   A.    I believe, but I'm not 100 percent sure that it was '09

15   where you got the cash, and '10, or maybe it was reversed.

16   I don't remember exactly.

17   Q.    All right.  So to reiterate to make sure I'm perfectly

18   clear on something, I'm showing you Government's 125.  This

19   is your letter of 30 October to the folks at FDEP?  Do you

20   remember that?

21   A.    Yes.

22   Q.    This is referencing this first state grant you didn't

23   get at all, right?  That's the 2008 one?

24   A.    Yes.  Move it up.  Yes, sir, I think that's correct.

25   Q.    Certainly, my apologies.

1    A.   Yes, I believe this is the one that --

2    Q.   That is the -- that's the one you didn't get anything

3    out of?

4    A.   Right.

5    Q.   All right.

6         I'm going to show you Government's 127.  Do you

7    remember this one?

8    A.   The one from Ms. Ferro, yes.

9    Q.   One of them, yes, sir.

10        Now, the highlighted portion I have there says:  We

11   will have the Plaza, Lee's office make up the difference.

12        That refers to the Clean Fuel's office at that time was

13   located in the Plaza building in Downtown Orlando?

14   A.   Correct.

15   Q.   Right?

16   A.   Right.

17   Q.   This is an example of one of those times when if money

18   runs short, you simply go to Mr. Maher and money is moved

19   around; right?

20   A.   Yes.  It was actually more than that.  We were selling

21   the yellow grease to cover payroll, as we were doing other

22   things in the biodiesel area; and in doing that, we often

23   had to make payroll on Friday, and the Orange County Bank

24   would allow us to go up to 50,000 OD to pay everybody, and

25   then the money came in usually from our sales of the yellow

1    grease or an advance from Mr. Maher.

2    Q.   You mean Orange Bank?

3    A.   Orange Bank.

4    Q.   Not Orange County Bank; right?

5    A.   I think it was just Orange Bank.  I don't know if it

6    was Orange County.

7    Q.   You indicated during your direct examination that

8    during your interactions with Mr. Maher, you observed that

9    he did not like confrontation?

10   A.   Correct.

11   Q.   I'm going to turn to -- turn your attention more

12   accurately to Government's 217, if I can put my fingers on

13   it.  You were asked about this a little earlier this

14   afternoon.  Do you remember this e-mail, the "in case I'm

15   hit by a meteor" e-mail?

16   A.   Yes.

17   Q.   This is Ms. Ferro, a critic of yours, perhaps.  Will

18   you read the line in the first complete paragraph beginning

19   "Lee's."  Let me zoom in a little bit for you.  There we go.

20   A.   The last sentence, you mean?

21   Q.   Yes.

22   A.   Lee's too nice a boss to say what needs to be said, and

23   I don't mind being blunt when my own financial future with

24   Lee is on the line with these hideous oversights.

25   Q.   That is a consistent description of Mr. Maher during

1   your entire time with him, isn't it?  He's

2   nonconfrontational, he's fairly nice, but doesn't always say

3   what needs to be said; right?

4   A.   That's two good adjectives, yes, sir.

5   Q.   Ms. Ferro did not have that aspect to her personality?

6   A.   No, she was much more into hyperbole.

7   Q.   Well, since you mentioned hyperbole, let's turn to

8   Government's 131.  Do you remember this one?  There we go --

9   let me pull it down a little bit for you.  Ms. Ferro and the

10  e-mail chain between the two of y'all?

11  A.   Correct.

12  Q.   All right.

13       Do you remember -- actually, the first e-mail in that

14  same chain, 3 March of '09, this is an e-mail you authored;

15  right?

16  A.   Correct.

17  Q.   And in it you say:  That I must turn into reality that

18  should/could be the $15 million; right?

19  A.   Correct.

20  Q.   That sentence begins:  In the next 7 days, we have

21  promises for meetings, et cetera, et cetera; right?

22  A.   With those three individuals.

23  Q.   Those were your words written on that date; right?

24  A.   Correct.

25  Q.   Now, I've highlighted at the bottom the next to last

1    sentence, and it says:  There are two new top ten reason

2    matrices that show why we are worth twice as much as any

3    other biodiesel company.

4         Now, in '09 on the 3rd of March, what assets did you,

5    when you use the word "we," have?

6    A.   We were in the process of closing Lakeland and we had

7    Groveland.

8    Q.   So you had Groveland and you hadn't closed on Lakeland

9    yet?

10   A.   Correct.

11   Q.   In that circumstance, you then say:  And justify the

12   $100 million valuation we are giving ourselves now.

13   A.   That was the number given to me by Lee, that we thought

14   the companies were worth that.

15   Q.   That was Lee's assessment of the value of the company?

16   A.   Yes.

17            MR. PHILLIPS:  Your Honor, may I approach?

18            THE COURT:  You may.

19            MR. PHILLIPS:  Thank you.

20   BY MR. PHILLIPS:

21   Q.   Mr. Long, take a second and look at that, if you would.

22        Do you recognize the handwriting?

23   A.   It's mine.

24   Q.   I'm sorry?

25   A.   It's mine.

1  Q.   This is a three-page missive, or letter, I guess, that

2  you wrote to Mr. Maher in 2008; right?

3  A.   Correct.

4        MR. PHILLIPS:  Your Honor, I move for admittance

5  of Defense 9.

6        MR. SIMPSON:  No objection.

7        THE COURT:  Without objection, Defense 9 is

8  admitted.

9        (DEFENDANT EXHIBIT 9:  Received in evidence.)

10  BY MR. PHILLIPS:

11  Q.   This is June of '08, right?

12  A.   Uh-huh.

13  Q.   I have it on the monitor in front of you.  Whether you

14  want to look at the paper or the monitor, it doesn't matter.

15  A.   I'll look at the monitor.

16  Q.   It says:  Re:  Earlier payment of the reminder of the

17  30K.

18       Do you see that?

19  A.   Yes.

20  Q.   Is it 130K or is it 30K?

21  A.   Just 30.

22  Q.   And that's money payable to you; right?

23  A.   Right.

24  Q.   You were in somewhat challenging financial

25  circumstances at the time; right?

1    A.    Correct.

2    Q.    Hadn't filed tax returns in a number of years?  Had a

3    number of creditors endeavoring to collect from you; right?

4    A.    Yes.

5    Q.    Now, I want to have you turn your attention to right in

6    the middle.  You see the line where it says "approx 175K."

7    Can you read that out loud for us, please?

8    A.    175K from the two sources for short-term cash.  I'm

9    further disturbed that the short-term 13 million to

10   18 million is not in the bank yet.

11   Q.    This is in 2008 in June; right?

12   A.    Right.

13   Q.    Apparently, before this, you had indicated to Mr. Maher

14   that somewhere between 13 and 18 million would be coming

15   into the bank; right?

16   A.    Correct.

17   Q.    And this is you explaining that that's now not going to

18   happen?

19   A.    Right.

20   Q.    All right.

21   A.    May I add to that answer?

22   Q.    Let me finish my question.

23       Where the paragraph begins "I am 99.999 percent sure,"

24   do you see that one?

25   A.    Uh-huh.

1  Q.   Read that one for me, please.

2  A.   I'm 99.999 percent sure the funds, at least 13 million,

3  most probably 15-plus, will be in our account in three weeks

4  or less.

5  Q.   Now, did you have a joint account with Mr. Maher at the

6  time?

7  A.   No.  That "our" meant the bank -- or meant the company.

8  Q.   The Clean Fuel account?

9  A.   Yes.

10 Q.   All right.  Keep reading, please.

11 A.   I am even more confident that we will have 100 million

12 raised by November 1st, assuming we start producing

13 biodiesel in July.

14      Do you want to know why those numbers, 13 and 18

15 million, were used?

16           THE COURT:  Sir, he can ask you questions, and

17 Mr. Simpson, if he wants to ask you redirect, will ask you

18 questions.

19           THE WITNESS:  Okay.

20           THE COURT:  He'll ask you questions, and if

21 Mr. Simpson wants to follow up, he can.

22           THE WITNESS:  Okay.

23      (Pause in proceedings.)

24 BY MR. PHILLIPS:

25 Q.   I'm going to show you Government's 153.  You may recall

1    this one yesterday being -- the one being slightly out of

2    sequence.  Do you see that?  Your goal -- you say:  My goal

3    is to get 1 to $2 million dispersed in 90 days and all

4    2.5 million before year end.

5          Your words; right?

6    A.    Correct.

7    Q.    And this is 10 June of '09; right?

8    A.    Right.

9          MR. PHILLIPS:  Your Honor, may I approach?

10         THE COURT:  Yes, you may.

11   BY MR. PHILLIPS:

12   Q.    Mr. Long, I've shown you a document we've marked

13   Defense Exhibit 103.  Do you recognize that document?

14   A.    Yes.

15   Q.    You wrote it, did you not?

16   A.    I'm sure I did.

17   Q.    I'm sorry?

18   A.    I'm sure I did.

19   Q.    On or about April 7 of 2010; right?

20   A.    Correct.

21   Q.    Excellent.

22         MR. PHILLIPS:  Your Honor, I would move for the

23   admission of Defendant's 103.

24         MR. SIMPSON:  No objection.

25         THE COURT:  Without objection, Defense 103 is

1    admitted.

2        (DEFENDANT EXHIBIT 103:  Received in evidence.)

3    BY MR. PHILLIPS:

4    Q.   This is the document you styled "Full-court press for

5    Larry Long"; right?

6    A.   Yes.

7    Q.   You had someone else type this, right, or format it in

8    the format we see here?

9    A.   Yes.

10   Q.   Now, in the column that says "millions," that totals,

11   what, $34.5 million -- I'm sorry.  Let me move it.  My

12   apologies.  There we go.  That totals 34.5 million; right?

13   A.   Correct.

14   Q.   And 5.5 million of that is for sure?  You've calculated

15   the probability of that occurring at 100 percent; right?

16   A.   Correct.

17   Q.   Now, of all of the ones on there, of all of the events

18   that you've predict -- of which you predict the outcome, the

19   only one that actually took place ironically is the first

20   one?

21   A.   Correct.

22   Q.   And that's the grant that was actually ultimately

23   funded under the amendment to the ARS 005 grant; right?

24   A.   Yes.

25   Q.   Not another penny other than that came in from those

1   transactions, did it?

2   A.   No, they were all failed efforts, and no one was

3   raising any money for biodiesel in the United States, but

4   you's are correct.

5   Q.   The entire market for biodiesel had gone to zero?

6   A.   For raising money, yes; no one raised any money for

7   about three years.

8   Q.   I'll show you Government's 144.  Your confidential

9   memorandum to Mr. Maher.  Here again, 2.25 million, which is

10  90 percent of the grant; right?

11  A.   Correct.

12  Q.   And then you run through the ITC, the investment tax

13  credit requirements that you had addressed in the prior

14  exhibit, you address the loan guarantees for $23 million

15  loan guarantee; right?

16  A.   Uh-huh.

17  Q.   And there, on the second page, there's an opportunity

18  grant.  Is that your handwriting where you struck through

19  the $46 million and wrote in $22 million?

20  A.   Yes.

21  Q.   And the second page -- sorry, my apologies, the third

22  page of that document, here's your other statement:  End of

23  summer, 20 million to 100 million cash infusion.

24       These are the targets you've set for yourself; right?

25  A.   We were working on, yes.

1  Q.   You wrote that document; right?

2  A.   Correct.

3  Q.   Again, is this one with of those documents you had

4  somebody else type for you, but you provided all the content

5  for?

6  A.   Show me the document again, please.

7  Q.   My apologies, I'll be glad to.

8       Top page.

9  A.   Probably I had someone in Greenville type that for me.

10  Q.   You didn't type it though, did you?

11  A.   Most likely not.

12  Q.   When you have someone do that, type things out, you --

13  your practice was to take and hand write out what you

14  wanted, hand it to them and say type it and format it

15  appropriately?

16  A.   Correct.

17  Q.   Sometimes that was Mr. Griswold, sometimes that was

18  someone else, but always in the South Carolina office?

19  A.   Generally, yeah.  Occasionally I could get typing help

20  in Florida.

21  Q.   Earlier today you testified about this doc -- this

22  government document's exhibit -- this document, Government

23  Exhibit 183.  Do you remember that one?

24  A.   Correct.

25  Q.   You see the language I've highlighted in green.

1  A.   We were thinking big and trying hard.

2  Q.   This is the document you wrote for your interaction

3  with Mr. Maher for the upcoming year 2011; right?

4  A.   Correct.

5  Q.   At the bottom you state:

6       If we do this correctly, we can have in excess of

7  $1 billion long-term in pending business.

8  A.   Right.  That's a five-year projection.

9  Q.   That's a five-year projection?

10  A.   Right.

11  Q.   The document is styled "Priorities that Maximize Value

12  in 2011;" right?

13  A.   Right.  And that included Solar Blue and the stadiums

14  as well as the Clean Fuel business.

15  Q.   On January 11, here's your agenda for that day.  Do you

16  remember that one, that's Government's 187.  Do you remember

17  that one?

18  A.   Correct.

19  Q.   Would you read Roman V for me, please.

20  A.   Larry's future:  Fix Lakeland foundation for billion

21  dollar valuation with multiple PPAs.

22  Q.   Purchase power agreements?

23  A.   Yes.

24  Q.   Is that what a PPA is?

25  A.   Yes.

1   Q.   Just so I understand this, on January 2011, Groveland

2   was not operating, was it?

3   A.   No.

4   Q.   At that point none of the other projects you had worked

5   on, other than the Florida grant, had come to fruition, had

6   it?

7   A.   Correct.

8   Q.   You discussed on your direct examination -- my

9   apologies.  You testified on direct examination about this

10  company called Biotek group?

11  A.   Correct.

12  Q.   That is a business that you and two other partners

13  owned or control?

14  A.   Yes, we had put together documents to form Biotek and

15  were working on it, yes.

16  Q.   Biotek owns nothing today; right?

17  A.   I believe it's out of business.

18  Q.   In 2011 it owned nothing then, too; right?

19  A.   Right.  I don't think Biotek started to exist until

20  2012, but I don't know -- remember the exact dates.

21  Q.   All right.  So in '12 it had nothing either; right?

22  A.   No, but we were raising funds.

23  Q.   Let me make sure I'm meticulously clear with my

24  question.  When Biotek came into existence in 2012, it had

25  no assets; right?

1   A.   That's correct.

2   Q.   The idea was you were going to go raise money and

3   acquire assets; right?

4   A.   Correct.

5   Q.   Is that right?

6   A.   Yes.

7   Q.   Didn't raise any money though, did you?

8   A.   No.

9   Q.   So at the time you testified on direct that you were

10  negotiating with Mr. Maher to acquire the Clean Fuel's

11  universe from him, there right at the end; right?

12  A.   Clean Fuel, yes.

13  Q.   With Clean Fuel?

14  A.   Yeah.

15  Q.   I'll leave it at that.  And you were going to raise

16  $50 million to do that?

17  A.   Correct.

18  Q.   You didn't raise the 50 million?

19  A.   No, our team did not.

20  Q.   Mr. Long, when you were at Clean Fuels, you used a

21  number of e-mail addresses, did you not?

22  A.   Yes.

23  Q.   You had LLong@CleanFuelUS.com; right?

24  A.   Correct.

25  Q.   During the time you were involved, you used that

1    account and sent e-mails to and from Mr. Maher, Leigh

2    Williams, a number of other people, Deb Ferro that we've

3    heard about in the case; right?

4    A.   Yes.

5            MR. PHILLIPS:  Your Honor, may I approach?

6            THE COURT:  You may.

7    BY MR. PHILLIPS:

8    Q.   Mr. Long, would you take a moment and look at the

9    document, please.

10           THE COURT:  And this is marked as what, counsel?

11           MR. PHILLIPS:  I'm sorry, my apologies,

12   Your Honor.  This was previously marked for identification

13   as Defense 524.

14           (Pause in proceedings.)

15   BY MR. PHILLIPS:

16   Q.   Have you had the opportunity to review those, Mr. Long?

17   A.   Yes.

18           THE COURT:  Before you do, sir, if you could spell

19   Biotek for my court reporter, please.

20           THE WITNESS:  B-I-O-T-E-K.

21           THE COURT:  Thank you.

22           MR. PHILLIPS:  Thank you, Your Honor.

23   BY MR. PHILLIPS:

24   Q.   Mr. Long, have you had the opportunity to familiarize

25   yourself with those documents?

1   A.   Right.

2   Q.   Those are -- speaking of the contents of those

3   documents, you either authored or received those documents;

4   right?

5   A.   Yes.

6   Q.   While you were employed at Clean Fuel and whatnot in

7   the ordinary course of your daily operation of business?

8   A.   Correct.

9        MR. PHILLIPS:  Your Honor, I would move Defense

10  524 into evidence now.

11       MR. SIMPSON:  No objection.

12       THE COURT:  Without objection, Exhibit 524 is

13  admitted into evidence, I'm sorry, Defense Exhibit 524.

14  (DEFENDANT EXHIBIT 524:  Received in evidence.)

15       MR. PHILLIPS:  Thank you, Your Honor.

16  BY MR. PHILLIPS:

17  Q.   Mr. Long, you've read these; right?

18  A.   Correct.

19  Q.   These are an exchange of e-mails between and among

20  yourself, Leigh Williams, Deb Ferro, Lee Maher and whatnot;

21  right?

22  A.   Correct.

23  Q.   With respect to the purchase of Lakeland; right?

24  A.   Right.

25  Q.   And the personal guarantees and such and the process;

1  right?

2  A.   Right.

3  Q.   You remember that time and these e-mails?

4  A.   Correct.

5  Q.   Okay.  I'm going to show you what is, I think, the --

6  let me make sure I reference it correctly -- the third page

7  of that exhibit, and the e-mail at the top is an e-mail from

8  you to Leigh Williams; right?  You know Ms. Williams to be

9  the attorney for Mr. Maher in the acquisition of Groveland;

10 right?

11 A.   Correct.

12 Q.   I'm sorry, of Lakeland, my apologies.

13 A.   Correct.

14 Q.   And you recognize the other names.

15      I want you to read for me, if you will, the -- pardon

16 me, beginning with the second sentence it starts "however."

17 A.   In the next two years the federal government will have

18 paid you between 30 to 40 million in subsidies at Lakeland

19 alone.

20 Q.   Stop there for a second.

21      You're speaking there to Mr. Maher, not to Ms. Williams

22 or Ms. Ferro; right?

23 A.   Correct.

24 Q.   The "you" in that sentence is your prediction of what's

25 going to happen to Mr. Maher; right?

1  A.   Right.

2  Q.   All right.  Keep going.

3  A.   Between biodiesel and tech grade glycerin we should

4  have, even with today's ridiculously low prices, be able to

5  bank 75 cents per gallon from the government, a full one

6  dollars if glycerin prices are reasonable, thus you have

7  four to five times the money needed to repay the

8  6.75 million.

9  Q.   To?

10  A.   And there's a typo in there, it should be per gallon

11  and if -- I would think it should say biodiesel prices, but

12  I'm not sure why it's stated that way.

13  Q.   You wrote it; right?

14  A.   Yes.

15  Q.   Okay.

16  A.   But -- but -- and that's based on producing 15 to

17  20 million gallons a year.

18  Q.   Hold on.  Hold on.

19  A.   Okay.

20  Q.   I wanted you to finish reading that line:

21       Times the money needed to repay the $6.75 million to?

22  A.   WEA.

23  Q.   WEA, World Energy Associates; right?

24  A.   Correct.

25  Q.   All right.

1       THE COURT:  Counsel, why don't we do this.  If

2  this is a natural point to take a break since you --

3       MR. PHILLIPS:  It kind of is, actually.

4       THE COURT:  It's been about an hour-and-a-half.

5  Ladies and gentlemen of the jury, we are going to take a

6  break.  When you come back, we'll go to about 6:00.  Leave

7  your notes in your chair.  They had some holiday

8  festivities, and I'm told that they put holiday treats in

9  the jury room for you, so apparently, you have a different

10 snack back there other than what we normally provide.

11      So please take a break, refresh yourselves.  And

12 when you come back, again, we'll continue with the

13 examination of Mr. Long.  I'll remind you, you must not

14 discuss this case amongst yourselves, that is, you must not

15 prejudge the case until you've heard all the evidence, my

16 instructions on the law, and the closing arguments of the

17 lawyers.

18      Thank you and have pleasant break.

19     (Jury out at 4:29 p.m.)

20      THE COURT:  Everybody take your seats, and we'll

21 take a break in just a second.

22      Let me just make a couple of observations.  I've

23 continued, we now find ourselves at 4:30.  Ms. Johnson

24 clearly was embarrassed this morning when she said, well,

25 yes, Judge, I was tired a couple of times yesterday, because

1  I've been watching her the entire day and she has been

2  completely awake, paying attention, and has been turned, and

3  I've been able to see her even better today because she's

4  been turned facing the witness because the chairs roll in

5  the jury box.

6       Moreover, I've continued to monitor Mr. Brooks.

7  He continues to look down, and every time he does, I've

8  looked over and he's had a pencil in his hand.  Moreover, I

9  will add, so the record's clear and it would be consistent,

10 and explain we've already had the sidebar where even defense

11 co-counsel acknowledged with Mr. Phillips that they had seen

12 the pencil, that another reason why that it would have

13 appeared odd to Mr. Phillips from his vantage point, as I

14 did, based on the government's observations, have looked at

15 Mr. Brooks more closely.

16      He is an elderly Caucasian gentleman, and without

17 having some -- this is not meant to disparage him.  But he

18 has very, very puffy eyes.  So even when I look at him

19 directly, face-on, when he's facing the witness and I -- he

20 almost looks like I would look if I had allergies because he

21 has some large bags around his eyes.  So that, combined with

22 the fact he looks down to write would be consistent with the

23 observations of both the Court as well as Mr. Phillips.

24 Again, as we noted at sidebar, depending on the angle you're

25 looking at somebody, it can appear differently.

1      Mr. Phillips, we've had a lot of witnesses on for

2  a long time, and I'm not asking this question to in any way

3  rush you.  Do you have any idea, sort of, how much time

4  you're going to need?

5      MR. PHILLIPS:  Your Honor, it being 4:30, I'm

6  confident I won't be finished by 6 P.

7      THE COURT:  Okay.

8      MR. PHILLIPS:  I don't know, with the benefit of

9  concatenation and further review, how long I will need

10 tomorrow, but it could be an hour or two more.

11     THE COURT:  Okay.

12     MR. PHILLIPS:  It could be 30, 45 minutes.

13     THE COURT:  I understand.  And you don't want to

14 tell me that it's less time, but it's, quite frankly, once

15 you can reflect upon your notes and so forth, generally

16 things move faster.  I'm only asking for purposes of the

17 government, if we start at 8:30, Mr. Simpson, you need to

18 make sure you have folks --

19     MR. SIMPSON:  Yes, sir.

20     THE COURT:  -- here and ready to go.

21     MR. SIMPSON:  Yes, sir.

22     THE COURT:  Okay.  All right.  We'll take a

23 ten-minute break.  I'll see everybody back at 4:45, and

24 we'll go till 6.

25     (Recess taken 4:32 p.m.)

1          (Resumed at 4:49 p.m.)

2               THE COURT:  Please take your seats.

3               Mr. Phillips, are you ready to proceed?

4               MR. PHILLIPS:  I am, Your Honor.

5               THE COURT:  Pam, did you give them a copy of

6     these?

7               MS. LOURCEY:  I e-mailed them a copy because it

8     was pretty thick.

9               THE COURT:  Mr. Phillips, Mr. Simpson, Ms. Lourcey

10    e-mailed counsel for both sides a copies of the exhibit list

11    showing what date they were marked and what date they were

12    admitted.  I'll compare those to my exhibit list, y'all

13    should do likewise.  That way we'll make sure everybody

14    knows what's in, and if either side thought something was

15    admitted and it wasn't, you know so you can correct it.

16              MR. SIMPSON:  Yes, sir.

17              THE COURT:  Let's bring in the jury.

18              And Mr. Phillips, just when you get to a point

19    approaching, since Mr. Simpson took it to right at 6:00 and

20    30 seconds yesterday.  You can do it at 6:00 and 30 seconds,

21    you can also do it at 5:59 and 45 seconds, but just when you

22    get to a natural stopping point as it approaches six.

23              MR. PHILLIPS:  Well, Your Honor, as I come to a

24    stopping point, I'll check the clocks, and see where we find

25    ourselves.  Thank you.

1          (Jury in at 4:51 p.m.)

2          THE COURT:  Everyone please take your seats.

3          Ladies and gentlemen of the jury, before we get

4     started, I'm going to give you the instructions like I do

5     each evening.  We're going to go till approximately 6:00.  I

6     say "approximately" because it could be 5:55, it could be

7     6:05.  I just told Mr. Phillips when he reached a natural

8     stopping point, to let us know.

9          I'll, again, remind you that you must not discuss

10    this case with anyone else when you leave tonight.  And when

11    you come back tomorrow morning and are in the jury room, you

12    must not discuss this case with each other.  This is for two

13    reasons.  First, you can't talk to anybody else because you

14    can't either give or receive any information about this case

15    from anyone other than the evidence that's admitted during

16    the course of the trial.  I, again, remind you that you must

17    not prejudge the evidence until you've heard all the

18    evidence.  We'll start tomorrow morning at 8:30, and we'll

19    go again till approximately 6:00.

20         We are on pace.  I know it may not seem like that

21    to you, but we are on pace to be where we thought we would

22    be at with the presentation of the case, which is the goal,

23    to get the case sooner rather than later to you next week.

24         So -- but I'll keep you apprised of where we

25    believe we're at.  Probably, I'll have a better idea Friday

1  about 5:00 where we're at, and I'll try to communicate that

2  with you after I've consulted with the lawyers.

3       Mr. Long, you're still under oath.  Mr. Phillips,

4  you can proceed with your cross-examination.

5       MR. PHILLIPS:  Thank you, Your Honor.

6  BY MR. PHILLIPS:

7  Q.  Mr. Long, on direct examination, you testified that you

8  would meet with Mr. Maher approximately every two weeks --

9  A.  Yes.

10  Q.  -- or biweekly was your word; right?

11  A.  Yes, correct.

12  Q.  Sometimes a little more, sometimes a little less

13  frequently?

14  A.  Correct.

15  Q.  You found during your time there, though, did you not,

16  that he -- he, Mr. Maher, was not particularly responsive to

17  e-mails; was he?

18  A.  No.

19  Q.  That's something of an understatement, isn't it?

20  A.  Yes.

21  Q.  Didn't respond to texts, either, did he?

22  A.  No.

23  Q.  I'm going to show you Government's 132.  Do you

24  remember this one from this morning?

25  A.  Yes.

1  Q.   This is the e-mail where Ms. Ferro is commenting about

2  Purada and the transaction and whatnot.  And then there's an

3  e-mail at the bottom that's from Leigh Williams.  That's the

4  attorney for Clean Fuels, Mr. Maher, with respect to the

5  purchase of Lakeland; right?

6  A.   Uh-huh.

7  Q.   What is the first sentence there?

8  A.   Please be sure Lee reads all of this.

9  Q.   On direct examination, you mentioned the term Frazier

10 Barnes valuation a number of times, you remember that

11 dialogue?

12 A.   Correct.

13 Q.   Frazier Barnes is a valuation firm; right?

14 A.   Consultant and valuation; correct.

15 Q.   Their business is built on opining or rendering an

16 opinion of value on certain assets; right?

17 A.   Correct.

18 Q.   Pretty big business, isn't it?

19 A.   They do very well.

20 Q.   And they have a lot of offices and a lot of people and

21 all that kind of fun stuff?

22 A.   Correct.

23 Q.   They've been a around a long time, too; haven't they?

24 A.   They're the leader in their field, yes.

25 Q.   You secured their assistance in valuing the Lakeland

1  property; right?

2  A.  Correct.

3  Q.  They did what they did and gave you a valuation report;

4  right?

5  A.  Correct.

6  Q.  You didn't like the number, though?

7  A.  We occasionally would contest the number, yes.

8  Q.  Well, you thought they undervalued the asset; right?

9  A.  I and Mr. Maher both thought they did.

10  Q.  Let me -- let's look at Government's 136, paragraph 4,

11  do you see that there?

12  A.  Uh-huh.

13  Q.  Yes?

14  A.  Yes, correct.

15  Q.  Thank you.  The last sentence above:  I trust the above

16  answers help.  Would you read it out loud?  It's

17  highlighted.

18  A.  I forced some major changes in assumptions Friday that

19  should increase the valuations.

20  Q.  You were speaking about efforts you had with Frazier

21  Barnes to increase the valuation of the Lakeland property;

22  right?

23  A.  Correct.

24  Q.  Now, it doesn't say we forced some major changes, does

25  it?

1    A.    No.

2    Q.    I, you individually, acting by yourself, on your own;

3    right?

4    A.    Yes.

5    Q.    You intimated a couple of times during your direct

6    examination that you mentioned the opportunity for

7    additional monies for Frazier Barnes or the payment of their

8    existing debt if they would go back and redo the thing;

9    right?

10   A.    Right.

11   Q.    You also said a couple of times that they made no

12   promises, but they would look?

13   A.    Correct.

14   Q.    What they represented was we've done a valuation

15   already; right?

16   A.    Yes.

17   Q.    If there is new information; right?

18   A.    Correct.

19   Q.    And if you pay us; right?

20   A.    Correct.

21   Q.    We will look at it again and see if it is, in fact,

22   incorrectly valued; right?

23   A.    Right.    Improvements have been made in the interim;

24   correct.

25   Q.    There was new data; right?

1    A.    Right.

2    Q.    And when you ask someone for an opinion, and you change

3    the factual basis, the opinion can change, too; right?

4    A.    Correct.

5    Q.    There was nothing nefarious about what you did.  You

6    didn't bribe them to get an additional $100 million

7    valuation or whatever it might be; right?

8    A.    No.  It was just a good give and take.

9    Q.    You paid them to do their job; right?

10   A.    Correct.

11   Q.    Okay.  In your direct examination, you mentioned a

12   fella by the name of Don Wood.

13   A.    Uh-huh, yes.

14   Q.    Mr. Wood was a grant writer who had worked with

15   Clean Fuel before your arrival; right?

16   A.    Yes, he had also worked for Mr. Maher and some project

17   maybe in previous years.

18   Q.    On other grant applications; right?

19   A.    I think so, but I'm not sure what he did prior to us

20   working together.

21   Q.    Let me finish -- I apologize.

22   A.    No, so I don't know what he exactly did, but they had

23   worked together.

24   Q.    You had the benefit of Mr. Wood's experience during

25   your preparation of the application for the grant ARS 005;

1  right?

2  A.   Correct.

3  Q.   You interfaced with him from time to time; right?

4  A.   Yes.

5  Q.   In fact, you asked him to supply you information from

6  time to time; right?

7  A.   Yes.

8  Q.   In fact, the bulk of the grant application was Mr.

9  Wood's work, wasn't it?

10  A.   Boy, I never thought about how much of the actual final

11  written word was mine or his, but he was a major factor in

12  all of our grants.

13  Q.   Let's talk about Government's 139 for a minute.  Do you

14  remember this one?

15  A.   Yes.

16  Q.   Your signature on the second page; right?

17  A.   Correct.

18  Q.   And you CCd Leigh Williams at Stump Dietrich?

19  A.   Yes.

20  Q.   Because they had been the attorneys representing

21  Clean Fuel in the underlying transaction?

22  A.   Correct.

23  Q.   You testified on direct that you ginned up this letter

24  endeavoring to manufacture some sort of problem with respect

25  to what was actually purchased at Lakeland; right?

1    A.    No.  I was told by Mr. Maher to write a letter and date

2    it three or four months prior so that we could challenge

3    them on some of the valuations and equipment lists and

4    things like that because he did miss the walk-through.  He

5    missed his flight and did not show up and was supposed to go

6    through the plant with me and Mitch, and he did not do that.

7    Q.    This is the due diligence you didn't do; right?

8    A.    Didn't get to do it; that's right.

9    Q.    No, didn't do; right?

10   A.    I -- no, I -- further, I told Mr. Maher that I thought

11   we should defer the purchase until we got to have the

12   walk-through with Mr. Gebolys, and he said, no, go ahead and

13   do it, even with his personal guarantee.

14   Q.    And his lawyers advising him of the contrary --

15   A.    Absolutely.

16   Q.    -- and you telling him how much money he's going to be

17   making in the next couple years; right?

18   A.    We hoped we would make a lot of money.

19   Q.    You told him he would be making tens of millions of

20   dollars, do you remember that e-mail?

21   A.    That was our objective, yes.

22   Q.    But those were your words to him incident to the

23   closing; right?

24   A.    Right.

25   Q.    Okay.  Now, this letter is dated 20 April '09.  You say

1  you actually wrote it a few months later --

2  A.  Correct.

3  Q.  -- so May/June of '09?

4  A.  It might have been even July or August, I don't know

5  exactly.

6  Q.  September?

7  A.  I don't know if it was that late or not, but --

8  Q.  October?

9  A.  -- it was clearly after the fact.  I don't know.

10  Q.  Clearly it's after the fact, but --

11  A.  Yeah.  I don't remember the date.

12  Q.  But some time in '09 absolutely?

13  A.  Yes.

14  Q.  More probable that it's closer to April than December;

15  right?

16  A.  That's a guess, I don't know.

17  Q.  You typed this one yourself?

18  A.  Probably not, it's too long, anything over a couple

19  paragraphs I didn't usually type.

20  Q.  And it's got that --

21  A.  Oh, yeah, charts.

22  Q.  -- lengthy chart?

23  A.  Yeah, no, I didn't do this.

24  Q.  You had someone in -- there we go -- you had someone in

25  South Carolina type this?

1    A.   Could have been South Carolina.  The nature of this

2    one, it could have been whoever Leigh's secretary was at

3    that point, too, could have been on this one.

4    Q.   And you sent this to Leigh Williams as well?

5    A.   Yes.

6    Q.   And you couldn't have sent it until you'd written it;

7    right?

8    A.   Correct.

9    Q.   And Ms. Williams sent it to the other side and

10   engendered a big hullabaloo about what was going on; right?

11   A.   Correct.

12   Q.   Now, you didn't tell Leigh Williams that this was

13   bogus, did you?

14   A.   Excuse me?

15   Q.   You didn't tell Leigh Williams that this was bogus, did

16   you?

17   A.   I really don't remember whether I did or not.  I know

18   that she would have known that it was after the fact as far

19   as when she saw it, so she may have thought that.  I don't

20   really remember the details.

21   Q.   Let's explore that just a second.  20 April '09 is the

22   date.  You manufactured this sometime later in '09 --

23   A.   Correct.

24   Q.   -- right?

25        You couldn't have sent it to Ms. Williams until you'd

1   done it; right?

2   A.   Correct.

3   Q.   So sometime later in '09 you supplied this to

4   Ms. Williams?

5   A.   Right.

6   Q.   And didn't tell her that this was something that was

7   of -- this was fabricated; this was bogus?

8   A.   Both timing and the magnitude, correct.

9   Q.   You never told her that; right?

10  A.   I don't remember what I told her completely.

11  Q.   Well, you do realize that Ms. Williams used this in the

12  dealings with the folks from the other side; right?

13  A.   Correct, correct.

14  Q.   Are you saying Ms. Williams did that intentionally?

15  A.   I don't know if she knew or not when she used it with

16  Elbow River.

17  Q.   Well, you didn't tell her, did you?

18  A.   I don't know if I did or not.  I do not remember.

19  Q.   You testified just a minute ago, and on direct, that

20  Mr. Maher told you to do that?

21  A.   Correct.

22  Q.   Was it on any of your agendas from any of your

23  meetings?

24  A.   It could have been, I don't remember if it was.

25  Q.   You seen one yet?

1   A.   What?  Excuse me?

2   Q.   Have you seen an agenda yet that you wrote that has

3   that item on it?

4   A.   Not that's been shown, but there were many agendas that

5   did not see the light of this courtroom, you know, there

6   was -- that was usually done every week.  Even if I didn't

7   get together, there would be some kind of a document I'd put

8   together.

9   Q.   Haven't seen them yet; right?

10  A.   Yeah.  I don't know if they exist or not.

11  Q.   There's no e-mail between and among you and Mr. Maher

12  or you CCing Mr. Maher or anybody else that reflects you

13  being tasked with doing this; right?

14  A.   No, he just told me.

15  Q.   The entire evidence of the fact that this document was

16  bogussed up by you, at the instruction of Lee Maher, is just

17  your testimony; right?

18  A.   Correct.

19  Q.   No other proof in the world, we have to take your word

20  for it?

21  A.   I don't know if he told anyone else that he suggested

22  that I do this and date it and make it over $2 million.  I

23  have no idea if he told anyone else.

24  Q.   That would also be true if he didn't tell you to do it;

25  right?

1  A.   Certainly could be, but he did.

2  Q.   Not in numerical sequence, but this is Government's

3  138.  You remember looking at this; right?

4  A.   Correct.

5  Q.   This is the response letter from World Energy to

6  Ms. Williams having supplied them with your document, I

7  guess we'll call it; right?

8  A.   Correct.

9  Q.   They'd take -- they, World Energy, takes significant

10  exception to the content of your letter --

11  A.   Correct.

12  Q.   -- and says it's absolutely false, fraudulent and quote

13  without merit end quote?

14  A.   Right.

15  Q.   That happens to be true, doesn't it?

16  A.   It's overstated a little bit, but that's very

17  relatively accurate, yes.

18  Q.   Well, let's look at the actual text.  Again, this is

19  Government's 138.  So the -- it says:

20      The allegations in your January 4, 2009 letter, and in

21  Mr. Long's letter of April 20, '09 -- that's the document we

22  looked at a minute ago; right?  Right?

23  A.   Correct.

24  Q.   Are at best disingenuous, entirely false and without

25  merit.

1    Is that also overstated?

2  A.   "It's entirely false" is because we were not allowed

3  the walk-through, and there was certainly some equipment

4  that was not accounted for when we did take because that was

5  a fairly old inventory they had at your earlier comments

6  about my due diligence.

7  Q.   It was old inventory, that's right.

8  A.   Correct.

9  Q.   It's one that the seller had generated a good period

10 before you actually bought the -- or Clean Fuel bought the

11 property; right?

12 A.   And updated also.

13 Q.   Hold on.  It was an old inventory; right?

14 A.   Updated old inventory, correct.

15 Q.   So there had been some changes to it?

16 A.   Yes.

17 Q.   But it was not current as of the date of closing;

18 right?

19 A.   No one had gone through in the previous month and made

20 a list of everything.

21 Q.   Including you?

22 A.   Correct.

23 Q.   Later in the Elbow River litigation you signed an

24 affidavit in essence following your false statements in

25 the -- in Government's 139.  Do you remember that?

1   A.   Yes.

2   Q.   This was during the litigation you wrote out an

3   affidavit, in essence repeating what's here, and you swore

4   to it under oath?

5   A.   Very bad decision on my part.

6   Q.   Actually, it's a crime, isn't it?

7   A.   Yes.

8   Q.   You called it perjury?

9   A.   Yes.

10  Q.   You're right, by the way.

11       Again, you did that because Lee Maher told you to?

12  A.   It was a continuation of the original request to go

13  ahead and battle with Elbow River to delay the payment of

14  the money.

15  Q.   So since you've already lied, go ahead and lie again,

16  right, that was the instruction to you; right?

17  A.   Not a good decision on my part.

18  Q.   But you did it?

19  A.   Yes.

20  Q.   And I want to make sure I'm clear on this:  At the time

21  that you wrote this letter, and later signed that perjurious

22  affidavit, you knew that was false; right?  What you were

23  stating was not true?

24  A.   The magnitude you're exactly right.  Yeah, the bulk of

25  the letter was fallacious.

1   Q.   In every great lie there's a little truth; right?   Is

2   that what we're dealing with here?

3          THE COURT REPORTER:   I'm sorry, what was your

4   answer?

5          THE WITNESS:   I said it was fallacious.   I think

6   that's a word.

7   BY MR. PHILLIPS:

8   Q.   That means laughable; right?

9   A.   Oh, I'm not sure.

10   Q.   What do you think it means?

11   A.   I don't know.   You certainly know.   We don't need to

12   argue about what the word means because I don't know

13   exactly.

14   Q.   You indicated in your direct examination that the

15   statute of limitations has expired on your perjury

16   prosecution.

17   A.   I believe, yes.

18   Q.   You believe that's true; right?

19   A.   Yes.

20   Q.   When did you tell the government you had perjured

21   yourself?

22   A.   On what subject are you talking about?

23   Q.   Well, we only have the one perjurious document you

24   swore to, which is the affidavit in the Elbow River matter.

25   You met with the government -- let me start over.   You met

1  with the government five times -- hold on.  Right?  Five

2  times?

3  A.    Probably, yes, five or six.

4  Q.    Or 7 or 8 or 10?

5  A.    No, no.

6  Q.    Or two or three or four?

7  A.    I'm not sure where you're going.  It's -- I think it's

8  five or six.

9  Q.    Let's go with five or six, doesn't matter.  When do

10 they start?

11 A.    It would have been May of 2013.

12 Q.    So four and a little over half years ago from today?

13 A.    Correct.

14 Q.    When was the last one?

15 A.    The day before the previous trial date, I think

16 November 13th, so it would have been around the 12th or 13th

17 of November of this year.

18 Q.    And you didn't meet with the government before the

19 start of this trial, other than to come in the courthouse

20 and testify?

21 A.    Correct.

22        THE COURT:  Could I see counsel at sidebar

23 briefly.

24        Ladies and gentlemen of the jury, you can stand

25 and stretch and talk amongst yourselves so long as it's not

1    about this case.

2        (Following conference held at sidebar at 5:12 p.m.)

3        THE COURT:  Before I ever instruct the jury as to

4    anything, I like to inquire of counsel.  I don't want to

5    leave that skunk in the room.  It makes it sound like there

6    was another jury trial.  I think I should tell this jury --

7        MR. SIMPSON:  I think that makes sense.

8        MR. PHILLIPS:  Absolutely.

9        MR. SIMPSON:  Yeah, if you just want to tell them

10   it was rescheduled.

11       THE COURT:  I'll say it was rescheduled.

12       MR. PHILLIPS:  Absolutely.

13       (Sidebar concluded at 5:13 p.m.)

14       THE COURT:  Ladies and gentlemen of the jury, I go

15   sidebar, and I -- some things I can't tell you with the

16   sidebar, but before I address the jury, I always, you know,

17   tell the lawyers what I'm going to do.

18       There was a reference to a prior trial.  It was a

19   prior trial date.  There was no prior trial.  For scheduling

20   purposes, I had to continue the trial.  I just don't ever

21   want -- you shouldn't assume anything that you're not told,

22   but I also don't want to leave something suggesting

23   something occurred.  There was not a prior trial.  There was

24   a prior trial date, actually, last month.  And due to

25   scheduling issues, I had to move it to this month.

1          So that's -- and you can inquire further of the

2     witness that it was about a trial date, but I just didn't

3     want to leave y'all with a false impression.

4          Counsel, you may proceed.

5          MR. PHILLIPS:  Thank you.

6     BY MR. PHILLIPS:

7     Q.   Mr. Long, that was a prior trial date for this case;

8     right?

9     A.   Correct.

10    Q.   Okay.  There we go.  So we've got March of '13, we've

11    got November of '17, and we've got three or four more

12    occurrences between the two.  When did those other three or

13    four take place?

14    A.   Quite a bit after the very first one, probably sometime

15    in '14 or maybe even '15, I don't know when, but it's

16    been -- it was a long time after.

17    Q.   So one in '14 or '15?  When were the next two -- one or

18    two?

19    A.   I don't know.  I did not keep track and I do not have

20    it written down.

21    Q.   Of the five occurrences, were you with your lawyer at

22    the time?

23    A.   Once or twice.  Most of the time, without my lawyer.

24    Q.   The first one was with your lawyer; right?

25    A.   Of course.

1   Q.   Your lawyer is Richard Rhodes; correct?

2   A.   Yes, correct.

3   Q.   Maybe the second one?

4   A.   Oh, boy, probably, but I really don't remember.

5   Q.   But not the last one or two anyway?

6   A.   Correct.

7   Q.   So, again, in which of those meetings did you tell the

8   government about your perjury?

9   A.   I have no idea.

10  Q.   But you absolutely did tell them; right?

11  A.   At some point, it came up, yes.

12  Q.   And you used the word "perjury;" right?

13  A.   Yes.  That's a word I was told to use, yes, from the

14  standpoint of what it was when you read it.

15  Q.   All right.  Other than if you were told that by your

16  lawyer -- I'm sorry, let me rephrase that, because I don't

17  want to know what you and your lawyer talked about.

18       Strike that.  I'll let that go anyway.

19       Did your lawyer come to any of the meetings after you

20  entered into your plea agreement and had your plea colloquy

21  with the judge?

22  A.   I do not believe so.

23  Q.   That was his last visit to Tallahassee on your matter?

24  A.   I believe so, yeah.

25  Q.   He still represents you, does he not, Mr. Rhodes?

1    A.    Correct.

2    Q.    Through at least the sentencing of your case?

3    A.    Yes.

4    Q.    I want to turn our attentions for just a minute to

5    the -- these agenda, plural, that you would write incident

6    to a meeting or otherwise, you claim, with Mr. Maher; all

7    right?

8    A.    Correct.

9    Q.    You have those in your mind.

10   A.    (Nods head up and down.)

11   Q.    Generally speaking, in anticipation of the meeting, you

12   would sit down and either handwrite or type up an agenda?

13   A.    Yes.

14   Q.    Make several copies of it, at least one for yourself,

15   and one for whoever else was going to be there?

16   A.    Correct.

17   Q.    Note on each of these for whom the document was

18   intended --

19   A.    Yes.

20   Q.    -- right?  It would say me, or Larry Long; right?

21   A.    No, they would say, Larry, Lee, and if there was --

22   seldom was there a third person, but if there was, I would

23   put their name down, too.

24   Q.    You would generally put a date on them --

25   A.    Correct.

1  Q.  -- right?  And this is in anticipation, before it ever

2  starts, you would list out all of the things that you wanted

3  to talk about?

4  A.  Yes.

5  Q.  I believe you testified on direct that there were a

6  number of times you didn't get through your whole list

7  during that meeting; right?

8  A.  Correct.

9  Q.  And that you would take and just roll those topics over

10  to the next one?

11  A.  Yes.

12  Q.  Sort of a rolling agenda concept?

13  A.  Yes.  And some would just be omitted, too, going

14  forward.

15  Q.  Some would just drop off completely?

16  A.  Yes.

17  Q.  The ones that rolled over were the ones you were still

18  interested in, and the ones that dropped off were the ones

19  you weren't interested in; right?

20  A.  Or it had become a moot issue because of the date that

21  it needed action by was over, yes.

22  Q.  I'm going to show you Government's 140, just as -- by

23  way of example.  That's your handwriting on the top right

24  corner that says Lee Maher; right?

25  A.  Correct.

1  Q.   This is your preprepared agenda for 1-27-10?

2  A.   Right.

3  Q.   Now, when you would have these meetings, you would give

4  Mr. Maher a copy of -- his copy of the agenda, you'd have

5  yours; right?

6  A.   Right.

7  Q.   On this one, you took his back; right?

8  A.   We probably mistakenly exchanged them, or there was

9  something he might have written on it that I needed.  But

10  usually, we ended up with our own copy, but it didn't always

11  happen.  And often, Lee didn't want his copy and would just

12  give it back to me.

13  Q.   Often, Mr. Maher didn't read his copy, did he?

14  A.   I think he read them. I think he read his e-mails at

15  the same time, but I didn't see answers.

16  Q.   I want to have you look at 142 for just a quick second.

17  Do you remember that one?

18  A.   I'm looking for the subject of it.  Okay.

19  Q.   That last sentence:  Also, I will get -- will you read

20  the rest of that for me?

21  A.   I will get the Cummins generator set 70,000.4K payable

22  delayed for at least another 90 days.

23  Q.   This is the smaller genset that you had purchased from

24  your former boss, or that Clean Fuels had purchased from

25  your former boss; right?

1  A.   Yes.  There were two gensets, a small and a large one.

2  Q.   Sorry, you're right, two gensets.  And that 70.4K would

3  pay for one or both of them but --

4  A.   Both.  Correct.

5  Q.   -- you interfaced with Cummins and got them to back off

6  for that period of time; right?

7  A.   Right.

8  Q.   This is what trashed your relationship with your former

9  boss; right?

10 A.   No.  It was not paying ever, other than, let's say, a

11 small amount of it.  That 90-day was not a big issue.  It

12 was later on.

13 Q.   Sequentially, Government's 146, four.  You reference a

14 nonbinding letter for Eagle Biodiesel; right?  Do you see

15 that?

16 A.   Yes.

17 Q.   Signed by you/me -- or you (me).  Do you see that?

18 A.   Yes.

19 Q.   That indicates that a letter was sent out, the

20 nonbinding letter, with your actual signature on it, but

21 appearing to be that of Lee Maher; right?

22 A.   It would imply that, but I don't know for sure in this

23 case.

24 Q.   Well, who wrote this?

25 A.   No, no.  On the nonbinding letter, I don't see the

1   nonbinding letter.

2   Q.   What did you mean when you wrote the words:  Signed by

3   you (me)?

4   A.   Either/or, or in his absence, I might sign it.

5   Q.   Did you type this?

6   A.   Yeah.  It's a short e-mail, I would have typed it

7   myself.

8   Q.   Mr. Simpson inquired of you on that document.  You

9   testified that you -- let me make sure I get this right.

10  You occasionally sign Lee Maher's name, but more frequently

11  put his initials on pages?

12  A.   On contracts; correct.

13  Q.   On contracts and other documents, not just contracts;

14  right?

15  A.   Occasionally, but usually, you didn't initial

16  everything unless it was fairly important.

17  Q.   Your understanding of the purpose for initialing a page

18  is so that, later, someone who looks at the document will

19  conclude that the person whose initials appear read it;

20  right?

21  A.   Yes.

22  Q.   Or at least saw it, let's be honest; right?

23  A.   Yes, saw probably more often.

24  Q.   At least saw, maybe read?

25  A.   Correct.

1  Q.   You also testified that you can tell when it's your

2  handwriting even though it purports to be someone else's

3  signature or initials; right?

4  A.   Yes.

5  Q.   Let me show you Government's 130, I'm going to zoom in

6  on a little bit of this.  Remember going over this

7  yesterday?

8  A.   Yes.

9  Q.   All right.  This is one you claim that the instructions

10  were for you to get the checks from not Don, or other than

11  from Don; right?

12  A.   Yes.

13  Q.   That's Mr. Sproat?

14  A.   Correct.  He was the CFO.

15  Q.   My apologies.  That's Government's 150.  Mr. Simpson

16  asked you during your discussion about that, about Bayhill

17  land company and the checks and whatnot from not Don, and so

18  forth.  You indicated -- I'm sorry.  You testified that

19  Mr. Maher sought to increase the purchase price of

20  Groveland?

21  A.   No, of Lakeland.

22  Q.   Of Lakeland, by $750,000?

23  A.   I believe it was 725, but yes, you're correct.

24  Q.   And have that money paid as a consulting fee, broker's

25  fee to some other company?

1   A.   Yes.

2   Q.   You indicated in your testimony that you didn't know

3   why somebody would do that.  There is, in fact, no rational

4   reason to do that; is there?

5   A.   I don't know.  Mr. Maher said, I want a fee paid for

6   this transaction, and I added it to the 7.25 million

7   purchase price, and it became 7.9 million something.

8   Q.   So, he said do it, you did it, end of conversation?

9   A.   Yes.

10  Q.   He did not explain to you the --

11  A.   No.  He didn't say what the fee was for.  He just said,

12  there's a fee, and he named the company.

13  Q.   Let me show you Government's 151, and I want to make

14  sure I get the big picture first.  Do you recognize that one

15  again?

16  A.   Yes.

17  Q.   All right.  At the bottom, it's got the

18  +Michelin/Atlanta Monday a.m., and some following stuff; do

19  you see that?

20  A.   Right.

21  Q.   That's your handwriting; right?

22  A.   Right, yes.

23  Q.   And it's got the 321, and Andrew gone, I guess it is

24  there?

25  A.   Yes.

1    Q.    That's also your handwriting?

2    A.    Correct.

3    Q.    And at the top, it says:  G4 AM follow up?

4    A.    Oh, yeah, it's 6-4 for June 4th.

5    Q.    June 4th a.m. follow up.  Again, your handwriting?

6    A.    Yes.

7    Q.    So you printed this e-mail out and then made those

8    handwritten notations on it; right?

9    A.    Correct.

10   Q.    And you would have had to do that some time after that

11   e-mail was sent on June 3rd; right?

12   A.    Yes.

13   Q.    And you marked it for June 4 follow up; right?

14   A.    Correct.

15   Q.    That's what you were doing?

16   A.    Uh-huh.

17   Q.    This is June 4, '10.  Read No. 3.

18   A.    Mid-month payment a week early for special house

19   payment and IRS payment.

20   Q.    Those are -- that's money to you; right?

21   A.    Yes, I requested, and occasionally Lee would advance or

22   give me extra money.

23   Q.    Sometimes you got advances; sometimes you got loans?

24   A.    Correct.

25   Q.    You were in fairly tight circumstances at the time?

1  A.   Yes, I was at half pay.

2  Q.   And you also were somewhat behind on your house at that

3  stage; right?

4  A.   Correct.

5  Q.   And still had some money due to the IRS?

6  A.   Yes, there was some past due payments I was making.

7  Q.   Mr. Simpson asked you during your direct examination

8  about Mr. Maher's responses to successes and failures.  Do

9  you remember that part?

10  A.   Could you give me a little more?

11  Q.   How did Mr. Maher react when you got a grant?  Do you

12  remember that?

13  A.   Very excited.  He's a very personable person and would

14  be excited and congratulate you if something happened.

15  Q.   As were you; right?

16  A.   Yes, we were both very positive.

17  Q.   And when failure came, disappointment was the response

18  and reaction; right?

19  A.   Correct.

20  Q.   You had the same experiences; right?

21  A.   Yes.

22  Q.   I'm sorry, the same emotional experiences, my

23  apologies.

24  A.   Right.

25  Q.   I'm going to show you Government's 154A and then the

1   following items.  Do you remember that one?

2   A.   Yes.

3   Q.   This is where you got the checks from the folks who

4   prepared the checks at the office there, and they -- was it

5   the dates, the numbers were wrong.  They weren't consistent

6   with your instructions and you failed to check them and, oh,

7   now we got to do them again?

8   A.   Correct.

9   Q.   Did you send a copy of that e-mail to Lee Maher?

10  A.   It doesn't appear I did.

11  Q.   You didn't, did you?

12  A.   No.

13  Q.   An easy one, 154C.  Do you see that one?

14  A.   Yes.

15  Q.   That's the stamp?  Mr. Maher's signature on the

16  signature line of the check, that's the stamp; right?

17  A.   Correct.

18  Q.   Okay.  Let's turn our attentions for a moment to

19  Government's 155.  Do you remember this yet from yesterday,

20  the fax?

21  A.   Yes.

22  Q.   You sent this fax; right?

23  A.   Correct.

24  Q.   All right.  Let me see if I can zoom in enough to get

25  this going.  You faxed it from Tobacco Plus at an 864 area

1  code number on 5 June, 2010; right?

2  A.   Correct.

3  Q.   In fact, this is the -- let me show you the whole

4  screen here.  This is the confirmation report; right?

5  A.   Yes, showing that the fax went through.

6  Q.   Fax went through.  That comes out of the machine

7  without any of your handwriting on it; right?

8  A.   Right, I would put notes on it.

9  Q.   And it comes out after the fax is completed; right?

10  A.   Correct.

11  Q.   The machine's connected, fax has gone through and then

12  the report gets printed?

13  A.   Yes.

14  Q.   And these are your handwritten notes on it; right?

15  A.   Correct.

16  Q.   I want to show you --

17        MR. PHILLIPS:  Your Honor, if I may I approach.

18        THE COURT:  You may.

19  BY MR. PHILLIPS:

20  Q.   I'm going to hand you the entire exhibit.

21        MR. PHILLIPS:  Your Honor, if I may ask of the

22  government --

23     (Discussion was held off the record.)

24        MR. PHILLIPS:  Your Honor, if I may have just a

25  second and approach.

1    THE COURT:  You may.

2    MR. PHILLIPS:  Thank you.

3    May I approach the witness, Your Honor?

4    THE COURT:  You may.

5    BY MR. PHILLIPS:

6    Q.   Mr. Long, would you take those -- take the documents

7    out of the envelope there for me, please -- or the

8    cellophane wrapper they're in.

9    Do you have them all in front of you there?

10   A.   Yes.

11   Q.   How many pages do you have in front of you?

12   A.   Five pages that were faxed I assume.

13   Q.   Are they single-sided or double-sided the document in

14   front of you?

15   A.   Single.

16   Q.   Five single-sided pages?

17   A.   Uh-huh.

18   Q.   Let's go back to the top page, how many pages in the

19   fax you sent?

20   A.   Fifteen, so there must have been more.

21   Q.   What were the other 10 pages?

22   A.   The number that would make sense --

23   Q.   No, what were they?  Do you -- let me --

24   A.   I think they were checks.  It says four checks in

25   May -- no on May 10.  I don't know what they all were, what

1    the other items were.

2    Q.    My simple first question is do you know what they were?

3    A.    Not now, no, I do not remember.

4    Q.    The contents of this exhibit we do have are your

5    handwritten action plan, as you called it --

6    A.    Uh-huh.

7    Q.    -- right?  That's on the top of page 2 of the exhibit

8    you have in front of you?

9    A.    Right.

10    Q.    You went over this with Mr. Simpson in your direct, and

11    the issue you had here on the -- this will be the third page

12    of that exhibit.  The challenge is the best -- I'm sorry, is

13    the best way to quote correct unquote.  Do you see that

14    part?

15    A.    Yes.

16    Q.    You describe her as petulant.  What does that mean?

17    A.    Generally short-tempered.

18    Q.    Did she express frustration with you during the grant

19    process?

20    A.    I believe we both expressed frustration with each

21    other.

22    Q.    With the timing of this item, which is, let's go back

23    to that, you sent this in 5 June of 2010; right?

24    A.    Uh-huh.

25    Q.    At that point, had you been informed that you weren't

1  getting any money under the grant you'd been awarded?

2  A.   Right.  That we had to now put more money in to be

3  reimbursed.

4  Q.   Hold on.  Simple, first question.  You'd discovered

5  that you'd put in all this grant work, the grant had been

6  awarded and you weren't getting any money; right?

7  A.   Correct.

8  Q.   So this is the what do we do about that?

9  A.   Alternatives of what we should try and do, yes.

10 Q.   In fact, you called -- I think on page 1 here, you

11 called it your back-up plan, do you see that?

12 A.   I'm sorry?

13 Q.   On the first page, on the cover page, one more, left

14 side.  Do you see that?

15 A.   Yes.

16 Q.   Florida grant, one is circled and it says back-up plan;

17 right?

18 A.   Okay.

19 Q.   These are your handwritten notes on the cover page

20 after you've already sent the fax; right?

21 A.   Yes.

22 Q.   You testified right after that that, at least at this

23 stage, in June of '10, you thought you could bend the

24 government to your will on the grant rather than the other

25 way, and Mr. Maher bet the other way and he was correct;

1   right?

2   A.   Yes.

3   Q.   When specifically did you conclude you couldn't bend

4   the State of Florida to your will on the grant?

5   A.   I do not remember exactly when.  And I don't know if

6   there's anything in these documents that says when, but it

7   would have been shortly after this.

8   Q.   The reason that the grant that Clean Fuels was awarded

9   didn't fund was because there was no matching; right?

10          MR. SIMPSON:  Excuse me.  Could we specify which

11  grant?

12          MR. PHILLIPS:  Very well.

13          THE COURT:  Sustained.

14  BY MR. PHILLIPS:

15  Q.   Government's Exhibit 30, which is the ARS 005 grant,

16  the one that was awarded under which you weren't originally

17  paid, but had to do the amendment for.  Do you know which

18  one I'm talking about?

19  A.   So it's the amended ARS?

20  Q.   ARS 005 pre-amendment?

21  A.   Okay.

22  Q.   Got that one in your mind?

23  A.   Okay.

24  Q.   You, in that grant application, sought reimbursement

25  for new expenses and for matching items; right?

1  A.  Correct, both.

2  Q.  And that's what -- what Ms. Burk told you, the match

3  doesn't count because it's the wrong time; right?

4  A.  Yes.

5  Q.  All right.  Now, here, in June of '10, looking at

6  Government's 158 -- make sure I'm on the right page -- do

7  you remember this one, your notes from the EOG meeting on 23

8  June of 2010?

9  A.  Yes.

10  Q.  Third page of that exhibit.  Can you read the

11  highlighted section right there where it starts matching.

12  A.  Can go all the way back to May 22, 2009.

13  Q.  Was this a change?

14  A.  I don't know whether it was a change or a confirmation.

15  Q.  But to your mind on that date, matching was legitimate

16  back to 22 May 2009?

17  A.  Based on, yes, that note.

18  Q.  That's what you took away from that meeting as

19  reflected in your notes?

20  A.  Correct.

21  Q.  Let's turn our attentions to 159, your 27 June memo.

22  Do you see that?

23  A.  Yes.

24  Q.  That first paragraph you use -- you address the

25  matching portion again; right?

1   A.   Correct.

2   Q.   And you're speaking of the matching portion, you're

3   speaking of the 6, 7 or $8 million that shows up in various

4   places on ARS 005; right?

5   A.   Correct.

6   Q.   Not the 2.3 for the genset?

7   A.   Correct.

8   Q.   In your direct examination you indicated that the

9   details of the grant, during the process of securing it,

10  were not generally known at Clean Fuel and that that was

11  both deliberate and by chance?

12  A.   Correct.

13  Q.   Was anybody else in the Orlando office of Clean Fuel

14  helping you do the grant?

15  A.   Don Wood may have still been helping some but not

16  probably too much.

17  Q.   He would have been there early on because he left

18  fairly early; right?

19  A.   The very original one he wrote quite a bit of, yes.

20  Q.   But other than Don Wood, nobody?

21  A.   Correct.

22  Q.   I'm going to show you what was previously admitted as

23  Government's 235.  Do you remember that one?

24  A.   Yes.

25  Q.   The handwriting is yours at the top where it says "CFL

1    closing"; right?

2    A.   Yes.

3    Q.   You printed this, wrote CFL closing on it, and threw it

4    in your files; right?

5    A.   Correct.

6    Q.   In fact, periodically, from time to time, we'll see

7    your handwritten notations at the top of a document.  That's

8    you having printed the document, classifying it for your own

9    filing structures; right?

10   A.   Yes.

11   Q.   Did Mr. Maher ever send you an e-mail in response to

12   that one?

13   A.   I doubt it.  He probably called me, I would guess, on

14   that.

15   Q.   In your direct exam, pardon me, you discussed

16   Government's 162, one of your meeting note -- meeting agenda

17   notes?

18   A.   Correct.

19   Q.   You see that there?

20   A.   Yes.

21   Q.   This was, again, Mr. Maher's copy that you left with;

22   right?

23   A.   Correct.

24   Q.   When Mr. Simpson was inquiring of you about this, you

25   testified that the plan that you and Mr. Maher, you say,

1  came to was to get the grant money, then buy the genset and,

2  quote, no -- with no one the wiser, unquote?

3  A.   I believe I said that, yes.

4  Q.   Mr. Simpson then asked you whose idea was it, and you

5  said it was just a joint agreement, it wasn't anybody's

6  idea, we just kind of, yeah, let's do that; is that what

7  happened?

8  A.   That description, no.  It would have been a discussion

9  of -- between us, and we were -- I was concerned about the

10  cash flow, and we'd been talking about doing this genset

11  anyway; and until the very end, there was always a small

12  probability the money would be available, but as it got

13  closer, it turns out we didn't have the money, and we went

14  with not sending the checks.

15  Q.   I'm going to show you Government's 164.  Do you

16  remember that one?

17  A.   Yes.

18  Q.   The first line there you've got the revised, quote,

19  match, unquote, numbers; right?

20  A.   Right.

21  Q.   This really isn't a match issue, is it?  It's a new

22  money issue; right?

23  A.   Correct.  And working with what the total numbers look

24  like afterwards, yes.

25  Q.   This is your draft of a letter you were planning to or

1  did, in fact, send to Kelley Smith, or a memo; right?

2  A.   Yes.

3  Q.   No indication on it you ever even showed it to

4  Lee Maher; right?

5  A.   I don't know.

6  Q.   I'm going to show you Government's 174.  Remember when

7  Mr. Simpson asked you about this one?

8  A.   Yeah, this is criteria for 1603.

9  Q.   That's your handwriting on the document; right?

10 A.   Yes.

11 Q.   Again, you print out the e-mail, you make some notes on

12 it, and throw it in the files; right?

13 A.   Right.

14 Q.   Government's 178, this is the one that reflects you

15 receiving that $8,000 payment.  You see that one there where

16 it says Elliot Davis --

17 A.   Yes.

18 Q.   -- then the 8,000 above the 22,230 number there?

19 A.   Correct.

20 Q.   That's the 1 percent that you were paid pursuant to

21 your employment agreement after the money came in from the

22 state; right?

23 A.   Yes.

24 Q.   And that's all you got paid for doing all that work;

25 right?

1    A.    Yes, other than my normal --

2    Q.    Compensation?

3    A.    Yes.

4    Q.    Which at first was W-2 salary and later it was a 1099

5    consultant basis?

6    A.    Right.

7    Q.    Out of $2.23 million --

8    A.    Correct.

9    Q.    -- that's all you got?

10   A.    Yes.

11   Q.    You did a lot of work for that, didn't you?

12   A.    Yes, I did.

13   Q.    12- and 14-hour days; right?

14   A.    There was nothing else to do but work when I was down

15   there; you're correct.

16   Q.    This is December 14 of '10.  You started on this

17   project in '08; right?

18   A.    Through many iterations; correct.

19         MR. PHILLIPS:  Your Honor, this is a pretty good

20   break point, I think.

21         THE COURT:  Thank you.

22         Ladies and gentlemen of the jury, I'd like to

23   thank you again for your patience and hard work.  We're

24   grateful for your attention and your willingness to serve.

25   I'll remind you not to discuss this case with anyone or with

1    each other.

2              We'll start back at 8:30 tomorrow morning.  I know

3    I delayed things this morning and my apologies, but I was

4    able to file those orders at lunch, so I shouldn't be

5    detained tomorrow morning.  So, again, I apologize for the

6    delay this morning.  I hope you have pleasant evening and a

7    safe dive home.  Please leave your notes in your chair.

8              Have a good evening.

9         (Jury out at 5:51 p.m.)

10             THE COURT:  You can step down, Mr. Long.

11        (Mr. Long exited the courtroom.)

12        (This concludes the excerpt of the jury trial held on

13   the 13th day of December, 2017.)

14                        * * * * * * * *

15             I certify that the foregoing EXCERPT is a correct
     transcript from the record of proceedings in the
16   above-entitled matter.  Any redaction of personal data
     identifiers pursuant to the Judicial Conference Policy on
17   Privacy are noted within the transcript.

18

19   /s/ Megan A. Hague_____                12/13/2017

20   Megan A. Hague, RPR, FCRR, CSR          Date
     Official U.S Court Reporter

21

22

23

24

25

1              **I N D E X**

2   GOVERNMENT'S WITNESSES                              PAGE

3   LARRY KENNETH LONG
    Cont. Direct Examination By Mr. Simpson              2
4   Cross-Examination By Mr. Phillips                   106
                    **E X H I B I T S**

5

| GOVERNMENT'S EXHIBITS | | OFFERED | RECEIVED |
| --- | --- | --- | --- |
| 231 | 10/6/12 email | 98 | 98 |
| 268 | Copy of Long's notes 3-21-11 | 83 | 83 |

| DEFENDANT'S EXHIBITS | | OFFERED | RECEIVED |
| --- | --- | --- | --- |
| 9 | Three-page letter written to Mr. Maher in 2008 | 147 | 147 |
| 103 | April 7, 2010 document | 151 | 151 |
| 524 | Documents | 158 | 158 |

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25